ACCEPTED
07-15-00297-cv
SEVENTH COURT OF APPEALS
AMARILLO, TEXAS
10/19/2015 10:03:21 PM
Vivian Long, Clerk

## No. 07-15-00297-CV

**COURT OF APPEALS**
**SEVENTH DISTRICT OF TEXAS**

_____

FILED IN
7th COURT OF APPEALS
AMARILLO, TEXAS

10/19/2015 10:03:21 PM

VIVIAN LONG
CLERK

**DIMOCK OPERATING COMPANY, and**
**JOE W. DIMOCK, D/BA DIMOCK PETROLEUM,**

*Appellants*,

**v.**

**SUTHERLAND ENERGY CO., LLC**

*Appellee*.

_____

*On appeal from Cause No. 11,098*
*46th District Court, Hardeman County, Texas*
*Hon. Dan Mike Bird, Judge Presiding*

---

# BRIEF OF APPELLANT

---

Respectfully submitted,

Lovell, Lovell, Newsom & Isern, L.L.P.
John H. Lovell, SBN 12609300
(john@lovell-law.net)
Barbara A. Bauernfeind, SBN 08190500
(barbara@lovell-law.net)
112 West 8th Avenue, Suite 1000
Amarillo, Texas 79101-2314
Telephone: (806) 373-1515
Facsimile: (806) 379-7176
ATTORNEYS FOR APPELLANT

ORAL ARGUMENT REQUESTED (TEX.R.APP.P. 39.1)

i

# IDENTITY OF PARTIES AND COUNSEL

The following is a list of parties and counsel to the trial court's judgment, as required by Rule 38.1(a), of the Texas Rules of Appellate Procedure.

TRIAL JUDGE:

Honorable Dan Mike Bird
46th Judicial District - Hardeman County
1700 Wilbarger Street, Room 34A
Vernon, Texas  76384
Telephone: (940) 552-7051
Facsimile: (940) 552-0305

APPELLANT (DEFENDANT):

Dimock Operating Company, and Joe W. Dimock, d/b/a Dimock Petroleum.

TRIAL COUNSEL:

Lovell, Lovell, Newsom & Isern, L.L.P.
John H. Lovell, SBN 12609300
(john@lovell-law.net)
Barbara A. Bauernfeind, SBN 08190500
(barbara@lovell-law.net)
112 West 8th Avenue, Suite 1000
Amarillo, Texas  79101-2314
Telephone:  (806) 373-1515
Facsimile:  (806) 379-7176

Cornell D. Curtis, P.C.
Cornell Curtis, SBN 24007069
(vernonlaw@sbcglobal.net)
1716 Main Street
Vernon, Texas  76384
Telephone:  (940) 552-9100
Facsimile:  (940) 552-2655

APPELLATE COUNSEL: Lovell, Lovell, Newsom & Isern, L.L.P.
John H. Lovell, SBN 12609300
(john@lovell-law.net)
Barbara A. Bauernfeind, SBN 08190500
(barbara@lovell-law.net)
112 West 8th Avenue, Suite 1000
Amarillo, Texas  79101-2314
Telephone:  (806) 373-1515
Facsimile:  (806) 379-7176

Cornell D. Curtis, P.C.
Cornell Curtis, SBN 24007069
(vernonlaw@sbcglobal.net)
1716 Main Street
Vernon, Texas  76384
Telephone:  (940) 552-9100
Facsimile:  (940) 552-2655

APPELLEE (PLAINTIFF): Sutherland Energy Co., LLC

TRIAL COUNSEL: Malone Law Firm
Chris Lehman, SBN 24046286
(clehman@malonelawtx.com)
1901 Lamar Street
P.O. Box 953
Vernon, Texas  76385
Telephone:  (940) 552-9946
Facsimile:  (940) 552-9925

Walters, Balido & Crain, L.L.P.
Jerry L. Ewing, Jr., SBN 06755470
Nathan R. Cash, SBN 24072026
Meadow Park Tower, 15th Floor
10440 North Central Expressway
Dallas, Texas  75231
Telephone:  (214) 749-4805
Facsimile:  (214) 760-1670

APPELLATE COUNSEL:         Malone Law Firm
Chris Lehman, SBN 24046286
(clehman@malonelawtx.com)
1901 Lamar Street
P.O. Box 953
Vernon, Texas 76385
Telephone: (940) 552-9946
Facsimile: (940) 552-9925

Walters, Balido & Crain, L.L.P.
Jerry L. Ewing, Jr., SBN 06755470
Nathan R. Cash, SBN 24072026
Meadow Park Tower, 15th Floor
10440 North Central Expressway
Dallas, Texas 75231
Telephone: (214) 749-4805
Facsimile: (214) 760-1670

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL ............................................................II

TABLE OF CONTENTS...................................................................................V

TABLE OF AUTHORITIES ..........................................................................VIII

STATEMENT OF THE CASE............................................................................1

STATEMENT REGARDING ORAL ARGUMENT ................................................2

ISSUES PRESENTED.......................................................................................2

A. ISSUES AS TO JULY 7, 2015 TEMPORARY INJUNCTION .......................2

B. ISSUES AS TO JULY 9, 2015 ORDER..................................................6

STATEMENT OF FACTS .................................................................................6

SUMMARY OF THE ARGUMENT ...................................................................22

ARGUMENT ...............................................................................................23

A. Standard of Review ..............................................................................23

B. Rules of Construction and Contract Interpretation ...........................24

C. Sutherland "Interpretation" Not Consistent With Texas Law .........26

D. After Trial Court Erroneously Authorized Unlimited Spending, Injunction Now Authorizes Unlimited Time to Drill...................................28

E. Trial Court Action Constitutes an Erroneous Pretrial Forfeiture of Leasehold...............................................................................30

F. Contract Construction Harmonizing and Giving Effect to All Provisions ..............................................................................31

G. Limits on Project Costs Common in Operating Agreements..........................32

H. Partial Assignment of Oil, Gas and Mineral Lease Was Subject to Parties' November 20, 2012 Agreement including the Operating Agreement...............................................................36

I. Trial Court Erroneously Rewrote Contract.......................................37

J. Lack of Probable Right to Recover...............................................38

K. Mandatory Provisions Are Abuse of Discretion.................................39

L. Injunction Erroneously Compels Assignment Even If Well Is Not Drilled and Completed Within Contract Deadline.........................40

M. Lack of Imminent Harm.................................................................41

N. Injunction Erroneously Has No Provision Requiring Compliance with Contract by Sutherland...............................................41

O. Injunction Order Erroneously Provided Investment Assurance.......42

P. Pending Suit and Lis Pendens Already Made Drilling Additional Wells a Risk for Sutherland, and is Privileged, So There Is No Imminent Harm...............................................................42

Q. Appellant Entitled to Maintain that Sutherland has Breached Contract and to File Lis Pendens.........................................46

R. Destroyed Status Quo....................................................................47

S. Violated Statute of Frauds..............................................................49

T. Violated Statute of Conveyances....................................................49

U. Erroneous Order of Specific Performance of Non-Existent Contract...................................................................................50

V. Illegal Prior Restraint on Speech....................................................51

W. Prior Breaches of Contract Bar Injunctive Relief............................53

X. Injunctive Relief Not Available to Party Guilty of Inequitable Conduct, Laches, and Unclean Hands..............................60

Y. No "Repudiation" by Dimock.........................................................60

Z. Injunction Improperly Restrains Right to Relief for Future Breaches of Contract...............................................................62

AA. Injunction Erroneously Granted Without Joinder of Necessary Parties..................................................................................................63

BB. Inadequate Bond...........................................................................63

CC. Error to Deny Dimock Injunctive Relief.........................................65

CONCLUSION AND PRAYER ................................................................66

CERTIFICATE OF COMPLIANCE........................................................68

CERTIFICATE OF SERVICE ................................................................69

# TABLE OF AUTHORITIES

**Federal Cases**

*Alexander v. U.S.*, 509 U.S. 544, 113 S.Ct. 2766 (1993) ......................................52

*Ashcroft v. Mattis*, 431 U.S. 171 (1977) ......................................39

*Grace Holdings, L.P. v. Sunshine Mining and Refining*, 901 F. Supp. 853 (D.Del.1995) ......................................42

*Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 51 S.Ct. 625 (1930) ......................................51

*Organization for a Better Austin v. Keefe*, 402 U.S. 415, 91 S.Ct. 1575 (1971)......................................51

**Texas Cases**

*Atkinson Gas Co. v. Albrecht*, 878 S.W.2d 236 (Tex.App.-Corpus Christi 1994, writ denied)......................................61

*Atlantic Richfield Co. v. W.O. Hilton*, 437 S.W.2d 347 (Tex.Civ.App.-Tyler 1969, no writ)......................................60, 61

*Aurora Petroleum, Inc. v. Cholla Petroleum, Inc.*, 2011 WL 652843 (Tex. App.—Amarillo 2011, no pet.) ......................................37

*Beaumont Bank, NA v. Buller*, 806 S.W.2d 223 (Tex. 1991) ......................................24

*Blaschke v. Wiede*, 649 S.W.2d 749 (Tex.App.—Texarkana 1983, writ ref'd n.r.e.) ......................................40, 41

*Borders v. KRLB, Inc.*, 727 S.W.2d 357 (Tex.App.-Amarillo 1987, writ ref'd n.r.e.)......................................24, 25

*Burrow v. Arce*, 997 S.W.2d 229 (Tex. 1999)......................................58

*Butnaru v. Ford Motor Co.*, 84 S.W.3d. 198 (Tex.2002)......................................23

*Casanova v. Falstaff Beer, Inc.*, 304 S.W.2d 207 (Tex.Civ.App.–Eastland, 1957, writ ref'd n.r.e.)......................................53

*Computek Computer & Office Supply v. Walton*, 156 S.W.3d 217 (Tex. App.–Dallas 2005, no pet.) ........................................................51

Cone v. Fagadau Energy Corp., 68 S.W.3d 147 (Tex. App. – Eastland, 2001, pet. den.) ...............................................................32, 33, 58

*Cox v. Davison*, 397 S.W.2d 200, 203 (Tex. 1965)................................32

*Cross Timbers Oil Co. v. Exxon Corp.*, 22 S.W.3d 24 (Tex.App.-Amarillo, 2000, no pet.)...............................................25, 30, 35

*Cundiff v. McLean & Miller*, 8 S.W. 43 (Tex. 1888) ............................46

*Eberts v. Businesspeople Pers.*, 620 S.W.2d 861 (Tex.Civ.App.-Dallas 1981, no writ)...............................................................50, 55

*El Paso Dev. Co. v. Berryman*, 729 S.W.2d 883 (Tex.App.-Corpus Christi 1987, no writ)..................................................................64

*Emmer v. Petroleum Co.*, 668 S.W.2d 487 (Tex.App.-Amarillo 1984, no writ)..................................................................................25

*Griffin v. Rowden*, 702 S.W.2d 692 (Tex.App.-Dallas 1986, writ ref'd n.r.e.) ...............................................................................47

*Guffey v. Utex Exploration Co.*, 376 S.W.2d 1 (Tex.Civ.App.-San Antonio 1964, writ ref'd n.r.e.) ...............................................50

*Halbert v. Standley*, 488 S.W.2d 887, 889 (Tex.Civ.App.-Waco 1972, writ ref'd n.r.e.)..........................................................................53

*Hammonds v. Hammonds*, 313 S.W.2d 603 (Tex.1958) ........................55

*HECI Explor. Co. v. Neel*, 982 S.W.2d 881 (Tex.1998) ........................25

*Hill v. Heritage Resources, Inc.*, 964 S.W.2d 89 (Tex. App. – El Paso, 1997, pet. den.) ...............................................................27, 28, 33

*IMCO Oil & Gas Co. v. Mitchell Energy Corp.*, 911 S.W.2d 916 (Tex. App. – Fort Worth 1995, no writ)...............................................35

*King Ranch, Inc. v. Chapman*, 118 S.W.3d 742 (Tex. 2003).................60

*Kropp v. Prather*, 526 S.W.2d 283 (Tex.Civ.App.-Tyler 1975, writ ref'd n.r.e.) ................................................................................47

*Ladner v. Reliance Corp.*, 293 S.W.2d 758 (Tex. 1956)..........................63

*Landry's Seafood Inn & Oyster Bar - Kemah, Inc. v. Wiggins*, 919 S.W.2d 924 (Tex. App.–Houston [14th Dist.] 1996, no writ).......................60

*Langdon v. Progress Laundry Cleaning Co.*, 105 S.W.2d 346 (Tex.Civ.App.-Dallas 1937, writ ref'd)........................................................53

*LeFaucheur v. Williams*, 807 S.W.2d 20 (Tex.App.—Austin 1991, no writ)................................................................................................40

*Liles v. Thompson*, 85 S.W.2d 784 (Tex. Civ.App.-El Paso 1935, writ dismissed) ................................................................................64

*Marketshare Telecom, LLC v. Ericson, Inc.*, 198 S.W.3d 908 (Tex.App.-Dallas 2006, no pet.)........................................23, 39, 52

*Mattern v. Herzog*, 367 S.W.2d 312 (Tex. 1963) ..................................28

*McCharen v. Bailey*, 87 S.W.2d 284 (Tex. App. - Eastland 1935, no writ)..........................................................................................63

*Mengden v. Penisula Prod. Co.*, 544 S.W.2d 643 (Tex. 1976) ..............32

*Michelin North America, Inc. v. First Industrial NLF 12 JV, LLC*, 2014 WL 586228 (Tex. App. – Houston (1st Dist.) 2014, no pet. history) ............................................................................................29

*Myers v. Gulf Coast Minerals Mgmt. Corp.*, 361 S.W.2d 193 (Tex. 1962) ............................................................................................25

Paint Rock Operating, LLC v. Chisholm Exploration, Inc., 339 S.W.3d 771 (Tex.App.—Eastland 2011, no pet.)...................................32, 34

*Petro Pro, Ltd. v. Upland Resources, Inc.*, 279 S.W.3d 743 (Tex. App. – Amarillo 2007, pet. den.).............................................................25, 36

*Phillips Pet. Co. v. American Trading and Prod. Corp.*, 361 S.W.2d 942 (Tex. Civ. App. – El Paso, 1962, writ ref'd n.r.e.)...............................43

*Phillips Petroleum Co. v. Gillman*, 593 S.W.2d 152 (Tex.Civ.App.-Amarillo 1980, writ ref'd n.r.e.) ................................................24

*Phillips v. Latham*, 523 S.W.2d 19 (Tex.Civ.App.-Dallas 1975, writ ref'd n.r.e.) ....................................................................................55

*Pirmantgen v. Feminelli*, 745 S.W.2d 576 (Tex.App.-Corpus Christi, no writ)............................................................................................46

*Questa Energy Corp. v. Vantage Point Energy, Inc.*, 887 S.W.2d 217 (Tex.App.-Amarillo 1994, writ denied) ......................................24

*Rhodia, Inc. v. Harris County*, 470 S.W.2d 415 (Tex.Civ.App.-Houston [1st Dist.] 1971, no writ)...............................................40

*Ross v. McLelland*, 281 S.W.2d 773 (Tex.Civ. App. - Fort Worth, 1955, writ ref'd n.r.e.) ..........................................................46

*Royal Indem. Co. v. Marshall*, 388 S.W.2d 176 (Tex.1965)...................................38

*Sakowitz, Inc. v. Steck*, 669 S.W.2d 105 (Tex. 1984)................................................47

*Schmidt v. Richardson*, 420 S.W.3d 442 (Tex.App.-Dallas 2014, no writ)...............................................................................................41

*Shadow Dance Ranch Partnership v. Weiner*, 2005 WL 3295664 (Tex. App. – San Antonio, 2005, no pet.) ......................................27

*Springer Ranch, Ltd. v. Jones*, 421 S.W.3d 273 (Tex. App. – San Antonio 2013, no pet.) ...............................................................26

*Sun Operating, Ltd. v. Holt*, 984 S.W.2d 277 (Tex.App.-Amarillo 1998, pet. denied) ...............................................................................24

*T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218 (Tex. 1992) ............................................................................................37

*Tanebaum Textile Co., Inc. v. Sidran*, 423 S.W.2d 635 (Tex. Civ. App. – Dallas 1967, writ ref'd n.r.e.) .........................................28

*Texas Independent Exploration, Ltd. v. Peoples Energy Petroleum-Texas, L.P.*, 2009 WL 2767037 (Tex. App. – San Antonio, 2009, no. pet.) ...................................................................................36

Texstar North America, Inc. v. Ladd Petroleum Corp., 809 S.W. 672
(Tex. App. – Corpus Christi 1991, writ den.)................................32

*Tri-Star Petroleum Co. v. Tipperary Corp.*, 101 S.W.3d 583
(Tex.App.-El Paso, 2003, pet. denied) ........................................48

*Valance Operating Co. v. Dorsett*, 164 S.W.3d 656 (Tex. 2005)
(concurring opinion) ......................................................................33

*Walling v. Metcalfe*, 863 S.W.2d 56 (Tex.1993) ...............................23, 24

*Webb v. Glenbrook Owners Ass'n., Inc.*, 298 S.W.3d 374 (Tex.App.-
Dallas 2009, no pet.) .....................................................................24

**Texas Rules and Statutes**

TEX. BUS. & COM. CODE §26.01(b)(4) ........................................ 49, 50

TEX. BUS. & COM. CODE §26.01(b)(6) ........................................ 49, 50

TEX. PROP. CODE §5.002...................................................................50

TEX. PROP. CODE §5.021...................................................................50

TEX. PROP. CODE ANN. §12.007 (Vernon 1984) ...........................47

TEX. R. APP. P. 38.1(e) ........................................................................2

Tex. R. App. P. 39.1(c) .........................................................................2

Tex. R. App. P. 39.1(d) .........................................................................2

Tex. R. Civ. P. 39 ................................................................................16

Tex. R. Civ. P. 682..............................................................................23

Tex. R. Civ. P. 684.......................................................................... 23, 63

Tex. R. Civ. P. 76a(1) .........................................................................46

**Secondary Authorities**

The Chicago Manual of Style R. 5.57 (14th Ed. 1993) ..........................9

TO THE HONORABLE SEVENTH COURT OF APPEALS:

Appellants/Defendants, Dimock Operating Company, and Joe W. Dimock, d/b/a Dimock Petroleum, will be referred to as "Dimock". Appellee/Plaintiff, Sutherland Energy Co., LLC will be referred to as "Sutherland". This is an appeal of an order granting a temporary injunction to Sutherland, and of an order denying a temporary injunction to Dimock. CR 1590, 1599.

## STATEMENT OF THE CASE

This suit arises from a disputed oil and gas farmout agreement, with an incorporated operating agreement. CR 12-62. Dimock first sought injunctive relief by Application for Temporary Injunction on August 1, *2014*. CR 126. Sutherland sought injunctive relief by Application for Temporary Injunction, and then an Amended Application, filed on June 11, 2015 and June 29, 2015, respectively. CR 1296, 1361. Dimock's Application was initially set for hearing for September 22, 2014, CR 167, but, at the hearing, the Trial Court deferred action on such Application. RR 2:4, 62. The Trial Court granted a Partial Summary Judgment in favor of Sutherland on October 21, 2014, based on its erroneous legal interpretation of the farmout agreement, but that order was vacated in December, 2014 and replaced by a December 19, 2014 order. CR 1268, 1282, 1285, 1286, 1613. Dimock filed a Motion for Permissive Appeal of the Partial Summary Judgment, but the Trial Court denied the Motion. CR 1269, 1284. The

1

Trial Court finally heard Dimock's Application for Temporary Injunction along with Sutherland's Amended Application for Temporary Injunction on July 2, 2015. RR 3:7. At the hearing, the Trial Court granted Sutherland's Amended Application for Temporary Injunction and denied Dimock's Application for Temporary Injunction, signing the order granting an injunction on July 7, 2015. RR 4:131, 140, CR 1590. The order denying Dimock's Application for Temporary Injunction was signed on July 9, 2015. CR 1599. A Writ of Injunction was issued July 7, 2015, CR 1595, and Sutherland's Bond was filed on July 7, 2015. CR 1593. Dimock filed his Notice of Appeal on July 21, 2015. CR 1609. The trial court judge is Judge Dan Mike Bird, 46th Judicial District Court, Hardeman County, Texas.

## STATEMENT REGARDING ORAL ARGUMENT

The Court should grant oral argument because it will give the Court a more complete understanding of the facts, will allow the Court to better analyze the legal issues, and will significantly aid the Court in deciding this case. See TEX. R. APP. P. 38.1(e), Tex. R. App. P. 39.1(c), and Tex. R. App. P. 39.1(d).

## ISSUES PRESENTED

**A. ISSUES AS TO JULY 7, 2015 TEMPORARY INJUNCTION**

ISSUE NO. 1: The Trial Court erred in entering the Temporary Injunction Order.

2

ISSUE NO. 2:     The Trial Court erred because there is no evidence, or insufficient evidence, of a cause of action against Dimock for the injunctive relief sought.

ISSUE NO. 3:     The Trial Court erred because there is no evidence, or insufficient evidence, of the existence of a wrongful act by Dimock.

ISSUE NO. 4:     The Trial Court erred because there is no evidence, or insufficient evidence, of imminent harm to Sutherland.

ISSUE NO. 5:     The Trial Court erred because there is no evidence, or insufficient evidence, of irreparable injury to Sutherland.

ISSUE NO. 6:     The Trial Court erred because there is no evidence, or insufficient evidence, of the absence of an adequate remedy at law.

ISSUE NO. 7:     The Trial Court erred because there is no pleading by Sutherland of repudiation of the Seismic Exploration and Farmout Agreement by Dimock.

ISSUE NO. 8:     The Trial Court erred in finding repudiation because there is no evidence, or insufficient evidence, of repudiation of the Seismic Exploration and Farmout Agreement.

ISSUE NO. 9:     The Trial Court erred because there is no evidence, or insufficient evidence, that Dimock has interfered with drilling operations that are underway, or has withheld any required assignment of drilling unit acreage after Sutherland has drilled and completed an additional well.

ISSUE NO. 10:    The Trial Court erred because there is no evidence Sutherland has drilled and completed an additional well under the Agreement, or has requested an

3

assignment of acreage from Dimock after drilling an additional well.

ISSUE NO. 11: The Trial Court erred because it destroyed the status quo rather than preserving the status quo.

ISSUE NO. 12: The Trial Court erred because the trial court rewrote the term of the Agreement.

ISSUE NO. 13: The Trial Court erred because the Temporary Injunction Order violates the Statute of Frauds and/or the Statute of Conveyances.

ISSUE NO. 14: The Trial Court erred because it failed to require Sutherland to comply with the Agreement, and to preserve Dimock's remedies for breach of the Agreement.

ISSUE NO. 15: The Trial Court erred because it commanded and prohibited actions of Dimock after November 19, 2015 (the end of the 3 year term of the contract).

ISSUE NO. 16: The Trial Court erred because the Temporary Injunction Order prevents Dimock from drilling wells on its own leases after November 19, 2015, and it prevents Dimock from stopping Sutherland from drilling a new well or conducting new operations on a Dimock leasehold after November 19, 2015.

ISSUE NO. 17: The Trial Court erred because it enjoins Dimock from withholding a lease acreage assignment after November 19, 2015 and/or from withholding a lease acreage assignment as to a well drilled and completed after November 19, 2015.

ISSUE NO. 18: The Trial Court erred because the Temporary Injunction Order is an unconstitutional illegal prior restraint on free speech and does not satisfy the

4

requirements of *Davenport v. Garcia*, 834 S.W.2d 4 (Tex.1992).

ISSUE NO. 19:     The Trial Court erred because a party who has breached a contract provision favorable to the other party cannot secure by injunction the enforcement of another contract provision favorable to it.

ISSUE NO. 20:     The Trial Court erred in entering the Temporary Injunction Order after evidence was presented of Sutherland breaching the Agreement by charging its own lawsuit expenses to "operating expense" of the Hamrick #3.

ISSUE NO. 21:     The Trial Court erred in entering the Temporary Injunction Order after evidence was presented of Sutherland breaching the Agreement by spending and charging to the Hamrick #3 $2.4 million on land and seismic expenses, none of which was for the Hamrick #3.

ISSUE NO. 22:     The Trial Court erred because the Agreement is ambiguous, and there are fact issues as to whether land and seismic costs are limited to $25,000.00, whether the land and seismic costs charged by Sutherland were reasonable or necessary for the Hamrick #3, and whether the Hamrick #3 paid out in 2014.

ISSUE NO. 23:     The Trial Court erred because Sutherland failed to join and give notice to all parties whose rights are affected by the writ of injunction.

ISSUE NO. 24:     The Trial Court erred in ordering an inadequate bond in the Temporary Injunction Order.

## B. ISSUES AS TO JULY 9, 2015 ORDER

ISSUE NO. 25:   The Trial Court erred in denying Dimock's Application for Temporary Injunction.

ISSUE NO. 26:   The Trial Court erred because the requested injunction would have preserved 51% of working interest proceeds of the Hamrick #3 for the rightful owner of the proceeds until final judgment.

ISSUE NO. 27:   The Trial Court erred because, as a matter of law, the Seismic Exploration and Farmout Agreement does not authorize unlimited spending on land and seismic costs to be charged to Dimock and/or payout of the Hamrick #3.

ISSUE NO. 28:   The Trial Court erred, as a matter of law, because the Seismic Exploration and Farmout Agreement limits expenditures for land and seismic costs to $25,000.00 unless Dimock authorizes further expenditures.

ISSUE NO. 29:   The Trial Court erred because, as a matter of law, the Hamrick #3 reached payout in March 2014.

## STATEMENT OF FACTS

1.      On November 20, 2012, Dimock and Sutherland executed a Seismic Exploration and Farmout Agreement ("Agreement"), including Exhibit C, an Operating Agreement ("Operating Agreement"). CR 12-62. Pursuant to Section 3.1, Sutherland was obligated to drill the Initial Earning Well. CR 13. The Hamrick #3 was drilled and completed as a producing oil well in June, 2013. CR 70. On Nov. 11, 2013, Dimock executed a Partial Assignment of Oil, Gas, and Mineral Lease to Sutherland including the Hamrick #3. CR 320.

6

2.      In the Operating Agreement, the parties agreed in Article VI, D, as follows:

> Operator shall not undertake *any single project* reasonably estimated to require an *expenditure in excess of twenty-five thousand Dollars ($25,000.00) except in connection with the drilling, Sidetracking, Reworking, Deepening, Completing, Recompleting, or Plugging Back* of a well that has been previously authorized by or pursuant to this agreement, provided, however, that, in the case of explosion, fire, flood or other sudden emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion are required to deal with the emergency to safeguard life and property but Operator, as promptly as possible, shall report the emergency to the other parties.

CR 36, emphasis added.  Paragraph 2.1 of Exhibit A of the Agreement states that "All operations conducted by Farmee regarding the Initial Earning Well, until such time as "project payout" is reached … *shall be at Farmee's sole cost and risk.*" CR 17.  Paragraph 6.1 of the Agreement states: "The Operating Agreement *shall apply to all Earned Wells*".  CR 14, emphasis added.

3.      Despite the $25,000 limit for any "project" that is not drilling, etc., beginning in 2014 Sutherland sent lease operating statements to Dimock showing that Sutherland was charging leasehold acquisition costs for other property (bonuses, etc.), charging seismic option costs for other property, and charging his own and his employee time obtaining leases and seismic options on other property, in sums far in excess of $25,000, to "land" costs and "seismic" costs of the

7

Hamrick #3, even though the Hamrick #3 had been completed in June, 2013. CR 229, 276-277, 324-325.

4. Land costs (in house, or for leasehold acquisitions) and seismic option costs for other properties are not "drilling, Sidetracking, Reworking, Deepening, Completing, Recompleting, or Plugging Back" expenses and are, therefore, subject to the $25,000 limit on expenses for any project in Exhibit C. Sutherland has admitted in Response to Request for Admissions that seismic costs and land costs are not Sidetracking, Reworking, Deepening, Completing, Recompleting, or Plugging Back costs. CR 343. In his Affidavit, Dimock, an operator, stated that land and seismic costs are not drilling costs. CR 324. No evidence was presented at any hearing that land and seismic costs are "drilling" costs.

5. Pursuant to Section 4.1 of the Agreement, "upon "project payout" of the Initial Earning Well, Farmee shall deliver to Farmor possession and operations of the Initial Earning Well and a fifty-one percent (51%) working interest, at Farmor's election, in the appropriate Earned Assignment defined in Paragraph 3.2 above." CR 13.

6. Paragraph 4.2 of Exhibit A, the Agreement states:

Project Payout and Monthly Statements. Beginning within six (6) months of completion *of Initial Earning Well* Farmee shall provide a monthly statement to Farmor reflecting the "project payout" status.

(a)     The Farmee's capital cost is defined as cost incurred by Farmee for land and seismic for the Hamrick Area 3D Shoot (a 15 square mile area defined in Exhibit B), a fifty thousand dollar ($50,000) prospect fee, and cost for drilling, testing, completing, and equipping, *the Initial Earning Well*[1].

(b)     The Farmee's revenue, which is the gross value of production as defined in Paragraph 4.1 above, *less* (i) applicable production or severance taxes, and any federal excise taxes; (ii) all royalties, overriding royalties, and other payments out of production which, as of the effective date of this Agreement, burden the interest assigned to Farmee; and, (iii) the cumulative *monthly operating cost of the well*, including ad valorem taxes.

(c)     When the Farmee's cumulative revenue equals two (2) times the Farmee's capital cost *the Initial Earning Well will have reached "project payout"*.  At that time, as stated in Paragraph 4.1 of this Agreement, the Farmee will turnover operations of the Initial Earning Well and assign fifty-one percent (51%) working interest, at Farmor's election, in the Initial Earning Well and drilling unit to the Farmor.

(d)     Concurrent to the "project payout" in Paragraph 4.2(c) above the Farmee will also assign the remaining forty-nine percent (49%) working interest to one or more 501(c)(3) nonprofit organizations of its choice subject to the Operating Agreement described in 6.1 of the Agreement.

CR 19-20, emphasis added.

7.      Accordingly, when Sutherland's cumulative revenue from the Hamrick #3 (the "Initial Earning Well") equaled two (2) times Sutherland's capital costs, the Hamrick #3 reached project payout.   With its Application for Temporary Injunction, Dimock presented to the trial court documents produced by Sutherland demonstrating that the drilling and completion cost of the Hamrick No. 3 well was

---

[1] One of the ambiguities in the Agreement is whether or not the phrase, "…, the Initial Earning Well" was intended to qualify or describe all the items in that sentence (i.e., land and seismic costs).  In construing this sentence, this comma may, or may not, be determined by a jury to have been intended as an "oxford comma."  The Chicago Manual of Style R. 5.57 (14th Ed. 1993).

$1,004,521. CR 142-146. After the initial well was spudded, the prospect fee (referenced in Section 4.2 (a) of Exhibit A of the Agreement) of $50,000 was refunded to Sutherland by Dimock on August 28, 2013. CR 326; CR 1533. Using the $25,000 limit in Exhibit C, Para. VI (D) for any project that is not drilling, etc., when the Hamrick #3 gross working interest revenue (less the specified items in Section 4.2(b) of Exhibit A, like taxes, royalties, and monthly operating expenses) is two times $1,029,521, or $2,059,042, the Hamrick #3 reached "project payout". CR 13, 20.

8. Through March, 2014, the cumulative net working interest income of the Hamrick #3 was $2,195,166.75, well in excess of the $2,059,042 amount for project payout of the Hamrick #3. CR 140, 141. The March, 2014 Lease Operating Statements (LOS), and Drilling and Completion Costs statements, prepared by Sutherland, were attached as Exhibit A to Defendant's Application for Temporary Injunction. CR 126-146.

9. Dimock objected in writing to the land and seismic costs, and demanded that no further capital costs for the initial earning well be incurred. CR 63-66, 327. By letter dated April 21, 2014, Dimock notified Sutherland that the Hamrick #3 had reached project payout, as per the March LOS of the Hamrick #3,

10

and Dimock made the election, and demanded[2], that Sutherland deliver operations and possession of the Hamrick #3, and assign a 51% working interest in the Hamrick #3 and drilling unit to Dimock. CR 65.

10.    Instead of complying with the Agreement, Sutherland refused to assign the working interest to Dimock and the charities, refused to turnover possession and operations, and has wrongfully converted all the post March, 2014 working interest proceeds of the Hamrick #3.  Sutherland continued to incur land costs (none of which were to acquire an oil or gas lease to drill the Initial Earning Well, because Dimock already owned that leasehold), and huge seismic expenses for a 15 square mile seismic shoot. See CR 488-1255, an Affidavit of Greggory D. Morgan, CPA, with his spreadsheet of these unrelated costs [CR 488-489 is the Affidavit; CR 491-498 is the spreadsheet outlining these unrelated costs].  The unrelated "land costs" were $951,176.99, and the unrelated seismic costs were $102,899.80, as of the time of the Affidavit was prepared.  Following the Affidavit and spreadsheet are copies presented to the trial court of the dozens of Sutherland-obtained oil and gas leases, top leases,  and seismic options, for itself only, of nearby sections of land not leased by Dimock. CR 499-1255. Sutherland used the working interest proceeds *of the initial earning well to lease 9 other sections of land for itself only* and obtain seismic options as to such other land, and "*charged*"

---

[2] At that point, the Christian charities were also entitled to receive an assignment of a 49% working interest.

11

that "land cost" and "seismic cost" for additional earning wells to the Initial Earning Well (Hamrick #3) to "extend" payout of the Hamrick #3 for over a year, all in breach of the Agreement. The only seismic was shot in the summer of 2014, approximately one year *after* the Hamrick #3 was drilled. RR 6:Def Exh. 4, P. 39.

11. Rod Sutherland, is the sole owner of Appellee, and admits that as of July, 2015, Sutherland had spent $2.4 million for such land costs and seismic costs, and has charged that amount to "payout" of the Hamrick #3. RR 5: Pl. Exh. 2; RR 4:83-84; RR 3: 41-42; CR 1471.

12. By its Original Answer and Counterclaim, Dimock alleged Breach of Contract, sought Declaratory Judgment, alleged a suit for debt, and alleged Breach of Fiduciary Duty. CR 69. Dimock filed its Application for Temporary Injunction on August 1, 2014 (CR 126). Refusing to rule on Defendant's 2014 request for injunctive relief, the trial court entered an erroneous Partial Summary Judgment in favor of Sutherland. CR 1268, 1285, 1286.

13. In its Responses to Request for Admissions, Sutherland admitted that throught payments received in July, 2014, Sutherland had received a totoal amount of $3,173,162.13 in working interest revenue from the Hamrick #3. CR 343.

14. As demonstrated in Sutherland's own documents, the Hamrick #3 reached project payout in March 2014. In March, 2014, Dimock and the Christian Charities were entitled to receive assignments. Dimock was then equitable owner

of 51% of the working interest in the Hamrick #3 and drilling unit, and the Christian Charities 49%. And as of March, 2014, Sutherland had no legal right to possess or use any of the working interest proceeds from the Hamrick #3, or to charge any well operations fees to the Hamrick #3 payout. Instead, an additional $2.4 million in land costs and seismic costs were charged by Sutherland to the Initial Earning Well payout by the time of the July, 2015 injunction hearing, and Sutherland retained an additional $2.4 million under Sutherland's 2 x costs payout theory.

15. In the trial court, Sutherland chose to totally ignore and/or disregard the Operating Agreement that Sutherland admits it signed, and under which Sutherland is operating the subject well. In its pleadings, Sutherland offered no reading of the Operating Agreement "other operations" provision that would authorize unlimited expenditures for "land costs" and "seismic costs" to be charged to Dimock, and claimed the Agreement is not ambiguous. Sutherland obtained a partial summary judgment without citing any legal authority in support of Sutherland's interpretation of the contract. Dimock's responses (with all exhibits) to Sutherland's partial summary judgment motion are incorporated herein by reference. CR 232, 368, 1256.

16. In addition to the ambiguities, there is a fact and/or legal issue whether the $25,000 limit in Exhibit C applies to land costs and seismic costs,

13

which would preclude awarding injunctive relief in favor of Sutherland. Further, given Dimock's ambiguity pleading, there are fact issues about Hamrick #3 "payout". CR 1348-1350. Both at the summary judgment hearing in September, 2014 and the injunction hearing in July, 2015, Sutherland had the burden of proof as to its factual and legal claims.

17. In addition, in April, 2014, shortly after filing the lawsuit, Sutherland began breaching the Agreement by *charging to the initial well as "operating" expenses,* its *own attorney's fees and expenses and personal expenses **incurred in this lawsuit**, including charging $800 per day for Rod Sutherland's own time spent on this lawsuit.* RR 4:74-76; See also CR 1493, 1580-1587. See also CR 141, the LOS Statement for April, 2014 when Sutherland began charging his lawsuit expenses, his attorney's $5000 retainer (CR 444), to "miscellaneous expense" on the LOS. Sutherland has never cited in the trial court any authority to charge his lawsuit expenses to operating expenses of the Hamrick #3. Sutherland admits that every dollar he spends on these "capital costs" [all of which are for some potential well *other than* the Initial Earning Well], the Initial Earning Well payout jumps by two dollars; and, when he charges to "operating expense" his own company time, expenses and attorney's fees for this lawsuit, he is reducing the working interest revenue of the initial earning well by another dollar, which also extends payout of the Initial Earning Well. RR 4:84.

14

18.     Sutherland's continuing wrongful conduct irreparably harms Dimock, the Christian Charities, and their property rights.

19.     As a direct and proximate result of Sutherland's wrongful actions, Dimock has suffered, and has continued to suffer, imminent and on-going injury in sums now in excess of $1,500,000, that is irreparable, and for which no adequate remedy at law exists, without the protection of a temporary injunction to preserve 51% of the working interest proceeds until final trial of the case.  Such injunctive relief would have preserved the status quo, and preserved the disputed working interest proceeds, but the trial court delayed until July, 2015 to rule on Plaintiff's Application for Temporary Injunction (filed in August, 2014) and then erroneously denied it.  CR 1599.  Dimock also unsuccessfully sought a jury trial in 2015. CR 1291, 1295.

20.     Dimock's requested injunction would have prevented Sutherland from using litigation to delay payment of well proceeds and using litigation as an excuse to charge his attorney's fees, and internal time spent on this lawsuit to "operating expense" of the Hamrick #3, all delaying payout of the Hamrick #3.

21.     As shown in Dimock's (a) Application for Temporary Injunction, (b) Answer and Counterclaim; and, in (c) Dimock's pleadings and evidence incorporated into its responses to Sutherland's applications for injunctive relief, Dimock has a cause of action against Sutherland for breach of contract and for

15

conversion, a probable right to the relief sought, and is incurring probable, imminent, and irreparable injury in the interim, now in excess of $1,500,000.

22.   In the alternative, Dimock requested that the trial court appoint a receiver to protect the working interest owners and to take charge of and hold the subject well, and working interest proceeds, subject to the final disposition of this litigation.   That request was denied when the Dimock's temporary injunction request was denied.  CR 126, 1599.

23.   Dimock's well was depleted by Sutherland's production of the subject well with no revenue from that production being paid to Dimock or the Christian Charities.  Dimock's and the Christian Charities' damages for their real property interests cannot be adequately measured by a certain pecuniary standard and cannot be adequately compensated for in damages.

24.   In the summer of 2015, about *4 months before the end of the three year term of the Agreement,* which ends on November 19, 2015, Appellee filed an Application for Temporary Injunction. CR 1296.

25.   Appellants specially excepted and objected to Plaintiff's Application for Temporary Injunction because Appellee failed to join all indispensable parties.  Tex. R. Civ. P. 39.  CR 1304.  Sutherland has granted interests in the Hamrick #3 and drilling unit to other parties, his employee Wade Tidmore, and his wife's relatives, Woody and Judy Thompson, and Joe and Vivian Revese.

16

CR 1457. Additionally, according to the testimony of Rod Sutherland, each of the following are intended beneficiaries of the Agreement, because they are the entities to whom the 49% working interest in the Hamrick #3 is to be conveyed on project payout, namely, Focus on the Family (Jim Dobson), Insight for Living (Chuck Swindell), Dallas Leadership Foundation, First United Methodist Church, and National Christian Foundation. CR 1466-1467. *None* of these persons or entities were joined, or given notice of the injunction hearing.

26. The term of the Agreement is stated in Section 9 of Exhibit A to the Agreement, as follows:

> The Agreement shall be *in effect for three (3) years* from the effective date or until such time as: (i) Farmee's rights to earn as assignment of interest have expired without Farmee having earned as assignment; (ii) Farmee has earned an assignment of interest and neither Farmee nor Farmor have any further rights or obligations under the Agreement; or (iii) this Agreement terminates pursuant to Paragraph 3.4 above as a consequence of Farmee's default. CR 22, emphasis added.

27. The "term" of the Agreement is clearly defined. Under (ii), if an Initial Well is drilled and completed as a producer, and an assignment of the working interest in the acreage including the drilling unit around that Initial Well is made, which occurred in this case, the Agreement as to any other acreage of the Dimock leaseholds ends if Farmee does not drill and complete additional producing well(s) within 3 years of November 20, 2012, because Farmee had no

17

contractual obligation to drill any other wells and had a limited option time (3 years from November 20, 2012) to drill additional well(s) on that other acreage, if it chose to do so. CR 13 [Section 5.1 of the Agreement], 22.

28. As of the date of the injunction hearing and orders, Sutherland had drilled no additional wells.[3] RR4:92, CR 1464. As Rod Sutherland admitted at his deposition, Sutherland had no obligation to drill any more wells and only had an option to drill other wells during the term of the Agreement. CR 1463, 1464.

29. Contrary to the stated term of the Agreement, Sutherland requested injunctive relief that the term of the Agreement be rewritten by the Court from 3 years to an indefinite period of years; i.e. "until Dimock's allegations in this lawsuit have been finally adjudicated and all applicable deadlines have expired." CR 1364. Dimock objected to the proposed injunction because it creates a new, indefinite term of the Agreement, it does not preserve the status quo, it does not enforce the term of the Agreement as written, and it rewrites the term of the Agreement directly contrary to the express term agreed to by the parties. CR 1439.

30. When Rod Sutherland signed the Agreement, he knew that his exclusive right to drill new wells ended on November 19, 2015. *Nowhere in the*

---

[3] After the injunction was entered, Sutherland drilled three additional wells on the property. Sutherland has already decided to plug one of the new wells.

18

*Agreement is there a right of the Farmee to extend the term of Agreement*, and possibly earn a right to an Assignment of any additional acreage from the Dimock leaseholds beyond November 19, 2015 (the end of the three year term) unless a new well is drilled and completed as a producer in paying quantities during the stated 3 year term. Because Sutherland failed to show it had a probable right to recover on the claim asserted, or that it was entitled to rewrite the contract to extend the term of the Agreement indefinitely, the Plaintiff's Amended Application for Temporary Injunction should have been denied.

31. In Paragraph 1.14 of the Amended Application for Temporary Injunction, Sutherland further claimed "Dimock is deliberately obstructing additional development of the Subject Leases and attempting to deprive Sutherland of the right to timely drill additional wells." CR 1363. Contrary to the assertion, the evidence at the hearing showed Dimock had not stopped Sutherland from drilling any well. RR 4: 97-99. Sutherland had not then drilled or completed any additional well as a producer in paying quantities. Sutherland *has made no request for an assignment of any additional acreage from Dimock after drilling and completing an additional well*. Dimock had taken no action whatsoever to "deliberately obstruct" any development. No gate had been locked. No one had been physically restricted from any property. *Id.* The only "wrong" Dimock had

19

committed was to take a contractual position in a judicial proceeding, which Sutherland did not like.

32.    Sutherland, a start-up company owned solely by Rod Sutherland, has done no internal suspense on behalf of Mr. Dimock or the Christian Charities from any of the income from the Hamrick # 3 well, and *doubts it has sufficient funds available* to pay Mr. Dimock or the Christian Charities back if the eventual legal decision in this case is that payout occurred in March of 2014.  CR 1472, 1511.

33.    Dimock tried to have this matter adjudicated by permissive appeal of the erroneous Partial Summary Judgment order to the Amarillo Court of Appeals, but Sutherland opposed the motion for permissive appeal.  CR 1269.  The legal issues at the heart of this dispute could have been resolved but for the opposition of, and delays caused by, Sutherland and the trial court to resolve this case.

34.    The delay in obtaining a final appellate decision about the proper calculation of "project payout" is a dilemma of Sutherland's own making. It is Sutherland who objected to an interlocutory appeal of the trial court's ruling on the parties' motions for summary judgment. CR 1273.  It is Sutherland who obtained a continuance of the trial setting.  CR 1288, 1294.

35.    The judicially extended option of Sutherland's right to drill wells enjoins Dimock from drilling wells on his own leaseholds after November 19,

2015. Dimock did not contract to give up the right to drill a well on his own leaseholds after November 19, 2015. The injunction directly and irreparably damages Dimock because it prevents him from drilling wells on his own leaseholds after November 19, 2015. And, what does Sutherland pay Dimock for the privilege to extend the term of the exclusive option to drill additional wells? Nothing, if this Court upholds the erroneous trial court injunction.

38.    Dimock also incorporated into its Response to Amended Application for Temporary Injunction [CR 1439], excerpts from the May 21, 2015 Deposition of Rod Sutherland [CR 1452-1499].   Significant portions of such Sutherland testimony are included as Exhibit J in the Appendix to this Brief.  In summary, as is evident from the noted portions of the deposition of Rod Sutherland, Sutherland admits it has charged at least $2.4 million in claimed "land" and "seismic" expenses to payout of the Hamrick #3, **none** of which was used to acquire acreage, locate, or drill the Hamrick #3. Sutherland *planned to continue the spending spree indefinitely*. In addition, Sutherland further delayed payout of the Hamrick #3 by charging his own and his various employees' time and expenses as to this lawsuit (at salary rates for petroleum engineers, and landmen) to "miscellaneous" expenses in the operating expenses for the Hamrick #3, which expenses are deducted from well proceeds (to further delay payout of the Hamrick #3), all in breach of the Agreement.

21

39.    Since March 2014, when the Hamrick #3 paid out, Sutherland has spent over $2 million more for nothing benefitting the subject well, and has put an additional $2 million in his pocket.    After doing all these admitted actions, Sutherland obtained a trial court injunction to enjoin Dimock's speech and conduct after his option period had expired, possibly indefinitely, and continue the unlimited spending spree with Hamrick #3 proceeds. The trial court erroneously granted such injunction.

40.    The trial court injunction destroyed the status quo. The status quo was the right to drill additional wells *as stated in the term* of the Agreement.

41.    The trial court's order rewriting the term of the Agreement indefinitely until this case is finally resolved, was an action it was not authorized to do, and is an abuse of discretion. A court is to construe contracts, not rewrite them.  And, in this case, the party who drafted the contract (See CR 1477) got the trial court to rewrite the term of his own farmout agreement to favor the author, all to the detriment and irreparable damage of Dimock.

## SUMMARY OF THE ARGUMENT

The trial court erred in denying Dimock's temporary injunction because it would have preserved 51% of the working interest proceeds of the Hamrick #3 until a final legal determination of payout of the subject well could be made.  And,

22

the trial court erred in entering the Temporary Injunction Order in favor of Sutherland because it rewrote the term of the farmout agreement, enjoining Dimock's speech and conduct beyond the end of the contractually determined option period effectively extending the time to drill and complete additional wells beyond the stated term of the Agreement. The order prohibits Dimock from drilling wells on its own leases after November 19, 2015. And, because the order prohibits Dimock's speech, it violates Dimock's right to free speech under the Texas Constitution.

## ARGUMENT

### A. Standard of Review

1. The trial court's grant or denial of a temporary injunction is reviewed on an abuse of discretion standard. *Butnaru v. Ford Motor Co.*, 84 S.W.3d. 198, 204 (Tex.2002); *Walling v. Metcalfe*, 863 S.W.2d 56, 58 (Tex.1993). The Court is to review de novo any determinations on questions of law that the trial court made in support of an injunction order. *Marketshare Telecom, LLC v. Ericson, Inc.*, 198 S.W.3d 908, 916 (Tex.App.-Dallas 2006, no pet.).

2. To obtain a temporary injunction, the applicant must plead and prove: a) a cause of action against the defendants; b) a probable right to the relief sought; and, c) a probable, imminent, and irreparable injury in the interim. *Id; Walling*, 863 S.W.2d at 57; Tex. R. Civ. P. 682, 684.

3.     A trial court's clear failure to analyze and apply the law correctly constitutes an abuse of discretion. *Webb v. Glenbrook Owners Ass'n., Inc.*, 298 S.W.3d 374, 380 (Tex.App.-Dallas 2009, no pet.). Further, sufficiency of the evidence is a relevant factor in determining whether the trial court had sufficient evidence to exercise its discretion in the manner it did. *Beaumont Bank, NA v. Buller*, 806 S.W.2d 223, 226 (Tex. 1991).

4.     A temporary injunction's purpose is to preserve the status quo pending a trial on the merits. *Walling v. Metcalfe*, 863 S.W.2d 56, 57 (Tex.1993).

## B.     Rules of Construction and Contract Interpretation

5.     When a dispute involves the interpretation of oil and gas contracts, and the contract is not ambiguous [which is what Sutherland contends], this Honorable Court applies "settled rules of law", including the following:

> The first mandates that construing an unambiguous contract involves a *question of law*. *Borders v. KRLB, Inc.*, 727 S.W.2d 357, 359 (Tex.App.-Amarillo 1987, writ ref'd n.r.e.).  Thus, we need not defer to any interpretation afforded by the trial court.  Second, when interpreting an instrument, we strive to give effect to its parties' intent. *Id*.  Furthermore, that *intent is garnered from the language of the contract, which language is considered in its entirety*. *Id.*  That is, we peruse the complete document to understand, *harmonize, and effectuate **all** its provisions*. *Questa Energy Corp. v. Vantage Point Energy, Inc.*, 887 S.W.2d 217, 221 (Tex.App.-Amarillo 1994, writ denied).  So too must we afford the words contained in the agreement their plain, ordinary, and generally accepted meaning, unless the instrument requires otherwise. *Sun Operating, Ltd. v. Holt*, 984 S.W.2d 277, 285 (Tex.App.-Amarillo 1998, pet. denied); *Phillips Petroleum Co. v. Gillman*, 593 S.W.2d 152, 154 (Tex.Civ.App.-Amarillo 1980, writ ref'd n.r.e.).

24

Finally, in applying the foregoing rules we may not rewrite the agreement to mean something it did not. *Borders v. KRLB, Inc.*, 727 S.W.2d at 359. Simply put, we cannot change the contract merely because we or one of the parties comes to dislike its provisions or thinks that something else is needed in it. *HECI Explor. Co. v. Neel*, 982 S.W.2d 881, 888-89 (Tex.1998). This is so because parties to the contract are considered masters of their own choices. They are entitled to select what terms and provisions to include in a contract before executing it. And, in so choosing, each is entitled to rely upon the words selected to demarcate their respective obligations and rights. In short, the parties strike the deal *they* choose to strike and, thus, voluntarily bind themselves in the manner *they* choose. And, that is why parties are bound by their agreement as written. *Emmer v. Petroleum Co.*, 668 S.W.2d 487, 490 (Tex.App.-Amarillo 1984, no writ). For a court to change the parties' agreement merely because the Court did not like the agreement, or because one of the parties subsequently found it distasteful, would be to undermine not only the sanctity afforded the contract but also the expectations of those who created and relied upon it."

*Cross Timbers Oil Co. v. Exxon Corp.*, 22 S.W.3d 24, 26-27 (Tex.App.-Amarillo, 2000, no pet.), emphasis added.

8. The court is to "analyze the entire instrument to understand and harmonize all parts of the instrument so as to give effect to all of its provisions." *Petro Pro, Ltd. v. Upland Resources, Inc.*, 279 S.W.3d 743, 748 (Tex. App. – Amarillo 2007, pet. den.). "No single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument." *Myers v. Gulf Coast Minerals Mgmt. Corp.*, 361 S.W.2d 193, 196 (Tex. 1962).

## C.      Sutherland "Interpretation" Not Consistent With Texas Law

9. Sutherland's "interpretation" that he can run up unlimited sums in land and seismic costs on lands other than Section 168 [where the Hamrick No. 3 well is located], and thereby forever delay payout of the Hamrick No. 3 well, is not consistent with the Operating Agreement to which Sutherland agreed on November 20, 2012. Sutherland's interpretation renders meaningless the operating agreement limitation on expenses for a non-drilling, etc. project. Sutherland's interpretation also does not "avoid when possible and proper a construction which is unreasonable, inequitable, and oppressive." *Springer Ranch, Ltd. v. Jones*, 421 S.W.3d 273, 280 (Tex. App. – San Antonio 2013, no pet.), emphasis added. The way to construe the subject contract which harmonizes and gives effect to all the provisions so that *none* is rendered meaningless, and which avoids an unreasonable, inequitable, and oppressive construction, was for the court to enforce the $25,000 limit on land costs and seismic costs. In *Springer Ranch*, the court referred to a case wherein a party's construction of a partnership agreement "taken to its logical conclusion, would allow [the party] to ignore [partnership] dissolution notices *indefinitely* and continue to demand capital *until [the other party's] ownership interest is eliminated* . . . thus produc[ing] an unjust, unreasonable, and oppressive result." *Springer Ranch*, 421 S.W.3d at 288, citing *Shadow Dance Ranch Partnership v. Weiner*, 2005 WL 3295664, at P. 4 (Tex. App. – San

26

Antonio, 2005, no pet.). Sutherland's "unlimited" land and seismic costs interpretation, taken to its logical conclusion, has allowed Sutherland to: 1) ignore the dollar limitation on such expenses in the Operating Agreement *indefinitely* and *charge over $2.4 million* in land and seismic costs, 2) *keep an additional $5 million* of Hamrick #3 revenue, and 3) effectively eliminate Dimock and the non-profit entities' ownership interest in the subject 160 acre drilling unit. Dimock and the Christian Charities have not benefitted from the land or seismic spending spree. So, under Sutherland's interpretation, he obtained all the rights he obtained in this contract without any consideration retained by Dimock. No reasonable person would assign all his interest in existing oil and gas leases on 3 sections of land for a payment he immediately has to return, with no realistic chance to ever regain any interest in the oil and gas leaseholds.

10.    Sutherland tries to ignore that express contractual non-drilling, etc. cost limitation, and, instead, inserted "all" or "unlimited" in front of "capital costs", or in front of "costs incurred by Farmee for land and seismic". But, the contract does not say all or unlimited "capital costs", or all or unlimited "land and seismic costs". "Basic to the *purpose* of the [joint operating agreement] is … *what proportional obligations and interests are borne by the respective working interest owners* …." *Hill v. Heritage Resources, Inc.*, 964 S.W.2d 89, 113 (Tex. App. – El Paso, 1997, pet. den.). Dimock had, and has, nothing to gain from Sutherland

27

spending Hamrick No. 3 well proceeds on lands or seismic as to lands outside of the preexisting Dimock leases. The trial court should have recognized that Sutherland "has failed to present sufficient evidence of a meeting of the minds of all parties...sufficient to "authorize it" to charge Dimock "unlimited" sums on land or seismic costs on other lands. *Hill* at 115. That was especially true when the Court was faced with an ambiguity pleading by Dimock.

**D.     After Trial Court Erroneously Authorized Unlimited Spending, Injunction Now Authorizes Unlimited Time to Drill**

11.     First, the trial court erroneously authorized *unlimited* spending on land and seismic costs for *unrelated* wells to be charged to the Hamrick #3 payout. Then, in the subject Temporary Injunction Order, the trial court further gutted Dimock's legal rights by ordering an indefinite term to the farmout agreement. Courts do not imply indefinite terms, or unlimited amounts, into terms used in a contract. A construction of a contract wherein a definite term is enforced is favored over an interpretation which includes the implication of an indefinite or unlimited term. *Tanebaum Textile Co., Inc. v. Sidran*, 423 S.W.2d 635, 637 (Tex. Civ. App. – Dallas 1967, writ ref'd n.r.e.). In this case, Sutherland argued and the trial court erroneously found that an *unlimited* amount can be spent by Sutherland on land costs and seismic costs. The idea that a court will not imply an unlimited term into a contract is also seen in court construction of option contracts and will provisions. *Mattern v. Herzog*, 367 S.W.2d 312, 219 (Tex. 1963). Unlimited

28

terms are not implied because doing so will "destroy the validity of the option provision". *Id. In this case, implying and/or finding that an unlimited amount of land costs and seismic costs can be incurred effectively has destroyed Dimock's vested right of reverter as to the Hamrick #3 and leasehold.* Then, by an injunction order "creating" an *indefinite term* for the drilling option in the farmout agreement, the trial court *expanded the destruction* of Dimock's legal and property rights *to the remainder of its leaseholds by expanding Sutherland's option* to drill and complete additional earning wells, and restrained Dimock's right to drill on his own leases, *beyond the stated three year term.*

12.    The trial court erred when it ignored the express three year term of the Agreement, and *created* an indefinite term of the Agreement. "Absurd, inequitable, or oppressive interpretations are to be eschewed unless they prove unavoidable." *Michelin North America, Inc. v. First Industrial NLF 12 JV, LLC*, 2014 WL 586228, at P. 3 (Tex. App. – Houston (1ˢᵗ Dist.) 2014, no pet. history). The trial court's interpretation of the Agreement is absurd, inequitable, and oppressive. There is no evidence, or legally insufficient evidence, that Sutherland was entitled to a determination that the term of the Agreement is for an indefinite period of years "until the allegations in this lawsuit are finally resolved." The trial court erroneously found a probable right to such absurd injunctive relief.

29

13. In granting Sutherland's Amended Application for Temporary Injunction, the trial court erroneously changed the written "term" of the subject Agreement just because Sutherland has now found that "term" distasteful. It should not be forgotten that Sutherland drafted the Agreement with the subject "term" in it. CR 1477. By rewriting the "term" of the Agreement, the trial court did exactly what it was not supposed to do, it took an action to favor one party that did "undermine not only the sanctity afforded the contract but also the expectations of those who created and relied upon it". *Cross Timbers*, 22 S.W.3d at 27, emphasis added.

## E. Trial Court Action Constitutes an Erroneous Pretrial Forfeiture of Leasehold

15. "Courts will not [construe a contract to] declare a forfeiture unless they are compelled to do so by language which can be construed in no other way." *Reilly v. Rangers Management, Inc.*, 727 S.W.2d 527, 530 (Tex. 1987). In *Reilly*, a managing partner tried to dilute limited partners' ownership shares by passing "amendments" to the partnership agreement. The court recognized that the managing partner's interpretation of the contract would work "a practical forfeiture" to the limited partners' interest. The trial court's legal "interpretation" of the Agreement in this case works a practical forfeiture of Dimock's property rights. *At the least*, there is a fact issue and legal issue whether land costs and seismic costs are expenses subject to the $25,000 limit agreed to by the parties. *At*

30

*the least*, there is a fact issue and a legal issue before any ruling should find the *term* of the drilling option, and the inability of Dimock to drill upon his own leases, extends *beyond November 19, 2015* (the end of the three year stated term). Before Dimock's property rights are, effectively, forfeited, a jury trial on the merits, as demanded, should be conducted.

**F.     Contract Construction Harmonizing and Giving Effect to All Provisions**

16.     When all the contract interpretation rules cited above are applied to the Agreement with its attached, and immediately effective, Operating Agreement, the obligations of the parties are evident, and the limitations on Sutherland to incur costs chargeable to Dimock and to payout of the "initial earning well", are evident. Sutherland could charge up to $25,000 of "land costs" and "seismic costs" to the initial well payout. And, *assuming no breach of contract by Sutherland*, Sutherland *had the exclusive option to drill and complete additional wells* as producers in paying quantities *during an express 3 year term, but not afterwards*.

17.     After applying the appropriate contract interpretation rules, the trial court should have also determined that the Hamrick #3 reached payout in March of 2014, as pleaded by Dimock. When a court is making a farmout "payout" determination, the court is to review the subject contract and the subject well(s) production proceeds and relevant costs to determine the date when the farmor's

31

reversionary interest takes effect. *Mengden v. Penisula Prod. Co.*, 544 S.W.2d 643, 648 (Tex. 1976).

## G. Limits on Project Costs Common in Operating Agreements

18. An oil and gas operating agreement can prohibit undertaking certain operations unless consent of non-operators is obtained. *Texstar North America, Inc. v. Ladd Petroleum Corp.*, 809 S.W. 672 (Tex. App. – Corpus Christi 1991, writ den.). In other cases, the operation can proceed, but, due to a dollar limit on the type of operation or project, no amounts for that operation or project above the specified limit can be charged to non-operators. *Cone v. Fagadau Energy Corp.*, 68 S.W.3d 147 (Tex. App. – Eastland, 2001, pet. den.); *Paint Rock Operating, LLC v. Chisholm Exploration, Inc.*, 339 S.W.3d 771 (Tex.App.—Eastland 2011, no pet.).

19. Texas courts have *not* ordered recoupment from well proceeds for other costs the drilling party might like to incur or charge against well production. *Cox v. Davison*, 397 S.W.2d 200, 203 (Tex. 1965). An "obligation" of another party to "pay" or "incur" an "expense" and to deduct it from oil or gas well production proceeds *is not implied under Texas law*. *Id*. The operator must prove that he is entitled to "charge" such specific expense under the terms of the Operating Agreement, or else such "expense" is not chargeable to the other party. *Id*.

20. The A.A.P.L. Form 610 Model Form Operating Agreement, which was used in this case, is a standard oil and gas agreement. *Hill v. Heritage Resources Inc.*, 964 S.W.2d 89 (Tex. Civ. App. – El Paso 1997, no writ). It sets forth a procedure for the parties to decide whether or not to pay for "other operations", or "projects" above a specified limit. *Valance Operating Co. v. Dorsett*, 164 S.W.3d 656, 666 (Tex. 2005) (concurring opinion). An operator may breach an operating agreement by improperly assessing charges above the specified limit to a non-operator. *Cone v. Fagadau Energy Corp.*, 68 S.W.3d 147 (Tex. Civ. App. – Eastland 2002, pet. den.).

21. In *Cone*, the court found the $15,000 contract limitation on "other projects" was "a limitation on the non-operator's exposure to liability for expenses incurred by the operator." *Cone*, 68 S.W.3d at 157. In objecting to the excess expenses, the non-operator "is attempting to obtain the benefit of his bargain as provided by the operating agreement." *Id.* at 161. If the limit is not enforced, the non-operator may never receive the benefit of his bargain. *Id.* Such is the case here where Sutherland continues to extravagantly incur seismic and land expenses (already in excess of $2,400,000) for other properties and other, undrilled, wells, and claims he can take all the Hamrick #3 production proceeds to pay for those expenses, take an additional equal amount for himself, (under the 2x payout formula) from well proceeds, and forever delay payout of the initial earning well.

33

22.     In *Paint Rock Operating, LLC v. Chisholm Exploration, Inc.*, 339 S.W.3d 771, 775-776 (Tex. App. – Eastland 2011, no. pet.), the Court held the operator was not entitled to be charged or reimbursed for the excess cost of the non-drilling, etc. operation. *Id., see also* footnote 3 on 777.  The limitation on expenditures for non-drilling, etc. projects makes sense when viewed from the perspective of the non-operator.  As to expenses from which he may, someday, benefit, like drilling expenses, Dimock's right to a reassignment of the lease is delayed until two times such unlimited expense is recouped from working interest proceeds.  But, as to "other expenditures", like buying oil and gas leases in only Sutherland's name (an alleged "land cost") and from which Dimock receives no benefit now or in the future, the amount of those "expenditures" is limited to $25,000, so that the "expenditures" for such other "projects" do not, in effect, render his right of reverter worthless.

23.     The limitation on expenditures for non-drilling, etc. projects is also consistent with the fact the parties did not agree to an area of mutual interest.  There is no benefit to Dimock of Sutherland leasing 9 other sections of land for himself.

24.     The Operating Agreement, is dated November 20, 2012, the same date as the Agreement.  It expressly says (contrary to the trial court ruling) "this agreement shall be effective as of the 20th day of November 2012." CR 45.  When

the parties sign such an operating agreement, it is binding between whichever parties sign the agreement and is effective on the day therein indicated. *IMCO Oil & Gas Co. v. Mitchell Energy Corp.*, 911 S.W.2d 916, 920 (Tex. App. – Fort Worth 1995, no writ).

25.     Reinforcing such an integration of the Agreement that limits Sutherland to recouping up to $25,000 of non-drilling, etc. costs, is the contract provision that states "The Operating Agreement shall apply to all Earned Wells." CR 14.

26.     The operating agreement has a limited payment obligation as to non-drilling, etc. "projects". A limited payment obligation is to be enforced by a court. *American Manufacturers Mutual Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex.2003) (the payment obligation of the insuror was limited and it did not owe its insureds for diminished market value of their repaired vehicles). If the court disregards a payment obligation provision, it renders such provision meaningless. *Id.* at 159. The court's ruling disregards the limited payment obligation signatory non-operator Dimock undertook. The subject limited payment obligation expressly itemizes the projects for which unlimited sums can be spent (drilling, etc.). The "itemization is telling for it provides evidence as to what was intended by the parties when the contracts were drawn." *Cross Timbers Oil Co.*, 22 S.W.3d at 27, emphasis added.

**H. Partial Assignment of Oil, Gas and Mineral Lease Was Subject to Parties' November 20, 2012 Agreement including the Operating Agreement**

27.    The Partial Assignment of Oil, Gas and Mineral Lease from Dimock to Sutherland for the Hamrick #3 [CR 320], stated in the granting clause, and in the "subject to" conditions, that the Partial Assignment was made subject to the terms and conditions of the prior Agreement between the parties.  When such "subject to" language is inserted in an assignment, the limitations in the various provisions of the referenced documents are "inserted" into the assignment.  *Texas Independent Exploration, Ltd. v. Peoples Energy Petroleum-Texas, L.P.*, 2009 WL 2767037, at p. 4 (Tex. App. – San Antonio, 2009, no. pet.).  "The phrase "subject to" is a *limitation of grant*, defining the nature, extent, and character of the estate conveyed."  *Petro Pro, Ltd. v. Upland Res., Inc.*, 279 S.W.3d 743, 750 (Tex. App. – Amarillo 2007, pet. den.).

28.    Further, the Agreement states:  "Except as may be otherwise provided in this [Agreement], Farmee [Sutherland] shall be bound by any written and appropriately executed agreement which affects the subject leases at the time of assignment [of any leasehold interest] to [Sutherland]."  CR 14 (Parag. 8.1).  The Operating Agreement applies to the Agreement and to the November, 2013 Partial Oil and Gas Lease Assignment to Sutherland of the interest in the Hamrick #3 and

36

drilling unit.  Sutherland's determinable fee is subject to the terms of the parties' Operating Agreement.

## I.     Trial Court Erroneously Rewrote Contract

29.     To be enforceable, the parties must agree to the material terms of a contract.  *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218 (Tex. 1992); *Aurora Petroleum, Inc. v. Cholla Petroleum, Inc.*, 2011 WL 652843 at *2 (Tex. App.—Amarillo 2011, no pet.)  When that "agreement" never occurs, the contract is *not binding* on the parties.  *Aurora*, 2011 WL 652843 at *2.  In this case, there is no "obligation" to drill any additional wells, only a stated 3 year option to drill such wells.

30.     In *Aurora*, a farmout agreement was held unenforceable as a matter of law when a material term was not agreed.  *Id.*  The time within which to drill was found to be material, if not pivotal, to the "existence of the accord" and was more than an "incidental detail."  *Aurora,* 2011 WL 652843 at *2.  The "contract" *rewritten* by the trial judge in the injunction order in this case is, as a matter of law, unenforceable because Dimock did not agree to such material and pivotal term, authorizing the drilling of additional wells on a Dimock leasehold beyond November 19, 2015.  In *Aurora*, this Honorable Court also noted: "we may not rewrite the agreement of the parties."  *Id.* at *3, Footnote 2.  The trial court

37

erroneously rewrote the term of the subject farmout agreement, and that is an abuse of discretion.

31. An important item not to be overlooked in the Agreement is the "Whereas" sentence. The "Whereas" sentence states as follows:

> Whereas, Farmor and Farmee desire to enter into an agreement pursuant to which Farmee shall have the right to earn certain of Farmor's rights under the oil and gas leases described below, **subject to all terms, reservations and conditions set forth herein.** CR 12, emphasis added.

The expressed primary purpose was to enter into a farmout agreement under which Sutherland might earn the right to an assignment of part of Dimock's oil and gas leases subject to the terms, reservations and conditions stated.

32. A trial court is not authorized to "rewrite the parties' contract *nor add to its language*." *American Manufacturers Mutual Ins. Co. v. Schaefer*, 124 S.W.3d 154, 162 (Tex.2003); *Royal Indem. Co. v. Marshall*, 388 S.W.2d 176, 181 (Tex.1965). "Courts cannot make new contracts between the parties, but must enforce the contracts as written." *Royal Indem.*, 388 S.W.2d at 181.

## J. Lack of Probable Right to Recover

33. To have a probable right to recover, a party must plead and present proof to support at least one valid legal theory. *Marketshare*, 198 S.W.3d at 922. If that "theory" is breach of contract, the applicant must show: (1) the existence of a valid contract; (2) the Plaintiff's performance or tendered performance, (3) the

38

Defendant's breach of the contract; and, (4) damages as a result of the breach. *Id.* at 923. Sutherland presented no evidence, or insufficient evidence, of each of these elements of a breach of contract. Sutherland had then drilled no additional well. Dimock had not failed to make an assignment of a lease, nor refused to do so. Sutherland had never performed, nor tendered performance of, any of its obligations as to an additional well, a condition precedent to any right to an assignment of any additional acreage. Dimock had breached no duty as to any additional well; as that situation had not then arisen. Sutherland "jumped the gun" when it filed the Application for Temporary Injunction.

As this court is well aware, courts generally refuse to declare rights between parties based on *future, hypothetical, or speculative facts*. A court is to adjudicate *present rights upon established facts*, not hypothetical facts. *Ashcroft v. Mattis*, 431 U.S. 171, 172 (1977), emphasis added.

## K. Mandatory Provisions Are Abuse of Discretion

34. The subject injunction *prohibits* Dimock from communicating with anyone other than Sutherland about Sutherland lacking authority to drill additional wells. It prohibits Dimock from "physically interfering" "with any drilling operations or other activities" *on Dimock's own leases **indefinitely***. It commands Dimock to sign lease assignments to Sutherland indefinitely, and the wording of those to-be-prepared documents is unknown. The issuance of a temporary

39

mandatory injunction is proper only if a mandatory order is necessary to prevent irreparable injury or extreme hardship. *LeFaucheur v. Williams*, 807 S.W.2d 20, 22 (Tex.App.—Austin 1991, no writ). A mandatory injunction should be denied absent a clear and compelling presentation of extreme necessity or hardship. *Rhodia, Inc. v. Harris County*, 470 S.W.2d 415, 419 (Tex.Civ.App.-Houston [1st Dist.] 1971, no writ). Sutherland failed to present evidence, and/or presented insufficient evidence, of "extreme necessity or hardship". Sutherland *had not spudded an additional well* or presented an assignment when the trial court entered such mandatory injunction.

**L.  Injunction Erroneously Compels Assignment Even If Well Is Not Drilled and Completed Within Contract Deadline**

35. The injunction order compels Dimock to give Sutherland an assignment of leasehold acreage even if a well is drilled after November 19, 2015 (the end of the 3 year term). The injunction is an order to "specifically perform" a contract **which Dimock did not sign**. In *Blaschke v. Wiede*, 649 S.W.2d 749 (Tex.App.—Texarkana 1983, writ ref'd n.r.e.), the parties signed a one year lease *with an option* to buy property. After the one year expired, the court found the holdover tenant's *one year option to buy had expired* and the tenant *had no cause of action to compel the property owner to sell the property after the one year term. Id.* In this case, the order allows Sutherland **to holdover indefinitely and drill wells indefinitely**, **and compel Dimock to assign leasehold acreage indefinitely**

40

**beyond November 19, 2015**, the end of the contract term. Like the holdover tenant in *Blaschke*, Sutherland has no cause of action for an unlimited option to acquire more leasehold acreage from Dimock, no cause of action to prohibit Dimock from drilling on his own leases after November 19, 2015, and no right to specific performance against Dimock as to any well drilled and completed on a Dimock leasehold after November 19, 2015.

## M. Lack of Imminent Harm

36.    It is an abuse of discretion to grant a temporary injunction based upon alleged "imminent harm" arising from "the mere existence of *unexercised* contractual rights." *Schmidt v. Richardson*, 420 S.W.3d 442, 446, 447 (Tex.App.-Dallas 2014, no writ). Numerous contractual prerequisites to Sutherland being entitled to an assignment of any additional acreage have not been met, but the trial court erroneously found "imminent harm". As the Dallas Court of Appeals found in *Schmidt*, the trial court abused its discretion when it granted Sutherland a temporary injunction.

## N. Injunction Erroneously Has No Provision Requiring Compliance with Contract by Sutherland

37.    Another glaring problem with the trial court injunction is it wrongly authorizes Sutherland to drill wells indefinitely *whether or not Sutherland performs the contract provisions as agreed*. Rewriting the term of the contract *coupled with* ordering the other party to, *unconditionally*, take certain actions,

41

effectively guts Sutherland's obligations to comply with the contract. Under the erroneous order, Dimock cannot stop performing and assigning its leasehold acreage even in the face of blatant contract breaches by Sutherland.

## O. Injunction Order Erroneously Provided Investment Assurance

38. Why did the trial court take such drastic action in the temporary injunction order? Because Sutherland was "afraid" that *if* he drills another well, Dimock *may* not sign a lease assignment. RR 3:57. A trial court cannot and *should not* make that investment decision for Sutherland. When a party asks a court for investment advice, the court should decline to provide it. *Grace Holdings, L.P. v. Sunshine Mining and Refining*, 901 F. Supp. 853, 863 (D.Del.1995).

## P. Pending Suit and Lis Pendens Already Made Drilling Additional Wells a Risk for Sutherland, and is Privileged, So There Is No Imminent Harm

39. The only alleged "imminent harm" Sutherland presented at the hearing was a letter exchange between counsel for the opposing parties. First, Sutherland's lawyer wrote a letter (and demanded a response) asking if Dimock contested Sutherland's right to drill additional wells. RR 5: Pl. Exh. 7. In response to Appellee's invitation and *command* to respond, Appellant's counsel sent a letter to Appellee's counsel dated June 3, 2015 (which is consistent with Appellant's pleadings) wherein he stated his opinion that the Hamrick #3 paid out in the spring

42

of 2014, that Sutherland has breached the Agreement by retaining the Hamrick #3 and all its working interest proceeds, and stated that Sutherland drills additional wells on Dimock's leases at its own risk. RR 5: Pl. Exh. 8. The June, 2015 correspondence exchange *between counsel* revealed no "imminent" harm.

40. Any well that Sutherland drills on a Dimock leasehold after the lis pendens was filed is, as a matter of law, subject to all legal claims of Dimock in this lawsuit. That is decades-old Texas law, not a new revelation in June, 2015. Further, even *with* the injunction improperly authorizing indefinite term drilling of wells, under Texas law, Sutherland would *drill any new well at the risk of losing it* if Dimock ultimately prevails in this lawsuit. *See Phillips Pet. Co. v. American Trading and Prod. Corp.*, 361 S.W.2d 942 (Tex. Civ. App. – El Paso, 1962, writ ref'd n.r.e.). Such well would be drilled while the temporary injunction order is being appealed, during pending litigation over whether the underlying contract has been breached, and while a lis pendens is on file.

41. The trial court erroneously granted the Temporary Injunction Order even after Sutherland *conceded* at the hearing that the June, 2015 *letter of Attorney Lovell did not matter*. Rod Sutherland, the sole member of Appellee (See RR 3:100), admitted he *wanted* his lawyer to write the letter that led to Attorney Lovell's June response. RR 4: 72. He further admitted he did not like the Lovell response, so he wanted an injunction. *Id*. He admitted there is a filed lis pendens

43

by Dimock as to the subject suit and acreage. RR 3: 66, 67. He admitted that anyone acquiring an interest while a lis pendens is on file, takes that interest subject to the outcome of the lawsuit. RR 3: 69-70. He further admitted that if the lis pendens refers to the 15 sections at issue [which the amended lis pendens does], then *the Lovell letter in July 2015 would not matter*. *Id*. Later, Rod Sutherland admitted the filed Amended Notice of Lis Pendens listed all 15 sections at issue. RR 4:78. The "harm" posed by the privileged Lovell letter is a red herring.

42. The Notice of Lis Pendens in this lawsuit was filed and recorded on July 31, 2014. RR 4:77; RR 6: Def. Exh. 1. The amended Notice of Lis Pendens, including all 15 sections at issue, was filed on September 19, 2014. RR 4:77-78; RR 6: Def. Exh. 2. The UCC Financing Statement was filed with the Texas Secretary of State on July 28, 2014. RR 6: Def. Exh. 3; RR 4:92.

43. Sutherland also tried to claim its "investors" might be scared off by the Lovell letter (which, of course, was *only sent to Sutherland's lawyer*). The only "investors" who allegedly have refused to invest in Sutherland's additional wells are Wade Tidmore, and Judy Thompson. RR 4:89. According to Rod Sutherland, Woody and Judy Thompson, Joe and Vivian Revesz, and Wade Tidmore and his wife are working interest owners, through Sutherland, in the Hamrick #3. Sutherland only has a separate Operating Agreement with them. RR 6: Def. Exh. 4, P. 22-23. Judy Thompson is Rod Sutherland's wife's cousin. RR

6: Def. Exh. 4, P. 25. Vivian Revesz is Rod Sutherland's wife's niece. *Id*. Wade Tidmore is an employee of Sutherland whose time *spent on this lawsuit* is being erroneously billed to "operating expense" of the Hamrick #3 (CR 1583), so as to delay the payout. Wade Tidmore helped Sutherland draft the subject Agreement. RR6:Def. Exh. 4, P. 104. Just because Rod Sutherland's relatives and employees, are not enamored with the idea of giving Rod Sutherland money to drill a new well on a Dimock leasehold, is not "imminent harm" caused by any wrongful act of Dimock.

44. The trial judge also had before him the Defendant's Second Amended Answer and Counterclaim. RR 4:113-114; CR 1336. As is apparent from that pleading (beginning at CR 1336), Dimock was alleging Sutherland was in breach of the Agreement, that Sutherland was converting Dimock's and the Christian Charities' working interest proceeds, and Dimock sought to foreclose its lien under the Operating Agreement. CR 1345. Dimock's claims against Sutherland have been of record since Dimock filed its Original Answer and Counterclaim on June 13, 2014. CR 12. Attorney Lovell's privileged comments as to Dimock's legal position in July 2015 were neither new nor novel.

45. The bottom line is Sutherland wanted an injunction specifically "because [Rod Sutherland] didn't like the content of the Lovell letter that Sutherland requested". RR 4:72. A party's unhappiness that the opposing party

45

disagrees with his legal interpretation of a contract, and that the opposing party asserts a contrary legal position which includes the consequences of his breach of a contract, is not a legal basis for a temporary injunction. "There is no power in courts to make one person speak only well of another." *Pirmantgen v. Feminelli*, 745 S.W.2d 576, 578 (Tex.App.-Corpus Christi, no writ). Dimock's counsel's opinion letter re-iterating Dimock's pleadings does not threaten Sutherland with any imminent danger, and may not be the subject of a temporary injunction. *Id*. at 578-579. Court records, including all Dimock's pleadings "are presumed to be open to the general public." Tex. R. Civ. P. 76a(1).

46. Further, the uncertainties caused by the continuation of this lawsuit, and the delay in obtaining a final appellate decision about the proper determination of "payout" of the Hamrick #3, is an uncertainty of Sutherland's own making. It is Sutherland who objected to an interlocutory appeal. It is Sutherland who obtained a continuance of the trial setting.

**Q. Appellant Entitled to Maintain that Sutherland has Breached Contract and to File Lis Pendens**

47. When a party has breached a contract, the other party is entitled to treat the contract as rescinded. *Halbert v. Standley*, 488 S.W.2d 887, 889 (Tex.Civ.App.-Waco 1973, writ ref'd n.r.e.); *Cundiff v. McLean & Miller*, 8 S.W. 43 (Tex. 1888); *Ross v. McLelland*, 281 S.W.2d 773 (Tex.Civ. App. - Fort Worth, 1955, writ ref'd n.r.e.). Dimock's attorney's letter expressing an opinion

46

consistent with the above line of cases is neither improper, nor a basis for a temporary injunction.

48. Good faith litigants are assured access to the judicial system. *Sakowitz, Inc. v. Steck*, 669 S.W.2d 105, 107 (Tex. 1984). Whether or not Dimock prevails on its claims, Dimock is entitled to maintain its legal position until this case is resolved through the court system. *Id*.

49. Further, Dimock is privileged to file a notice of lis pendens. TEX. PROP. CODE ANN. §12.007 (Vernon 1984). The filing of a notice of lis pendens is part of a "judicial proceeding." *Kropp v. Prather*, 526 S.W.2d 283, 287 (Tex.Civ.App.-Tyler 1975, writ ref'd n.r.e.). Further, *any communications*, oral or written, uttered or published in the due course of any judicial proceeding is absolutely privileged. *Id.* at 286; *See* also *Griffin v. Rowden*, 702 S.W.2d 692, 694 (Tex.App.-Dallas 1986, writ ref'd n.r.e.). All Dimock has done by filing a lis pendens, and Dimock's counsel sending a letter to Sutherland's counsel (which Sutherland's counsel requested) indicating his opinions *are all communications in a judicial proceeding* that are privileged as a matter of law. None of such acts are "wrongful" conduct on which to base the granting of a temporary injunction.

**R. Destroyed Status Quo**

50. "The status quo is defined as the last, actual, peaceable, non-contested status that preceded the controversy." *Tri-Star Petroleum Co. v. Tipperary Corp.*,

101 S.W.3d 583, 588 (Tex.App.-El Paso, 2003, pet. denied). The term of the option to drill additional wells under the Agreement is 3 years from November 20, 2012. The subject temporary injunction *destroys* that status quo. Under the temporary injunction, Sutherland can drill additional wells on Dimock leaseholds until further order of the court, and Dimock is enjoined from drilling on his own leases after November 19, 2015. The trial is not set until February 2016, over two months after the end of the 3 year contract term. Who knows if Sutherland will obtain another continuance?

51. Besides being a direct violation of the Agreement to authorize Sutherland to drill after November 19, 2015, the temporary injunction restrains Dimock from drilling on his own leases after November 19, 2015, another violation of the status quo.

52. The Temporary Injunction Order also destroys the status quo because it also authorizes Sutherland to drill additional wells on the "subject leases *and any lands pooled therewith*" for the same indefinite term into the future. CR 1597. The right to *drill wells indefinitely* into the future is not just on Dimock's leaseholds, but also on any lands that Sutherland in the future might decide to pool with any part of a Dimock leasehold.

48

## S.    Violated Statute of Frauds

53.    By eliminating the 3 year stated term of the Agreement, the trial court abused its discretion and created a "contract" which violates the Statute of Frauds. Such a "rewrite" violates the Statute of Frauds.  No agreement which is not to be performed within one year is enforceable against a party unless that agreement is in writing and signed by the parties.  TEX. BUS. & COM. CODE §26.01(b)(6). Further, the new, unsigned, "agreement" created by the trial court is a court-created, unenforceable, contract for the sale of real estate, an oil and gas leasehold, which also violates the Statute of Frauds.  TEX. BUS. & COM. CODE §26.01(b)(4).  Under the order, Sutherland could drill a well in January 2016 (after the 3 year signed contract term) and claim he is entitled to an assignment of acreage from Dimock's oil and gas leasehold.  If the appeal in this case extends into 2017 and Sutherland is still drilling new wells on a Dimock leasehold, Sutherland could claim he is entitled to a leasehold assignment in 2017 and compel Dimock to provide an assignment.  Dimock signed no such agreement, and it is enforceable under the Statute of Frauds.

## T.    Violated Statute of Conveyances

54.    For the same reasons outlined above as to the Statute of Frauds, the temporary injunction order also violates the Statute of Conveyances because it is not signed by Dimock or any authorized agent of Dimock.  TEX. PROP. CODE

§5.021. A conveyance of real property must be in writing and signed by the conveyor or his agent authorized in writing. *Id.* Judge Bird is not an authorized agent of Dimock. When an instrument purports to convey an interest in real estate, but fails to comply with the statute of conveyances, the instrument is unenforceable to convey the property or interest. TEX. PROP. CODE §5.002. The "contract" created by the injunction order that purports to authorize and compel the conveyance of an interest in Dimock's oil and gas leasehold beyond November 19, 2015, is an abuse of discretion and is void. TEX. BUS. & COM. CODE §26.01(b)(4) and §26.01(b)(6) [Statute of Frauds]; TEX. PROP. CODE §5.021 [Statute of Conveyances]; *Guffey v. Utex Exploration Co.*, 376 S.W.2d 1, 4-5 (Tex.Civ.App.-San Antonio 1964, writ ref'd n.r.e.).

**U. Erroneous Order of Specific Performance of Non-Existent Contract**

55. The Temporary Injunction Order is also an erroneous order of specific performance. It compels Dimock to assign leasehold acreage for a well drilled after November 19, 2015. "[A]n injunction has the effect of a decree of specific performance." *Eberts v. Businesspeople Pers.*, 620 S.W.2d 861, 864 (Tex.Civ.App.-Dallas 1981, no writ).

56. Further, the Temporary Injunction Order is erroneous because it precludes Dimock from lawful activities that are a proper exercise of its rights. *Computek Computer & Office Supply v. Walton*, 156 S.W.3d 217, 220-21 (Tex.

50

App.–Dallas 2005, no pet.). Dimock is expressly precluded from stopping Sutherland from drilling new wells after November 19, 2015, or drilling his own, both lawful activities of Dimock that would be a proper exercise of its legal rights under the Agreement.

## V. Illegal Prior Restraint on Speech

57. The temporary injunction enjoins Defendants from "**Communicating to investors, lenders, partners, mineral owners, surface owners, working interest owners, employees, contractors, service providers, purchasers of production, and other third parties not involved in the litigation that Plaintiff is a trespasser or lacks the authority to drill and produce additional wells on the Subject Leases, or on acreage pooled therewith.**" CR 1591, emphasis added.

58. The injunction is an illegal prior restraint on speech. *Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 51 S.Ct. 625 (1930); *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 91 S.Ct. 1575 (1971). Further, such injunction violates Art. 1, Sec. 8, of the Texas Constitution, which provides: "Every person shall be at liberty to speak, write or publish his opinions on any subject, being responsible for the abuse of that privilege; no law shall ever be passed curtailing the liberty of speech or of the press." The subject order

51

erroneously prohibits Dimock from communicating about this lawsuit and his contentions in the lawsuit.

59. A "judicial order that forbids certain communications before they occur constitutes a prior restraint." *Alexander v. U.S.*, 509 U.S. 544, 550, 113 S.Ct. 2766 (1993); *Marketshare Telecom, LLC v. Ericson, Inc.*, 198 S.W.3d 908, 917 (Tex.App.-Dallas 2006, no pet.). *Prior restraints on speech are presumptively unconstitutional. Davenport v. Garcia*, 834 S.W.2d 4, 10 (Tex.1992). The trial court in this case failed to meet the requirements of *Davenport* before it issued the subject injunction. There is nothing in the record that the parties discussed or presented evidence concerning whether the injunction was the least restrictive means to prevent the alleged harm. *Marketshare*, 198 S.W.3d at 917; *Davenport*, 834 S.W.2d at 10. The subject injunction gag order does not satisfy the requirements of *Davenport*.

60. Communications by a litigant *as to its beliefs and its position in a lawsuit, which are not false or misleading, cannot constitutionally be enjoined. Marketshare*, 198 S.W.3d at 920. A prior restraint of a *party's statement of position in a lawsuit,* does not justify imposition of a gag order by temporary injunction. *Id*.

## W. Prior Breaches of Contract Bar Injunctive Relief

61. A party who breaches a contract provision favorable to the other party cannot secure, by injunction, the enforcement of another contract provision favorable to it. *Langdon v. Progress Laundry Cleaning Co.*, 105 S.W.2d 346, 347 (Tex.Civ.App.-Dallas 1937, writ ref'd); *Chapman Air Conditioning v. Franks*, 732 S.W.2d 737, 740 (Tex.Civ.App.-Dallas 1987, no writ) The burden is on Sutherland to establish contract compliance before injunctive relief can be considered. *Halbert v. Standley*, 488 S.W.2d 887, 889 (Tex.Civ.App.-Waco 1972, writ ref'd n.r.e.); citing *Casanova v. Falstaff Beer, Inc.,* 304 S.W.2d 207 (Tex.Civ.App.–Eastland, 1957, writ ref'd n.r.e.).

62. Dimock has pleaded and presented proof, as outlined in this Brief, that Sutherland has breached the Agreement. Therefore, injunctive relief for Sutherland should have been denied.

63. The evidence shows Sutherland has violated the subject Agreement by charging over $2 million in unrelated "seismic" costs, and "land" costs to the Hamrick #3. The most recent "Hamrick Prospect Payout Estimation" [created by Sutherland] shows Sutherland's claimed "cumulative expenditures" of $3,439,371.00. RR 5: P1. Exh. 2. That figure includes the erroneously charged $2.4 million in land and seismic costs for wells *other than* the Hamrick #3. See also RR 5: P1. Exh. 3. Sutherland admits *none* of the "seismic cost" was used to

53

locate the Hamrick #3. No seismic was even shot before that well was drilled and completed. RR 4:87; RR 6:Def Exh. 4, P. 38. Sutherland admits *none* of the "land cost" was used for pooling, drilling, or locating the Hamrick #3. RR 4:87. None of the seismic cost or land cost charged by Sutherland was a cost of "the Initial Earning Well" as required by the Agreement to be chargeable to such well. CR 19.

64. Further, the evidence shows Sutherland is charging his and his employee's *own time* as "land" expenses, labeled as "company labor" to the Hamrick#3 well and its payout. RR 5: P1. Exh. 3. It is time Sutherland and his employees, allegedly spent getting leases on *other* land. RR3:45-46; RR4:87,90; RR6:Def. Exh. 4, P. 51-52. The Agreement does not authorize those in-house expenses be charged to the Hamrick #3 or its payout.

65. Further, Sutherland *admits it is charging all of its attorney's fees in this lawsuit to "operating expenses" of the Hamrick #3*. RR 4:74-75. Sutherland has charged to *"operating expenses" of the Hamrick #3 "this entire lawsuit basically*." RR 4:76. Also, Sutherland admitted he is billing out his time spent on the lawsuit at $800 per hour, and employee Wade Tidmore's time at $400 per hour, to the Hamrick #3 "operating expense". Id. Sutherland admits that every dollar he spends on this lawsuit he is reducing the revenue of the Hamrick #3 by one dollar in the payout calculation. RR 4:84. Sutherland cavalierly believes it has total "discretion on expenditures" it attributes to the Hamrick #3 payout. RR 4:85-86.

54

Through the end of May, 2015, Sutherland, had charged approximately $103,000.00 in lawsuit expenses and Sutherland employee time and expenses regarding the lawsuit to the initial earning well payout calculation. RR 4:88. No authority was presented to the trial court to justify such charges. Sutherland's external and internal litigation expenses are being charged as part of the "miscellaneous" expense line item under well "operating expense." RR5: P1. Exh. 4-6; RR6:Def. Exh. 4, P. 89-90. In months when that line item exceeds $80.00, litigation expenses are being charged as "operating expense" and delaying the Hamrick #3 payout. *Id*. Examples of such improper charges are in Exhibits 94-99, 101 to Sutherland's deposition ["litigation" expense charge]. CR 1580-1585, 1587; RR6:Def. Exh. 94-99, 101. Showing how Sutherland decided (on a salary plus benefits basis) to charge his time, and his employees' time shown in Exh. 100 to Sutherland's deposition. CR 1586.

66.     Expenses of litigation are not recoverable from an adverse party unless expressly provided by statute or contract. *Eberts v. Businesspeople Pers.*, 620 S.W.2d 861, 864 (Tex.Civ.App.-Dallas 1981, no writ); *Hammonds v. Hammonds*, 313 S.W.2d 603, 605 (Tex.1958). "This rule applies to a litigant's loss of time." *Eberts*, 620 S.W.2d at 863; *Phillips v. Latham*, 523 S.W.2d 19, 27 (Tex.Civ.App.-Dallas 1975, writ ref'd n.r.e.). There is no contract provision that

55

authorizes Sutherland's charging of external or internal litigation costs to the Hamrick #3 payout.

67. The "effect" of Sutherland's above-cited breaches of contract are in evidence. Sutherland admitted the Hamrick #3 working interest well revenue exceeded the cost to drill and complete the well *by early November, 2013*. RR6:Def. Exh. 4, P. 141-142. He also admitted that two times payout would have been reached by April 2014, if Sutherland had not spend money on something else. *Id*; *See* also Exh. 77 to Sutherland's Deposition, CR 1546; RR6:Def. Exh. 77. In creating "payout statements" beginning in early 2014, Sutherland improperly coached his employees how to attribute their "time" to the "Hamrick Prospect" and then charge it such well. Exhs. 80, 84, 85, 86 to Sutherland's deposition, CR 1549, 1553, 1554, 1555. Rod Sutherland displayed his attitude when he said "in essence half the money we spend is being paid for by Mr. Dimock and the other half is being paid by some Christian charity." Exh. 87 to Sutherland's deposition, CR 1556. He further referred to it as "good return on the money we spend." *Id*. He expressly sanctioned the unlimited spending spree with Hamrick #3 proceeds and delighted in pocketing another dollar for every dollar he spent.

68. Further, Sutherland admits it has duty to act in good faith as to Dimock (CR 1474), but proceeded to spend Dimock's and the Christian Charities' money and endlessly delay payout of the Hamrick #3. The nature of the needed

56

limited seismic represented by Sutherland to Dimock leading up to the 2012 Agreement is reflected in an email of Rod Sutherland which is Exh. 40 to Sutherland's Deposition (CR 1501), which Deposition was attached to Defendants' Response to Plaintiff's Amended Application for Temporary Injunction (CR 1439). Limited seismic was represented as being needed to "determine an optimum location" for the Roy Hamrick #1 replacement well, which turned out to be *the Hamrick #3*. *See* also, Exhibits 41 and 42 to Sutherland's deposition, CR 1503, CR 1505. Dimock's position is that seismic and land costs were included in the initial earning well payout in case Sutherland had to pay some land or seismic costs *for that initial earning well*. RR 5:Pl. Exh. 11, P. 202. The evidence shows *no such land expenses or seismic expenses were even needed for such Initial Earning Well*. Sutherland's unending spending spree for unrelated land and seismic costs is breach of the duty to act in good faith under the Operating Agreement and is also a breach of Sutherland's fiduciary duties to Dimock as to the Hamrick #3 proceeds.

69. Sutherland violated Article VI, D, of the Operating Agreement by charging to the subject well, and Dimock, sums in excess of $25,000 (in fact, over $2.4 million) for a project that was not drilling, sidetracking, reworking, deepening, completing, recompleting, or plugging back of the Hamrick #3, the Initial Earning Well.

57

70. Further, Sutherland has violated Section 2.1 of Exhibit A to the Agreement, that "all operations conducted by Farmee regarding the Initial Earning Well, until such time as "project payout" is reached . . *shall be at Farmee's sole cost and risk*." CR 17. Sutherland has not borne the cost and risk of his land acquisitions outside the Dimock leasehold, and the cost and risk of his seismic expenses. Dimock and the charities have been erroneously charged all those expenses and have received zero benefit from them.

71. There is a fact issue every month of 2014 and 2015 whether Sutherland breached the Agreement with Dimock by charges which exceed the $25,000 limit on non-drilling, etc. expenses or projects. *Cone v. Fagadau Energy Corp.*, 68 S.W.3d 147 (Tex. App. – Eastland 2001, pet. den.).

72. There is a fact issue each month, beginning in April 2014, whether Sutherland breached the Agreement by charging and/or recouping from the working interest proceeds of the Hamrick #3, Sutherland's legal expenses and costs in this lawsuit, including "internal" lawsuit expenses and external legal expenses.

73. There is also a fact issue as to Hamrick #3 payout. An expert's opinion testimony can defeat a summary judgment claim as a matter of law. *Burrow v. Arce*, 997 S.W.2d 229, 235 (Tex. 1999). Dimock attached to its summary judgment response, the Affidavit of Gregg Morgan, a CPA. CR 333. As

was stated in Mr. Morgan's report, he reviewed the evidence in this case and he is of the opinion that the Hamrick #3 reached payout in March, 2014. Further, the Affidavit of Joe W. Dimock, raises fact issues as to breach of contract and breach of fiduciary duty by Sutherland. His Affidavit, which was attached to his summary judgment response, was later incorporated into Dimock's injunction response. CR 324. As shown in that Affidavit, the intent was for the Agreement and Operating Agreement to constitute a single agreement. Part of the agreement was the parties agreed to a $25,000 non-drilling, etc. project limit. Further, Dimock, who is an oil and gas lease operator, confirmed that "land costs" and "seismic costs" are not costs that are "drilling, Sidetracking, Reworking, Deepening, Completing, Recompleting or Plugging Back" costs as those terms are used in the oil and gas industry. Further, Dimock expressed his opinion that payout of the Hamrick No. 3 well occurred in March, 2014. Such evidence raises fact issues which should have precluded the trial court from granting the erroneous partial summary judgment to Sutherland, and from granting the subject erroneous injunction when fact issues were present as to breach of contract.

74. No evidence was ever presented by Sutherland that land expenses or seismic expenses are "drilling" expenses. Sutherland admitted in Response to Requests for Admission that land expenses and seismic expenses are not any of the other 6 categories of expenses not subject to the $25,000 project limit. Therefore,

the subject disputed expenses (in sums already in excess of $2.4 million), are either judicially admitted not to be, or not proven to be, the types of expenses that are not subject to the $25,000 limit. All such charges in excess of the $25,000 limit are evidence of a breach of contract by Sutherland, and a breach of Sutherland's fiduciary duty to Dimock as to Hamrick #3 proceeds.

## X. Injunctive Relief Not Available to Party Guilty of Inequitable Conduct, Laches, and Unclean Hands

75.    The evidence outlined in this Brief also shows Sutherland is guilty of inequitable conduct, laches and unclean hands, which also precludes a grant of injunctive relief. *Landry's Seafood Inn & Oyster Bar - Kemah, Inc. v. Wiggins*, 919 S.W.2d 924, 927 (Tex. App.–Houston [14th Dist.] 1996, no writ).

## Y. No "Repudiation" by Dimock

76.    In the findings stated in the Temporary Injunction Order, the court found that Dimock has repudiated the Agreement. CR 1596. Repudiation is a question of fact. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 756 (Tex. 2003). To establish repudiation, first a party has to plead repudiation, and then the party has the "affirmative burden of establishing that they had actual notice of [the repudiation] and that, in reliance thereon, operations were suspended…" *Atlantic Richfield Co. v. W.O. Hilton*, 437 S.W.2d 347, 355 (Tex.Civ.App.-Tyler 1969, no writ). In this case, Appellee has *not* pled repudiation, and there is, at the very least, a fact issue whether there has been repudiation. Sutherland's only presented

60

"proof" of unpleaded repudiation is the June, 2015 letter from Attorney Lovell discussed in detail in Section ___ of this Brief. That letter merely expresses counsel's opinion that Sutherland has breached the parties' contract and his client will continue to pursue its lawful remedies for such breaches.

77. Repudiation requires evidence that "the lessor must have asserted a clear, unequivocal challenge to the lessee's title to, and interest in the lease." *Atkinson Gas Co. v. Albrecht*, 878 S.W.2d 236, 239 (Tex.App.-Corpus Christi 1994, writ denied). Texas courts have a narrow view of what constitutes unequivocal notice of forfeiture or a positive challenge to lessee's title to the lease, refusing to find unequivocal notice in the recording of top-leases, the remittance of *letters stating opinions about the status of leases*, or the act of shutting in a well. *Atkinson Gas*, 878 S.W.2d at 239; *Atlantic Richfield*, 437 S.W.2d at 354-55.

78. In *Atlantic Richfield*, the court found that the statement by lessors' attorney that the lessors were of the opinion that Atlantic did not have a lease was *not* a repudiation. *Id.* at 353. The lessors were merely informing the lessee of their subjective opinion regarding the status of lessee's lease. The statements did not repudiate the lease. *Id.*

79. The court went further to find that Atlantic Richfield's *continued operations on the lease* showed a lack of repudiation. *Id.* at 355. At the time of the injunction hearing, Sutherland had continued operating the Hamrick #3, and

retaining its the working interest proceeds, *for over a year* after Dimock alleged that Sutherland is in breach of the Agreement. There is no evidence, or insufficient evidence, of repudiation of the Agreement by Dimock.

**Z.    Injunction Improperly Restrains Right to Relief for Future Breaches of Contract**

80.    The temporary injunction order fails to provide for the possibility that Sutherland may breach the agreement after the date of the injunction order, and fails to protect Dimock's legal right to seek redress in court for such breach, including termination of the contract. *B & A Pipeline Co. v. Dorney v. Enserch Corporation*, 904 F.2d 996, 1002 (5th Cir.1990). The trial court wholly failed to consider that Dimock and Sutherland are still doing business and to protect Dimock from future breaches of contract by Sutherland. Future breaches could affect and/or eliminate any "option" of Sutherland to drill an additional well.

81.    Further, the provisions compelling an *assignment of acreage* also violate this legal principle. Sutherland could drill a well after November 19, 2015 or a well that does not produce in paying quantities and still demand a lease assignment from Dimock (i.e. an assignment not available under the Agreement). If Sutherland breaches the Agreement or the Operating Agreement after the date of the order and before "final hearing and determination of this cause," the order compels Dimock to still assign his leasehold acreage to a breaching party. And,

who knows what language Sutherland might insert into such as-of-yet, non-existent document?  Such order is an abuse of discretion.

**AA.  Injunction Erroneously Granted Without Joinder of Necessary Parties**

82.  All parties whose rights will be directly affected by the writ of injunction are to be included in any injunction proceeding.  *Ladner v. Reliance Corp.*, 293 S.W.2d 758, 764-65 (Tex. 1956).  All parties to a contract are to be included in an injunction proceeding if the applicant is seeking to restrain enforcement of a contract.  *McCharen v. Bailey*, 87 S.W.2d 284-85 (Tex. App. - Eastland 1935, no writ).  Despite Dimock's objection that Sutherland failed to join or even notify necessary parties (CR 1304), the trial court erroneously granted a Temporary Injunction without notification to the parties to whom Sutherland contracted to assign a working interest in the Hamrick #3, and without notification to the charities who own 49% of the working interest in the Hamrick #3 because the subject well paid out in 2014.

**BB.  Inadequate Bond**

83.  The trial court erred in entering the Temporary Injunction Order with a bond of only $15,000.00.  RR 4:138.  Dimock had requested that the bond be at least $1,000,000.00.  RR 4:136.  The amount of the bond is subject to appellate court review.  Tex. R. Civ. P. 684.  To protect the adverse party, the amount of the bond must relate to the potential damages in the lawsuit.  *El Paso Dev. Co. v.*

*Berryman*, 729 S.W.2d 883, 888-89 (Tex.App.-Corpus Christi 1987, no writ). At the time of the July, 2015 injunction hearing, Sutherland had already withheld from Dimock and the Christian Charities over $3,000,000.00 in working interest revenue from the Hamrick #3, and the trial court was authorizing unlimited drilling into the future (beyond the end of the stated term of the Agreement) on Dimock's oil and gas leaseholds, over the express objection of Dimock. Further, Dimock showed Sutherland did not have assets to pay back the sums already withheld from Dimock if the case is reversed on appeal, much less the additional sums owed as to wells the trial court was "authorizing" Sutherland to drill into the indefinite future. The subject order authorizes unlimited drilling, unlimited charging of expenses for additional wells, and authorizes Sutherland to keep the working interest revenue from such future wells. When a well is drilled by a trespasser who has notice of the objection of the oil and gas leaseholder, the oil and gas leaseholder does not owe the drilling and completion costs of such a well. *Liles v. Thompson*, 85 S.W.2d 784 (Tex. Civ.App.-El Paso 1935, writ dismissed). There is no legal basis for Sutherland to recoup from Dimock any costs of new wells drilled on Dimock's leaseholds after November 19, 2015, or to retain any well revenue from such wells, but the trial court erroneously authorized such extra-contractual drilling, without a sufficient bond to repay Dimock when such erroneous injunction is reversed.

64

84.    A $15,000.00 bond is wholly inadequate to compensate Dimock as to new wells the court authorized Sutherland to drill outside the term of the Agreement, and to compensate Dimock for the loss of the right to drill wells on his own leases after November 19, 2015.

## CC.  Error to Deny Dimock Injunctive Relief

85.    As shown by the evidence outlined in this Brief, the trial court erred when it denied Dimock's Application for Temporary Injunction.  Such Injunction would have upheld the Agreement of the parties, and preserved the status quo by preventing Sutherland from obtaining *and spending* Dimock's 51% and the Christian Charities' 49% working interest revenue of the Hamrick #3.  Such Injunction would have stopped Sutherland from charging Dimock for land and seismic costs in excess of $25,000 (which are now $2.4 million and still climbing). Dimock established that Sutherland, a start-up company, does not have the assets to repay Dimock and the Christian Charities when Dimock prevails on appeal as to the interpretation of the Agreement and as to Sutherland's breaches of contract, and Sutherland has made no attempt whatsoever to do an internal suspense of Hamrick #3 revenue to repay Dimock, or the Christian Charities.  Dimock established breaches of contract by Sutherland on a monthly basis from April 2014 until the date of the injunction hearing in July 2015.  Damages to Dimock in excess of $1.5 million had already been caused by Sutherland, which has insufficient

assets to repay those damages.  Further, as the evidence outlined above showed, if a receiver had been appointed to operate the well, as was requested by Dimock in its Application for Temporary Injunction, the improper charging of Sutherland's legal expenses and internal "lawsuit expenses" (already in excess of $100,000) to "operating expenses" of the Hamrick #3 would be stopped.

## CONCLUSION AND PRAYER

Dimock prays that, upon hearing, this Court reverse the Temporary Injunction Order of July 7, 2015, reverse the July 9, 2015 Order denying Dimock's Application for Temporary Injunction and grant such injunction, and Dimock prays that this Court find that, as a matter of law, the $25,000 limit in the Agreement applies to land and seismic expenses, find that the Hamrick #3 paid out in March, 2014, and remand this cause for further proceedings consistent with such rulings. Dimock prays for such other and further relief to which Dimock may be entitled.

DATED this 19th day of October, 2015.

66

Respectfully submitted,

Lovell, Lovell, Newsom & Isern, L.L.P.
John H. Lovell, SBN 12609300
(john@lovell-law.net)
Barbara A. Bauernfeind, SBN 08190500
(barbara@lovell-law.net)
112 West 8th Avenue, Suite 1000
Amarillo, Texas  79101-2314
Telephone:  (806) 373-1515
Facsimile:  (806) 379-7176


By: */s/ John H. Lovell*
      John H. Lovell

ATTORNEYS FOR DIMOCK

67

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Tex. R. App. P. 9.4 because it contains 14,590 words as determined by the computer software's word-count function, excluding the parts of the brief exempted by Tex. R. App. P. 9.4(i)(2)(B).

2.      This brief complies with the typeface requirements of Tex. R. App. P. 9.4(e) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2007 in 14 point Times New Roman font.

Dated:  October 19, 2015.

*/s/ John H. Lovell*
John H. Lovell

## CERTIFICATE OF SERVICE

       I hereby certify that a true and correct copy of the foregoing document was delivered, as certified below, this 19th day of October, 2015 to:

Cornell Curtis                                   *via email: vernonlaw@sbcglobal.net*
CORNELL D. CURTIS, P.C.
1716 Main Street
Vernon, TX 76384

Jerry L. Ewing, Jr.                           *via email: jerry.ewing@wbclawfirm.com*
Nathan R. Cash                            *via email: nathan.cash@wbclawfirm.com*
WALTERS, BALIDO & CRAIN, L.L.P.
10440 North Central Expressway
Dallas, TX 75231

Chris Lehman                           *Via email: clehman@malonelawtx.com*
MALONE LAW FIRM
1901 Lamar Street
P. O. Box 953
Vernon, TX 76385

Stanley Watson                               *Via email: srwatson1@att.net*
307 Main Street
P. O. Box 506
Quanah, TX 79252-0506

Mr. Ryan S. Mindell          *Via email: r*yan.mindell@texasattorneygeneral.gov
Texas Attorney General
P. O. Box 12548
Austin, TX 78701

                                          */s/ John H. Lovell*
                                          John H. Lovell

# No. 07-15-00297-CV

## COURT OF APPEALS
## SEVENTH DISTRICT OF TEXAS

_____

### DIMOCK OPERATING COMPANY, and
### JOE W. DIMOCK, D/BA DIMOCK PETROLEUM,

*Appellants*,

v.

### SUTHERLAND ENERGY CO., LLC

*Appellee.*

_____

*On appeal from Cause No. 11,098*
*46th District Court, Hardeman County, Texas*
*Hon. Dan Mike Bird, Judge Presiding*

# APPENDIX TO BRIEF OF APPELLANT

| | | |
|---|---|---|
| A | Temporary Injunction Order dated July 7, 2015 | CR 1590-92 |
| B | Order Denying Defendant's Application for Temporary Injunction dated July 9, 2015 | CR 1599 |
| C | Seismic Exploration and Farmout Agreement dated November 20, 2012 with Joint Operating Agreement | CR 12-62 |
| D | Partial Summary Judgment dated December 19, 2014 | CR 1286-87 |
| E | Sutherland Lease Operating Statement for the Hamrick #3 well through March, 2014. | CR 140, 141 |
| F | Sutherland Authority for Expenditure of Drilling and Completion Costs for the Hamrick #3 well | CR 142-146 |
| G | Dimock letter demanding 51% working interest and operations of the Hamrick #3 well dated April 21, 2014 | CR 65-66 |

| | | |
|---|---|---|
| H | Sutherland "Hamrick Prospect Payout Estimation" as of the end of May, 2015. | RR 5:PL Ex.2 |
| I | Sutherland "Hamrick Prospect Capital Costs" as of the end of May, 2015. | RR 5:PL Ex. 3 |
| J | Excerpts of Rod Sutherland's Deposition. | |

Respectfully submitted,

Lovell, Lovell, Newsom & Isern, L.L.P.
John H. Lovell, SBN 12609300
(john@lovell-law.net)
Barbara A. Bauernfeind, SBN 08190500
(barbara@lovell-law.net)
112 West 8th Avenue, Suite 1000
Amarillo, Texas  79101-2314
Telephone:  (806) 373-1515
Facsimile:  (806) 379-7176


By: /s/ John H. Lovell
      John H. Lovell
ATTORNEYS FOR APPELLANTS

# Cause No. 11098

| | |
|---|---|
| Sutherland Energy Co., LLC, | IN THE DISTRICT COURT |
| Plaintiff, | |
| v. | |
| Dimock Operating Company and Joe W. Dimock d/b/a Dimock Petroleum, | HARDEMAN COUNTY, TEXAS |
| Defendants. | 46th JUDICIAL DISTRICT |

## Temporary Injunction Order

On July 2, 2015, the Court heard Plaintiff's Amended Application for Temporary Injunction. Plaintiff and Defendants appeared in person and/or through their attorneys and announced ready.

After considering the pleadings, Plaintiff's sworn amended application for injunctive relief, the evidence, and arguments of counsel, the Court is of the opinion that the application should be GRANTED.

The Court FINDS that Defendants have repudiated the parties' respective rights and obligations under the Seismic Exploration and Farmout Agreement regarding the drilling of additional wells on the Subject Leases, or on acreage pooled therewith, intending to harm Plaintiff and effectively depriving Plaintiff of the ability to drill such additional wells before the expiration of the drilling deadline.

The Court FINDS that if Defendants were to interfere with drilling operations that are underway or withhold the required assignment of drilling unit acreage after Plaintiff has drilled and completed a well as a producer, the consequences would be disastrous to Plaintiff and irreparably deprive it of its benefit of the bargain under the Agreement.

The Court FINDS that the harm to Plaintiff is imminent, and that if Defendants are not immediately enjoined as provided herein, Plaintiff's time for drilling additional

TEMPORARY INJUNCTION ORDER
*Sutherland Energy Co., LLC v. Dimock Operating Company, et al*

The 7th day of July 2015
at 3:30 o'clock
PAGE 1 OF 3

1590

wells on the Subject Leases, or on acreage pooled therewith, will expire before a full trial can be held on the merits of the parties' claims.

The Court FINDS that if Defendants are not immediately enjoined as provided herein, Plaintiff will be irreparably injured because the loss of the right and opportunity to drill additional wells on the Subject Leases, or on acreage pooled therewith, is unique, irreplaceable, and cannot be measured by any certain pecuniary standard.

IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED that the clerk of this Court issue a writ of injunction pending final hearing and determination of this cause enjoining Defendants and their officers, agents, servants, employees, representatives, and those persons in active concert or participation with them who receive actual notice of this Order from:

1. Communicating to investors, lenders, partners, mineral owners, surface owners, working interest owners, employees, contractors, service providers, purchasers of production, and other third parties not involved in the litigation that Plaintiff is a trespasser or lacks the authority to drill and produce additional wells on the Subject Leases, or on acreage pooled therewith;

2. Physically interfering with Plaintiff's drilling operations or other activities on the Subject Leases, or on acreage pooled therewith;

3. Attempting to deny Plaintiff access to the Subject Leases, or on acreage pooled therewith;

4. Withholding the acreage assignment required by Section 5.4 of the Seismic Exploration and Farmout Agreement in the event Plaintiff completes an additional well as a producer of oil or gas in paying quantities.

Prior to the issuance of the writ of injunction, Plaintiff shall file with the clerk a bond in the sum of $15,000 payable to Defendants, approved and conditioned as the law requires.

It is further ordered that the cause be set for trial on the merits with respect to the ultimate relief sought in the 46th District Court of Hardeman County at 9:00 a.m. on February 8, 2016.

SIGNED on July 7, 2015.

Dan Mike Bird
PRESIDING JUDGE

# Cause No. 11098

| | |
|---|---|
| **Sutherland Energy Co., LLC,** | IN THE DISTRICT COURT |
| Plaintiff, | |
| v. | |
| **Dimock Operating Company and Joe W. Dimock d/b/a Dimock Petroleum,** | HARDEMAN COUNTY, TEXAS |
| Defendants. | 46th JUDICIAL DISTRICT |

## Order Denying Defendants' Application for Temporary Injunction

On July 2, 2015, the Court heard Defendants' application for temporary injunction. After considering the pleadings, Defendants' application for injunctive relief, the evidence, and arguments of counsel, the Court is of the opinion that the application should be DENIED.

It is, therefore, ORDERED, ADJUDGED AND DECREED that Defendants' request for temporary injunctive relief is DENIED.

Signed July 9, 2015.

Honorable Dan Mike Bird
PRESIDING JUDGE

FILED
The _13th_ day of _July 2015_
at _9:00_ o'clock _a_ M.
ELLEN LONDON
Clerk, District Court, Hardeman County, Texas

1599

# SEISMIC EXPLORATION AND FARMOUT AGREEMENT

This agreement is by and between Dimock Operating Company, including Joe W. Dimock and also dba Dimock Petroleum, (Farmor) whose address is 4245 Kemp Blvd., Suite 518, Wichita Falls, TX 76308 and Sutherland Energy Co., LLC (Farmee) whose address is 500 Lamar Court, Irving, Texas 75038.

Whereas, Farmor and Farmee desire to enter into an agreement pursuant to which Farmee shall have the right to earn certain of Farmor's rights under the oil and gas leases described below, subject to all terms, reservations and conditions set forth herein. This Seismic Exploration and Farmout Agreement ("Agreement") is between Farmor and Farmee and shall be effective on the date it is executed by Farmee as provided in Section 9.

Now, therefore, in consideration of the mutual covenants and agreements herein contained, Farmor and Farmee agree as follows:

## I. LANDS AND LEASES.

1.1    Subject Leases.    Farmor represents, but does not warrant title expressly or impliedly, they are the owner of certain rights in and to the Oil and Gas Mineral Leases (Subject Leases) described on Exhibit "B" attached hereto.

1.2    Exclusive Right to Explore and Lease.    As of the Effective Date and until the termination of this Agreement, Farmee shall have the sole, exclusive, absolute, and irrevocable right to lease oil and gas interests in and under the Lands, and Farmor shall not grant, let, or lease (including any renewals, extensions, amendments or modifications of Existing Leases) to any Person (other than Farmee) the right to investigate, explore, prospect, or drill for or produce oil and/or gas or conduct exploration, geologic operations and geophysical surveys on the Subject Leases (except in accordance with the terms and conditions of existing Subject Leases) without Farmee's prior written consent, which consent may be granted or withheld by Farmee in its sole discretion.

1.3    Reservations.    Farmor expressly reserves and excepts from the terms of this Agreement any and all rights and interests to and operations of existing well bores, disposal wells, and surface equipment and personalty located in, on or under the Subject Leases (except as provided in 10.2 of Exhibit A).

## II. SEISMIC EXPLORATION.

2.1    Operations.    Farmor grants to Farmee the sole, exclusive, and irrevocable right to conduct Seismic Exploration Operations on, under, and in the Subject Leases during the term of this Agreement, including any appropriate or necessary related rights of ingress and egress. In conducting all operations under this Agreement, Farmee shall use its sole discretion to determine the type, nature, timing, and extent of all Seismic Exploration Operations.

Farmee shall pay for damages, as appropriate, to the owner(s) of the surface on which the Seismic Exploration Operations are being conducted,

2.2    Ownership and Disclosure of Generated Information.    Farmor and Farmee shall each own full rights and interests in the Generated Information (raw seismic data). Farmee shall provide one (1) copy of the Generated Information to Farmor. Farmee shall retain possession and control of the original copies of the Generated Information. For three (3) years from the effective date of this Agreement and upon at least ten (10) days written notice, Farmor (including a representative) may have reasonable access to examine and review the Generated Information at Farmee's principal place of business or any other convenient place designated by Farmee.

From the effective date of this Agreement, both Farmor and Farmee acknowledge and agree that the Generated Information, Evaluation Material and all derivatives therefrom (including, without limitation, maps and other analyses), is and shall remain at all times secret, proprietary, and

12



confidential, and agree to disclose that information only in conformance with the confidentiality provisions as stated in Paragraph 2.5 of Exhibit A, or as otherwise agreed by the parties in writing.

## III. DRILLING OBLIGATION.

3.1     Initial Earning Well.  Farmee shall drill a well, (the "Initial Earning Well"), with the spud date being within two hundred forty (240) days of the effective date of this agreement (Deadline Date).  The surface location of the well must be within two thousand (2000) feet of the Farmor's Roy Hamrick No. 1 well surface location.   In the absence of a condition or event of force majeure, or termination of this Agreement prior to the Deadline Date, in accordance with the terms and conditions of this Agreement, Farmee agrees to drill or cause to be drilled a well to a depth of at least eight thousand seven hundred (8700) vertical feet from the surface of the ground or sufficient to test the Chappel formation, whichever is less.  If Farmee decides to sidetrack the wellbore of the Initial Earning Well to adequately test the Chappel formation the sidetrack hole will still be considered the Initial Earning Well for this Agreement.  However, if mechanical problems or impenetrable strata or other conditions in the hole make further drilling impracticable, under generally accepted oil field practices, a substitute well may be drilled as defined in Paragraph 2.6 of Exhibit A.  Completion operations for the Initial Earning Well must commence within thirty (30) days after the drilling rig is moved off location.

3.2     Earned Assignment.  As soon as practicable after Farmor is satisfied Farmee has complied with all of its obligations under this Agreement with regard to the completion of the Initial Earning Well as a producer of oil and/or gas in paying quantities, including the foregoing specifications, Farmor shall deliver to Farmee an acreage assignment as described in Paragraph 3.3 of all Farmor's interest within the "drilling unit", as defined in Paragraph 3.2 of Exhibit A, formed for the Initial Earning Well, from the surface to a depth of three hundred (300) feet below the deepest depth drilled in the Initial Earning Well, subject to Farmor reserving the back in interest described in Paragraph 4.1 below.  Such Assignment will be without warranty of any kind including title, whether express or implied.

3.3     Acreage Assignment.  If an acreage assignment is earned for the Initial Earning Well under Paragraph 3.2 it shall be limited to the "drilling unit" as defined in Paragraph 3.2 in Exhibit A.

## IV. INITIAL RESERVED INTEREST.

4.1     Conversion.   Upon "project payout" of the Initial Earning Well, as defined in Paragraph 4.2 of Exhibit A, Farmee shall deliver to Farmor operations of the Initial Earning Well and a fifty-one percent (51%) working interest, at Farmor's election, in the appropriate Earned Assignment defined in Paragraph 3.2 above.

## V. ADDITIONAL EARNING WELLS.

5.1     Farmee's Option.  Farmee shall have the right, but not the obligation, to drill additional wells (Additional Earning Well) on, or acreage pooled with, Subject Leases.

5.2     Vertical Wells.  For any "vertical" Additional Earning Well drilled, Farmee shall carry Farmor for a twenty-five percent (25%) working interest to production casing point.  Farmor will then have a casing point election as to whether to participate on a cost forward basis.  Production casing point shall mean such time as the well has been drilled, logged, evaluated and sufficient tests have been run in order that a determination may be made to either set production casing or to plug and abandon the well as a dry hole.

5.3     Horizontal Wells.  For any "horizontal" Additional Earning Well drilled, Farmee shall carry Farmor for a twelve and one half percent (12.5%) working interest through installation of production facilities or, at Farmor's option, Farmee shall assign to Farmor a net revenue interest of 8% as an overriding royalty interest (i.e. a net revenue interest of 8% of 8/8ths).

5.4    Additional Earned Assignment.   As soon as practicable after Farmee has completed an Additional Earning Well as a producer of oil and/or gas in paying quantities, Farmor shall deliver to Farmee an acreage assignment of all Farmor's interest within the "drilling unit" formed for the Additional Earning Well, from the surface to a depth of three hundred (300) feet below the deepest true vertical depth drilled in the Additional Earning Well, subject to Farmor reserving the carried interest described above.   Such Assignment will be without warranty of any kind including title, whether express or implied.

5.5    Acreage Assignment.   If an acreage assignment is earned for an Additional Earning Well under Paragraph 5.4 it shall be limited to the "drilling unit" as defined in Paragraph 3.2 in Exhibit A.


## VI. OPERATING AGREEMENT.

6.1    Form.   An AAPL Model Form 610-1989 Joint Operating Agreement is attached as Exhibit C of this agreement and the parties shall execute such Operating Agreement or an exact duplicate of same.  The Operating Agreement shall apply to all Earned Wells.  The Operating Agreement shall be subject to this Agreement so that in the event of any conflict between the Operating Agreement and this Agreement, this Agreement shall be the governing Agreement.


## VII. NOTICES AND WELL INFORMATION.

7.1    General.   All well data, information and notices to be given to Farmor as provided in this Agreement shall be given as follows:

Farmor:     Mr. Joe W. Dimock         Farmee:     Mr. Rod Sutherland
            Dimock Operating Co.                   Sutherland Energy Co., LLC
            4245 Kemp Blvd., Suite 518            500 Lamar Court
            Wichita Falls, TX 76308              Irving, TX  75038
            (940) 761-1071                        (469) 586-4393

Farmor or Farmee may change their address at any time by furnishing a written notice of change of address to the other party.


## VIII. AGREEMENTS AFFECTING FARMOUT LANDS.

8.1    Farmee Bound.   Except as may be otherwise provided in this Agreement, Farmee shall be bound by any written and appropriately executed agreement which affects the Subject Leases at the time of assignment to Farmee.

8.2    Other Agreements.   Subject to the disclaimer of liability contained in Section 8.1 above, Farmor believes in good faith that the only other agreements affecting any interest to be assigned to Farmee are the oil and gas leases described in Exhibit B and the following agreements:

None known other than those that may have been filed of record.

③

## IX. EXECUTION.

9.1    Execution. Duplicate originals of this Agreement are being signed. This Agreement shall be null and void at Farmor's option if one of the duplicate originals of this Agreement is not signed by Farmee and returned to Farmor within ten (10) days after the date shown below Farmor's signature.

FARMOR:    Dimock Operating Co.
                   Joe W. Dimock dba
                   Dimock Petroleum

FARMEE:    Sutherland Energy Co., LLC

By: _____
      Joe W. Dimock

By: _____
      Rod A. Sutherland

Title: Individually and DBA Dimock Petroleum
      And as President of Dimock Operating
      Company

Title:  President

Date: _November 20, 2012_

Date: November 20, 2012

## ACKNOWLEDGMENT

**STATE OF TEXAS**

**COUNTY OF** _Wichita_

This instrument was acknowledged before me on this _22_ day of November, 2012 by Joe W. Dimock in the capacities stated.

_____
NOTARY PUBLIC, STATE OF TEXAS

SHIRAH SHARP
Notary Public, State of Texas
My Commission Expires
August 13, 2016

## ACKNOWLEDGMENT

**STATE OF TEXAS**

**COUNTY OF DALLAS**

This instrument was acknowledged before me on this _20_ day of November, 2012 by Rod A. Sutherland in the capacity stated.

_____
NOTARY PUBLIC, STATE OF TEXAS

JENNIFER L NERIA
My Commission Expires
June 5, 2016



15

**EXHIBIT A**
**TO SEISMIC EXPLORATION AND FARMOUT AGREEMENT**

**GENERAL TERMS AND CONDITIONS**

**TABLE OF CONTENTS**

Paragraph

1.  Title and Access to Farmout Lands
    1.1   Title Information
    1.2   Other Information in Farmor's Possession
    1.3   Access by Farmee and Farmor

2.  Conduct of Operations
    2.1   Cost and Risk
    2.2   Performance Standards
    2.3   Lease Obligations
    2.4   Well Information
    2.5   Confidentiality
    2.6   Substitute Wells

3.  Earned Assignment
    3.1   Scope of Assignment
    3.2   Drilling Unit
    3.3   Pooling and Spacing
    3.4   Default by Farmee

4.  Initial Earning Well Reversionary Working Interest
    4.1   Production Revenue
    4.2   Project Payout and Monthly Statements
    4.3   Audits

5.  Liability and Insurance
    5.1   Relationship of Parties
    5.2   Farmee's Indemnity
    5.3   Required Insurance Coverage

6.  Assignments, Encumbrances and Restrictions

7.  Reassignment Rights of Farmor
    7.1   Termination or Cancellation of Leases
    7.2   Abandonment of Wells

8.  Renewals and Extensions

9.  Term of Seismic Exploration and Farmout Agreement

10. Miscellaneous
    10.1   Electric Logs
    10.2   Existing Tank Battery
    10.3   Taxes
    10.4   Income Tax Provisions
    10.5   Furnishing Data
    10.6   Severability
    10.7   Force Majeure
    10.8   Information Provided
    10.9   Farmee's Experience
    10.10  Disclaimer

# GENERAL TERMS AND CONDITIONS

## 1. Titles and Access to Farmout Lands.

1.1    Title Information. Upon request by Farmee, Farmor shall make available to Farmee copies of all title opinions, abstracts of title, and other title information in Farmor's possession with respect to the Subject Leases. Providing such items shall not be construed as a warranty or representation by Farmor of title or ownership. Any curative work or additional title examination required by Farmee shall be conducted by Farmee at its sole cost and risk. On request, Farmee shall provide Farmor with a copy of all curative work, title information, and title opinions resulting from any additional title examinations conducted by Farmee.

1.2    Other Information in Farmor's Possession. Farmor agrees to provide to Farmee (at Farmee's sole cost and expense) all information of the nature generally described as follows which relates to the Subject Leases which the Farmor may have in its possession or control: oil and gas leases, maps, plats, geological and geophysical information, well logs, and land records.

1.3    Access by Farmee and Farmor. To the extent Farmor can authorize it, Farmee and its contractors and subcontractors shall be entitled to exercise all of Farmor's rights of ingress and egress pertaining to the Subject Leases for the purpose of conducting operations. Farmor shall advise Farmee of any unusual limitations or restrictions on ingress or egress, known to Farmor, and Farmee and its contractors and subcontractors shall comply with such limitations or restrictions. During Farmee's operations Farmor and Farmor's representatives shall have access at all times to the well-site, including the derrick floor, for the purpose of observation. All information requested by Farmor concerning operations shall be promptly furnished by Farmee.

## 2. Conduct of Operations.

2.1    Cost and Risk. All operations conducted by Farmee regarding the Initial Earning Well, until such time as "project payout" is reached (as defined in Exhibit A, 4.2 (c)) shall be at Farmee's sole cost and risk. All operations conducted by Farmee regarding Additional Earning Wells up to production casing point for a vertical well and through installation of production facilities for a horizontal well shall be at Farmee's sole cost and risk.

2.2    Performance Standards. Farmee's operations shall be conducted in a diligent and workmanlike manner, and in accordance with applicable federal, state and local laws, regulations, and orders. Whether or not the Initial Earning Well, and any other well drilled by Farmee, is completed as a producer of oil and/or gas in order to earn an assignment, Farmee shall use its best efforts, in accordance with good oil and gas practice, to complete the well as a producer of oil and/or gas in paying quantities. If the well cannot reasonably be completed as a producer of oil and/or gas, Farmee shall promptly plug the well and perform all necessary surface restoration work.

2.3    Lease Obligations. Except as otherwise provided in the body of this Agreement, Farmee shall at its sole cost, risk, and expense comply with all of the express and implied covenants and other obligations of the oil and gas leases covering the Subject Leases, including the payment of royalties, shut-in royalties, and delay rentals, and the cost of any renewals or extensions of the leases.

2.4    Well Information. During Farmee's operations, Farmee shall promptly furnish Farmor the following information pertaining to the Initial Earning Well and any other well drilled by Farmee:

(a)    Written notice of the time and date on which the well is spud.

(b)    A daily drilling report for operations conducted during the immediately preceding day.

17

(c)     Written reports on all cuttings and cores taken in the well.

(d)     Reasonable advance notice of any production tests, pressure tests, cores, and logs to be run in the well so that Farmor may witness the operations.

(e)     Copies of all reports and other forms filed with any federal, state, or local governmental authority concerning the well.

(f)     A complete copy of any mud log and a complete copy of any electrical logs run on the well.

(g)     Copies of all fluid analyses and other reports or information obtained during drilling and completion of the well.

(h)     Any other information specifically required by Farmor as part of this Farmout Agreement.

2.5     Confidentiality.     The terms provided herein replace and supersede the previously executed Confidentiality Agreement by and between Sutherland Energy Co., LLC and Dimock Operating Company, including Joe W. Dimock personally and dba Dimock Petroleum, dated July 3, 2012. Farmee agrees to treat any information provided by or on behalf of Farmor and any derivative information prepared by or for Farmee based on the information in accordance with the provisions of this Agreement and to take or abstain from taking certain other actions hereinafter set forth.

a.     The term "Evaluation Material" shall be deemed to include (i) Generated Information as defined in Paragraph 2.2 of this Agreement, (ii) any workover reports, well logs, title opinions, lease descriptions, maps, interpretations, evaluations and reports regarding Subject Leases provided by Farmor to Farmee under this Agreement, and (iii) all notes, analyses, compilations, studies, interpretations or other documents prepared by or for Farmee which, contain, reflect, or are based upon, the information furnished to Farmee under this Agreement.

b.     The term Evaluation Material includes information in whatever form it may exist, whether oral, written, graphic, or electronic. The term Evaluation Material does not include information which becomes generally available to the public other than as a result of a disclosure by Farmee, or becomes available to Farmee on a non-confidential basis from a source other than Farmor or any of its Representatives.

c.     Farmee has the right to show Evaluation Material only to potential investors and working interest owners to promote participation in drilling wells within the Hamrick Area 3D Shoot. Prior to viewing the Evaluation Material any potential investor or working interest owner must sign a confidentiality agreement with terms similar to this Agreement. The Evaluation Material can only be viewed at Farmee's office or office of a contract geoscientist designated by Farmee or Farmor and no copies of the Evaluation Material shall be disseminated. It is incumbent upon the Farmee to protect the confidential nature of the Evaluation Material to the benefit of both the Farmor and Farmee notwithstanding termination of this Agreement.

d.     If Farmee is required to disclose such information by a court of law or other governmental entity having jurisdiction, Farmee will timely notify Farmor so that Farmor may take action to obtain the protection necessary to preserve the confidentiality of the Evaluation Material. Farmor reserves the right to assign all of its rights, powers and privileges under this Agreement, including, without limitation, the right to enforce all of the terms of this Agreement. In addition, this Agreement shall inure to the benefit of Farmor, its parent corporation, if any, and all subsidiaries thereof.

2.6     Substitute Wells.     If Farmee has failed to earn an assignment under the terms of this Agreement, either (i) because the Initial Earning Well failed to reach the required depth as a result of mechanical problems or impenetrable strata or other conditions in the hole which make further drilling impracticable, under generally accepted oil field practices; or (ii) because the Initial Earning Well was drilled to the required depth but it is not capable of producing in paying quantities, Farmee shall have the option, but not the obligation, to drill one or more substitute wells subject to the following provisions:

(a)     Farmee shall give Farmor written notice describing the status of the well and stating whether or not Farmee elects to drill a substitute well. This notice shall be given while the drilling rig or completion unit is on the well. Failure to timely make such an election shall be deemed to be an election by Farmee not to drill a substitute well.

(b)     If Farmee elects to drill a substitute well it shall spud within sixty (60) days after Farmee's election to drill it, and the well shall be drilled, tested, and completed or plugged and abandoned in accordance with all of the requirements specified for the Initial Earning Well, and with the same consequences. The substitute well shall be considered as the Initial Earning Well for all purposes of this Agreement.

## 3. Earned Assignment.

3.1     Scope of Assignment.  Any assignment of interest earned by Farmee shall be subject to all of the provisions of the Agreement and all its Exhibits, whether or not any of the provisions are recited in the assignment. Farmor shall retain all rights and interests not expressly assigned to Farmee. The assignments shall be without warranty of title, express or implied, but the assigned interest shall be free and clear of all royalties, overriding royalties and other such payments out of production, except those in existence as of the effective date of the Agreement.

3.2     Drilling Unit.  Whenever an assignment relates to the "drilling unit" for an Earning Well (Initial or Additional Earning Well), the term "drilling unit" is deemed to mean the area within the surface boundaries of the drilling unit, spacing unit or proration unit, as the case may be, established or prescribed as of the date of the Agreement by field rules or special order of the appropriate regulatory authority for the objective reservoir to be tested or the reservoir in which the Earning Well is completed. In no case shall the unit size exceed one hundred sixty (160) acres for a well. However, for a horizontal drainhole well the unit size can be increased (above 160 acres) based upon the displacement of the horizontal drainhole as specified by the appropriate regulatory authority.

3.3     Pooling and Spacing.  Farmor agrees to allow pooling of Subject Leases, if permitted by the existing Oil and Gas Mineral Lease(s), with adjacent leases but only for any Additional Earning Wells. The pooled unit must consist of acreage from which at least half is contributed by the Subject Leases if sufficient non-producing acreage on the Subject Leases is available. By signing this Agreement Farmor is not waiving its right to protest a Statewide Spacing Rule 3.37 exception as defined in Title 16, Part1, Chapter 3 of the Texas Administrative Code.

3.4     Default by Farmee.  Concurrent with approval of this document, by both parties, Farmee shall make a fifty thousand dollar ($50,000) deposit with Farmor. If Farmee spuds the Initial Earning Well by the Deadline Date the deposit will be refunded. If not, it will be forfeited and this Agreement shall automatically terminate without notice, effective as of the Deadline Date.

## 4. Initial Earning Well Reversionary Working Interest.

4.1     Production Revenue.  Income to be applied toward the project payout of the Initial Earning Well shall be based on the gross value of oil and gas produced and saved from the Initial Earning Well in proportion to the interest assigned.  For the purpose of this Agreement, "gross value" means the gross proceeds actually received by Farmee in an arm's length sale of the production.

4.2     Project Payout and Monthly Statements.     Beginning  within  six  (6)  months  of completion of Initial Earning Well Farmee shall provide a monthly statement to Farmor reflecting the "project payout" status.

(a)     The Farmee's capital cost is defined as cost incurred by Farmee for land and seismic for the Hamrick Area 3D Shoot (defined in Exhibit B), a fifty thousand dollar ($50,000) prospect fee, and cost for drilling, testing, completing, and equipping, the Initial Earning Well.

(b)     The Farmee's revenue, which is the gross value of production as defined in Paragraph 4.1 above, less: (i) applicable production or severance taxes, and any federal excise

19

taxes; (ii) all royalties, overriding royalties, and other payments out of production which, as of the effective date of this Agreement, burden the interest assigned to Farmee; and, (iii) the cumulative monthly operating cost of the well, including ad valorem taxes.

(c)     When the Farmee's cumulative revenue equals two (2) times the Farmee's capital cost the Initial Earning Well will have reached "project payout". At that time, as stated in Paragraph 4.1 of this Agreement, the Farmee will turnover operations of the Initial Earning Well and assign fifty-one percent (51%) working interest, at Farmor's election, in the Initial Earning Well and drilling unit to the Farmor.

(d)     Concurrent to the "project payout" in Paragraph 4.2(c) above the Farmee will also assign the remaining forty-nine percent (49%) working interest to one or more 501(c)(3) nonprofit organizations of its choice subject to the Operating Agreement described in 6.1 of the Agreement.

4.3     Audits.     Upon written notice to Farmee, Farmor may, during normal business hours, audit Farmee's books and records relating to working interest payments and/or the calculation of payout. Such audit rights may be exercised at any time while project well(s) are producing and for a period of 24 months after project payout status has been achieved, despite an earlier termination of this Farmout Agreement.

## 5. Liability and Insurance.

5.1     Relationship of Parties.     In performing its obligations, Farmee shall be an independent contractor and not the agent of Farmor. Nothing in this Agreement shall be construed as creating a partnership or otherwise establishing joint or collective liability. The relationship of the parties for federal and state income tax purposes shall be as set forth in Paragraph 11.2 below, and shall be effective from and after the effective date of this Agreement.

5.2     Farmee's Indemnity.     Farmee shall indemnify and hold harmless Farmor and its employees and agents from all claims, demands, losses, and liabilities of every kind and character arising out of Farmee's performance or failure to perform under this Agreement, or the acts of or failure to act by Farmee's employees, agents, contractors and/or subcontractors.

5.3     Required Insurance Coverage.     At all times while Farmee has the right to earn an assignment of interest or is conducting operations on the Farmout Lands, Farmee shall maintain, at its sole cost, the following insurance coverage for its operations:

(a)     Worker's Compensation Insurance in full compliance with all applicable state and federal laws, unless the necessary insurance is carried by the Farmee's subcontractors.

(b)     Employer's Liability Insurance with limits of one million dollars ($1,000,000) per accident covering injury or death to any employee who may be outside the scope of the Worker's Compensation statute in the State of Texas.

(c)     Commercial (or Comprehensive) General Liability Insurance with combined single limits per occurrence (and general aggregate, if Applicable) of one million dollars ($1,000,000) for Bodily Injury and Property Damage, Including Property Damage from Blowout and Cratering, Completed Operations, and Broad Form Contractual Liability with respect to any contract that Operator may enter into hereunder.

(d)     Automobile Liability Insurance covering non-owned and hired automotive equipment with limits for Bodily Injury and Property Damage of not less than one million dollars ($1,000,000) covering all automobile equipment used in the operations contemplated hereunder.

(e)     Control of Well Insurance with total loss coverage for up to three million dollars ($3,000,000).

20

## 6. Assignments, Encumbrances and Restrictions.

This Agreement shall be binding on the respective heirs, successors, and assigns of Farmor and Farmee. Farmor may freely assign or encumber its interest at any time, but Farmee shall not assign or encumber its interest in the Initial Earning Well without the prior written consent of Farmor, which consent shall not be unreasonably withheld. Any attempt by Farmee to assign or encumber its interest without Farmor's prior written consent shall constitute a default under Paragraph 3.3 above. When an assignment or encumbrance is made, Farmee shall promptly furnish a copy to Farmor. Any rights to reassignment retained by Farmor shall be superior to all liens, encumbrances, debts, judgments, claims, overriding royalty interests, and production payment burdens and other obligations created or incurred by Farmee and asserted against any oil and gas lease that is the subject of this Agreement. Any interest in any oil and gas lease included in the Subject Leases reverting to Farmor or reassigned to Farmor shall be free and clear of all such liens, encumbrances, debts, judgments, claims, overriding royalty interests, and production payment burdens and other obligations.

## 7. Reassignment Rights of Farmor.

7.1    Termination or Cancellation of Leases. If at any time after an interest in any oil and gas lease is assigned to Farmee, and Farmee elects to surrender its interest in the lease, or allow the lease to expire by its terms, or subjects the lease to possible cancellation for failure to comply with any express or implied covenant, Farmee shall notify Farmor in writing at least sixty (60) days before the intended date of surrender or expiration, or as soon as practicable in the event of possible cancellation, and Farmor shall then have thirty (30) days to notify Farmee in writing of Farmor's election to reacquire such interest. If Farmor elects to reacquire the interest, Farmee shall promptly assign it to Farmor free and clear of all royalties, overriding royalty interests, and other payments out of production and any other lease burden, except those in existence as of the effective date of this Agreement and except those to which Farmor has consented. Upon such assignment, Farmor shall reimburse Farmee for Farmee's share of the estimated salvage value of any salvable equipment in and on any wells covered by the assignment, less estimated salvage costs. Farmor's failure to notify Farmee in writing shall be deemed an election to not reacquire the interest.

7.2    Abandonment of Wells. Farmee shall not plug and abandon any well without giving Farmor written notice at least sixty (60) days before the intended plugging date. Farmor shall then have fifteen (15) days to notify Farmee in writing of Farmor's election to take over the well. Upon giving that notice, Farmor shall own Farmee's interest in the well and the related equipment, along with any and all interest Farmee owns in the drilling unit for the well taken over, excluding any other producing wells and related equipment in the drilling unit, and excluding any depth intervals or formations which would not have been earned under this Agreement. As soon as practicable after that time, Farmee shall make such assignment to Farmor as may be necessary to evidence the foregoing. At that time, Farmor shall reimburse Farmee for the estimated salvage value of Farmee's salvable equipment in and on the well, less estimated salvage costs. Farmee shall have no further rights or obligations under this Agreement, except Farmee shall be liable for all actions which occurred prior to the effective date of the takeover. Farmor's failure to notify Farmee in writing shall be deemed an election by Farmor to not take over the well.

If Farmor's election to take over results in a diversity of ownership giving rise to a commingling of production with uncommon ownership, in Farmee's storage tanks, Farmor shall be responsible for and shall bear all cost of setting and connecting tanks and pipelines for production from the well taken over by Farmor, unless otherwise agreed upon.

## 8. Renewals and Extensions.

If any oil and gas lease included in the Subject Leases is extended or renewed in whole or in part by either party or their agents, during the term of the Agreement, this Agreement shall apply to such extension or renewal to the same extent as it would have applied to the original lease. For this purpose, any new lease covering an interest originally included in the Subject Leases and acquired within ninety (90) days after the termination of the original lease shall be considered an extension or renewal.

## 9. Term of Seismic Exploration and Farmout Agreement.

The Agreement shall be in effect for three (3) years from the effective date or until such time as: (i) Farmee's rights to earn an assignment of interest have expired without Farmee having earned an assignment; (ii) Farmee has earned an assignment of interest and neither Farmee nor Farmor have any further rights or obligations under the Agreement; or, (iii) this Agreement terminates pursuant to Paragraph 3.3 above as a consequence of Farmee's default.
3.4

## 10. Miscellaneous.

10.1  Electric Logs.  Farmee shall run an open hole electric log suite consisting of at least a gamma ray, induction, density, and neutron logs on the vertical section of any newly drilled well. The density and neutron logs may be limited to only potentially productive intervals. If the first attempt to log the hole is unsuccessful a hole conditioning trip with drill pipe must be made and a second attempt made to obtain electric logs. If well control or adverse hole conditions arise this requirement may be disregarded.

10.2  Existing Tank Battery.  Farmor shall allow Farmee free use of the currently existing tank battery and production facility near the Roy Hamrick #1 well as the production facility for the Initial Earning Well for up to ninety (90) days after initial production is obtained. If Farmee elects to continue using the production facility beyond the ninety (90) days Farmee shall make payment of twenty-five thousand dollars ($25,000) to Farmor to purchase the production facility. The Bill of Sale of such production facility will be on an "AS IS WHERE IS WITH ALL FAULTS" basis with no warranty whatsoever, whether express or implied.

10.3  Taxes.  Farmee shall pay when due all taxes, including, but not limited to, federal excise taxes, and state and local ad valorem, occupation, severance, excise, privilege or regulatory taxes, now or hereafter lawfully assessed against Farmee's interest in the Farmout Lands or the production attributable to Farmee's interest.

10.4  Income Tax Provisions.  If this Agreement is or may be construed as creating a partnership for federal or state income tax purposes, then, unless the parties expressly provide for a tax partnership in this Agreement, Farmee is authorized and directed to execute and file on behalf of all parties an election to be excluded from application of the provisions of Subchapter K, Chapter 1, Subtitle A of the current United States Internal Revenue Code, and any amendments, or to be excluded from application of any comparable provisions of state law. Each party agrees to furnish such additional evidence of that election as may be necessary or proper.

10.5  Furnishing Data.  Each party has the affirmative duty to timely supply adequate data to the other party when such data is necessary to comply with Federal, State or local reporting requirements.

10.6  Severability.  Any term or provision of this Agreement that is invalid or unenforceable in jurisdiction in which the Subject Leases are located shall be ineffective to the extent of the invalidity or unenforceability, without rendering invalid or unenforceable the remaining terms and provisions of this Agreement or affecting the validity or enforceability of any terms and provisions of this Agreement. If any provision of this Agreement is so broad as to be unenforceable, each provision shall be interpreted to be only as broad as is enforceable.

10.7    Force Majeure.    Conditions of force majeure shall limit the Farmee's obligation to perform under this Agreement for the duration of such condition, and shall extend the term of this Agreement by a period equal to the relevant force majeure period effected. "Force Majeure" shall mean any conditions or events which prevent Farmee from performing its obligations under this Agreement and that are not reasonably within the control of Farmee, and that by the exercise of due diligence, the Farmee shall not have been able to avoid or overcome, including without limitation, acts of God, rules, laws, and regulations, wars or warlike action (whether actual or impending), arrests, and other restraints of government (civil or military), blockages, insurrections, riots, epidemics, earthquakes, fires, sabotage or seizure by any government or other public authority, and any other such causes, whether of the kind herein enumerated or otherwise.

10.8 Information provided.    Farmor and Farmee acknowledge and agree that, notwithstanding anything herein to the contrary, all information made available to Farmee by Farmor is without representation or warranty as to the accuracy or completeness thereof.

10.9    Farmee's Experience.    Farmee represents that it is a knowledgeable and experienced oil and gas operator and investor, and is acquiring the Subject Leases for investment and not with a view to the resale or other distribution thereof. On or before the Closing, Farmee shall be in full compliance with all laws, orders, rules and regulations applicable to operators of oil and gas properties in the State of Texas including, without limitation, licensing, permitting, bonding and insurance requirements.

Farmee represents that it is sophisticated in the evaluation, purchase, ownership and operation of oil and gas properties. In entering into this Agreement and consummating the transactions contemplated by this Agreement, Farmee has relied and shall rely solely on Farmee's independent investigation of and judgment with respect to the Subject Leases and the advice of Farmee's own legal, tax, economic, environmental, engineering, geological and geophysical advisors and not on any comments or statements of any representatives of, or consultants or advisors engaged by Farmor.

10.10 Disclaimer.    **THE INTERESTS SUBJECT TO THIS AGREEMENT ARE BEING ASSUMED BY FARMEE WITHOUT WARRANTY OF ANY KIND, EXPRESS, IMPLIED, STATUTORY, COMMON LAW OR OTHERWISE, AND THE PARTIES HEREBY EXPRESSLY DISCLAIM, WAIVE AND RELEASE ANY EXPRESS WARRANTY OF MERCHANTABILITY, CONDITION OR SAFETY AND ANY EXPRESSED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE; AND FARMEE ACCEPTS THE SUBJECT INTERESTS "AS IS, WHERE IS, WITH ALL FAULTS." ALL DESCRIPTIONS/DOCUMENTATION OF ANY KIND AND CHARACTER HERETOFORE OR HEREAFTER FURNISHED TO FARMEE BY FARMOR HAVE BEEN AND SHALL BE FURNISHED SOLELY FOR FARMEE'S CONVENIENCE, AND HAVE NOT CONSTITUTED AND SHALL NOT CONSTITUTE A REPRESENTATION OR WARRANTY OF ANY KIND BY FARMOR. THE PARTIES HEREBY ACKNOWLEDGE AND AGREE THAT, TO THE EXTENT REQUIRED BY APPLICABLE LAW, THE DISCLAIMERS CONTAINED IN THIS AGREEMENT ARE "CONSPICUOUS" FOR THE PURPOSES OF SUCH APPLICABLE LAW.**

**EXHIBIT B**
**TO SEISMIC EXPLORATION AND FARMOUT AGREEMENT**

**DESCRIPTION OF SUBJECT LEASES**

The Subject Leases covered by the Seismic Exploration and Farmout Agreement, in which Farmee shall have the right to earn an Assignment under the terms of the Agreement, are described as follows:

All leases, to all depths, pertaining to the following wells in Hardeman County, Texas:

1.  Roy Hamrick Well No. 1
2.  Mabry-Hamrick Unit 2 Well No. 1, and
3.  Georgia-Pacific Well No. 1.

The wells are located in Sections 144, 147, and 168 of Block H of the W. & NW. R.R. Co. Survey. The Hamrick Area 3D Shoot is defined as these three sections and also includes all the immediately adjoining sections.

# MODEL FORM OPERATING AGREEMENT

### Exhibit C
### Of Seismic Exploration and Farmout Agreement
### Between Dimock Operating Company, including Joe W. Dimock
### And also dba Dimock Petroleum and
### Sutherland Energy Co., LLC
### Dated November 20, 2012.

OPERATING AGREEMENT

DATED

__November 20__ , __2012__ ,
<sub>year</sub>

OPERATOR   __Sutherland Energy Co., LLC__

CONTRACT AREA   __The following Sections of Block H of the W. & NW. RR. Co. Survey:__

__122-124, 143-148, 167-169, and 174-176.__

COUNTY OR PARISH OF   __Hardeman__                    , STATE OF   __Texas__

COPYRIGHT 1989 – ALL RIGHTS RESERVED
AMERICAN ASSOCIATION OF PETROLEUM
LANDMEN, 4100 FOSSIL CREEK BLVD.
FORT WORTH, TEXAS, 76137, APPROVED FORM.

A.A.P.L. NO. 610 – 1989

## TABLE OF CONTENTS

| Article | Title | Page |
|---|---|---|
| I. | DEFINITIONS | 1 |
| II. | EXHIBITS | 1 |
| III. | INTERESTS OF PARTIES | 2 |
| | A. OIL AND GAS INTERESTS: | 2 |
| | B. INTERESTS OF PARTIES IN COSTS AND PRODUCTION: | 2 |
| | C. SUBSEQUENTLY CREATED INTERESTS: | 2 |
| IV. | TITLES | 2 |
| | A. TITLE EXAMINATION: | 2 |
| | B. LOSS OR FAILURE OF TITLE: | 3 |
| | 1. Failure of Title | 3 |
| | 2. Loss by Non-Payment or Erroneous Payment of Amount Due | 3 |
| | 3. Other Losses | 3 |
| | 4. Curing Title | 3 |
| V. | OPERATOR | 4 |
| | A. DESIGNATION AND RESPONSIBILITIES OF OPERATOR: | 4 |
| | B. RESIGNATION OR REMOVAL OF OPERATOR AND SELECTION OF SUCCESSOR: | 4 |
| | 1. Resignation or Removal of Operator | 4 |
| | 2. Selection of Successor Operator | 4 |
| | 3. Effect of Bankruptcy | 4 |
| | C. EMPLOYEES AND CONTRACTORS: | 4 |
| | D. RIGHTS AND DUTIES OF OPERATOR: | 4 |
| | 1. Competitive Rates and Use of Affiliates | 4 |
| | 2. Discharge of Joint Account Obligations | 4 |
| | 3. Protection from Liens | 4 |
| | 4. Custody of Funds | 5 |
| | 5. Access to Contract Area and Records | 5 |
| | 6. Filing and Furnishing Governmental Reports | 5 |
| | 7. Drilling and Testing Operations | 5 |
| | 8. Cost Estimates | 5 |
| | 9. Insurance | 5 |
| VI. | DRILLING AND DEVELOPMENT | 5 |
| | A. INITIAL WELL: | 5 |
| | B. SUBSEQUENT OPERATIONS: | 5 |
| | 1. Proposed Operations | 5 |
| | 2. Operations by Less Than All Parties | 6 |
| | 3. Stand-By Costs | 7 |
| | 4. Deepening | 8 |
| | 5. Sidetracking | 8 |
| | 6. Order of Preference of Operations | 8 |
| | 7. Conformity to Spacing Pattern | 9 |
| | 8. Paying Wells | 9 |
| | C. COMPLETION OF WELLS; REWORKING AND PLUGGING BACK: | 9 |
| | 1. Completion | 9 |
| | 2. Rework, Recomplete or Plug Back | 9 |
| | D. OTHER OPERATIONS: | 9 |
| | E. ABANDONMENT OF WELLS: | 9 |
| | 1. Abandonment of Dry Holes | 9 |
| | 2. Abandonment of Wells That Have Produced | 10 |
| | 3. Abandonment of Non-Consent Operations | 10 |
| | F. TERMINATION OF OPERATIONS: | 10 |
| | G. TAKING PRODUCTION IN KIND: | 10 |
| | (Option 1) Gas Balancing Agreement | 10 |
| | (Option 2) No Gas Balancing Agreement | 11 |
| VII. | EXPENDITURES AND LIABILITY OF PARTIES | 11 |
| | A. LIABILITY OF PARTIES: | 11 |
| | B. LIENS AND SECURITY INTERESTS: | 12 |
| | C. ADVANCES: | 12 |
| | D. DEFAULTS AND REMEDIES: | 12 |
| | 1. Suspension of Rights | 13 |
| | 2. Suit for Damages | 13 |
| | 3. Deemed Non-Consent | 13 |
| | 4. Advance Payment | 13 |
| | 5. Costs and Attorneys' Fees | 13 |
| | E. RENTALS, SHUT-IN WELL PAYMENTS AND MINIMUM ROYALTIES: | 13 |
| | F. TAXES: | 13 |
| VIII. | ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST | 14 |
| | A. SURRENDER OF LEASES: | 14 |
| | B. RENEWAL OR EXTENSION OF LEASES: | 14 |
| | C. ACREAGE OR CASH CONTRIBUTIONS: | 14 |

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

## TABLE OF CONTENTS

    D. ASSIGNMENT; MAINTENANCE OF UNIFORM INTEREST: .................................................15
    E. WAIVER OF RIGHTS TO PARTITION:.............................................................................15
    F. PREFERENTIAL RIGHT TO PURCHASE: ..........................................................................15
IX.   INTERNAL REVENUE CODE ELECTION ........................................................................15
X.   CLAIMS AND LAWSUITS ..............................................................................................15
XI.   FORCE MAJEURE ........................................................................................................16
XII.   NOTICES .....................................................................................................................16
XIII.   TERM OF AGREEMENT ...............................................................................................16
XIV.   COMPLIANCE WITH LAWS AND REGULATIONS ..........................................................16
    A. LAWS, REGULATIONS AND ORDERS: ..........................................................................16
    B. GOVERNING LAW:....................................................................................................16
    C. REGULATORY AGENCIES: ..........................................................................................16
XV.   MISCELLANEOUS .......................................................................................................17
    A. EXECUTION:............................................................................................................17
    B. SUCCESSORS AND ASSIGNS: ....................................................................................17
    C. COUNTERPARTS: ......................................................................................................17
    D. SEVERABILITY ........................................................................................................17
XVI.   OTHER PROVISIONS ..................................................................................................17

# A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

## OPERATING AGREEMENT

THIS AGREEMENT, entered into by and between ___Sutherland Energy Co., LLC_____,

hereinafter designated and referred to as "Operator," and the signatory party or parties other than Operator, sometimes hereinafter referred to individually as "Non-Operator," and collectively as "Non-Operators."

## WITNESSETH:

WHEREAS, the parties to this agreement are owners of Oil and Gas Leases and/or Oil and Gas Interests in the land identified in Exhibit "A," and the parties hereto have reached an agreement to explore and develop these Leases and/or Oil and Gas Interests for the production of Oil and Gas to the extent and as hereinafter provided,

NOW, THEREFORE, it is agreed as follows:

## ARTICLE I.

## DEFINITIONS

As used in this agreement, the following words and terms shall have the meanings here ascribed to them:

A. The term "AFE" shall mean an Authority for Expenditure prepared by a party to this agreement for the purpose of estimating the costs to be incurred in conducting an operation hereunder.

B. The term "Completion" or "Complete" shall mean a single operation intended to complete a well as a producer of Oil and Gas in one or more Zones, including, but not limited to, the setting of production casing, perforating, well stimulation and production testing conducted in such operation.

C. The term "Contract Area" shall mean all of the lands, Oil and Gas Leases and/or Oil and Gas Interests intended to be developed and operated for Oil and Gas purposes under this agreement. Such lands, Oil and Gas Leases and Oil and Gas Interests are described in Exhibit "A."

D. The term "Deepen" shall mean a single operation whereby a well is drilled to an objective Zone below the deepest Zone in which the well was previously drilled, or below the Deepest Zone proposed in the associated AFE, whichever is the lesser.

E. The terms "Drilling Party" and "Consenting Party" shall mean a party who agrees to join in and pay its share of the cost of any operation conducted under the provisions of this agreement.

F. The term "Drilling Unit" shall mean the area fixed for the drilling of one well by order or rule of any state or federal body having authority. If a Drilling Unit is not fixed by any such rule or order, a Drilling Unit shall be the drilling unit as established by the pattern of drilling in the Contract Area unless fixed by express agreement of the Drilling Parties.

G. The term "Drillsite" shall mean the Oil and Gas Lease or Oil and Gas Interest on which a proposed well is to be located.

H. The term "Initial Well" shall mean the well required to be drilled by the parties hereto as provided in Article VI.A.

I. The term "Non-Consent Well" shall mean a well in which less than all parties have conducted an operation as provided in Article VI.B.2.

J. The terms "Non-Drilling Party" and "Non-Consenting Party" shall mean a party who elects not to participate in a proposed operation.

K. The term "Oil and Gas" shall mean oil, gas, casinghead gas, gas condensate, and/or all other liquid or gaseous hydrocarbons and other marketable substances produced therewith, unless an intent to limit the inclusiveness of this term is specifically stated.

L. The term "Oil and Gas Interests" or "Interests" shall mean unleased fee and mineral interests in Oil and Gas in tracts of land lying within the Contract Area which are owned by parties to this agreement.

M. The terms "Oil and Gas Lease," "Lease" and "Leasehold" shall mean the oil and gas leases or interests therein covering tracts of land lying within the Contract Area which are owned by the parties to this agreement.

N. The term "Plug Back" shall mean a single operation whereby a deeper Zone is abandoned in order to attempt a Completion in a shallower Zone.

O. The term "Recompletion" or "Recomplete" shall mean an operation whereby a Completion in one Zone is abandoned in order to attempt a Completion in a different Zone within the existing wellbore.

P. The term "Rework" shall mean an operation conducted in the wellbore of a well after it is Completed to secure, restore, or improve production in a Zone which is currently open to production in the wellbore. Such operations include, but are not limited to, well stimulation operations but exclude any routine repair or maintenance work or drilling, Sidetracking, Deepening, Completing, Recompleting, or Plugging Back of a well.

Q. The term "Sidetrack" shall mean the directional control and intentional deviation of a well from vertical so as to change the bottom hole location unless done to straighten the hole or drill around junk in the hole to overcome other mechanical difficulties.

R. The term "Zone" shall mean a stratum of earth containing or thought to contain a common accumulation of Oil and Gas separately producible from any other common accumulation of Oil and Gas.

Unless the context otherwise clearly indicates, words used in the singular include the plural, the word "person" includes natural and artificial persons, the plural includes the singular, and any gender includes the masculine, feminine, and neuter.

## ARTICLE II.

## EXHIBITS

The following exhibits, as indicated below and attached hereto, are incorporated in and made a part hereof:

___X___ A. Exhibit "A," shall include the following information:

    (1) Description of lands subject to this agreement,

    (2) Restrictions, if any, as to depths, formations, or substances,

    (3) Parties to agreement with addresses and telephone numbers for notice purposes,

    (4) Percentages or fractional interests of parties to this agreement,

    (5) Oil and Gas Leases and/or Oil and Gas Interests subject to this agreement,

    (6) Burdens on production.

_____ B. Exhibit "B," Form of Lease.

___X___ C. Exhibit "C," Accounting Procedure.

_____ D. Exhibit "D," Insurance.

_____ E. Exhibit "E," Gas Balancing Agreement.

_____ F. Exhibit "F," Non-Discrimination and Certification of Non-Segregated Facilities.

_____ G. Exhibit "G," Tax Partnership.

_____ H. Other: _____

- 1 -

28

If any provision of any exhibit, except Exhibits "E," "F" and "G," is inconsistent with any provision contained in the body of this agreement, the provisions in the body of this agreement shall prevail.

### ARTICLE III.
### INTERESTS OF PARTIES

**A. Oil and Gas Interests:**

If any party owns an Oil and Gas Interest in the Contract Area, that Interest shall be treated for all purposes of this agreement and during the term hereof as if it were covered by the form of Oil and Gas Lease attached hereto as Exhibit "B," and the owner thereof shall be deemed to own both royalty interest in such lease and the interest of the lessee thereunder.

**B. Interests of Parties in Costs and Production:**

Unless changed by other provisions, all costs and liabilities incurred in operations under this agreement shall be borne and paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties as their interests are set forth in Exhibit "A." In the same manner, the parties shall also own all production of Oil and Gas from the Contract Area subject, however, to the payment of royalties and other burdens on production as described hereafter.

Regardless of which party has contributed any Oil and Gas Lease or Oil and Gas Interest on which royalty or other burdens may be payable and except as otherwise expressly provided in this agreement, each party shall pay or deliver, or cause to be paid or delivered, all burdens on its share of the production from the Contract Area up to, but not in excess of, their interest _____ and shall indemnify, defend and hold the other parties free from any liability therefor. Except as otherwise expressly provided in this agreement, if any party has contributed hereto any Lease or Interest which is burdened with any royalty, overriding royalty, production payment or other burden on production in excess of the amounts stipulated above, such party so burdened shall assume and alone bear all such excess obligations and shall indemnify, defend and hold the other parties hereto harmless from any and all claims attributable to such excess burden. However, so long as the Drilling Unit for the productive Zone(s) is identical with the Contract Area, each party shall pay or deliver, or cause to be paid or delivered, all burdens on production from the Contract Area due under the terms of the Oil and Gas Lease(s) which such party has contributed to this agreement, and shall indemnify, defend and hold the other parties free from any liability therefor.

No party shall ever be responsible, on a price basis higher than the price received by such party, to any other party's lessor or royalty owner, and if such other party's lessor or royalty owner should demand and receive settlement on a higher price basis, the party contributing the affected Lease shall bear the additional royalty burden attributable to such higher price.

Nothing contained in this Article III.B. shall be deemed an assignment or cross-assignment of interests covered hereby, and in the event two or more parties contribute to this agreement jointly owned Leases, the parties' undivided interests in said Leaseholds shall be deemed separate leasehold interests for the purposes of this agreement.

**C. Subsequently Created Interests:**

If any party has contributed hereto a Lease or Interest that is burdened with an assignment of production given as security for the payment of money, or if, after the date of this agreement, any party creates an overriding royalty, production payment, net profits interest, assignment of production or other burden payable out of production attributable to its working interest hereunder, such burden shall be deemed a "Subsequently Created Interest." Further, if any party has contributed hereto a Lease or Interest burdened with an overriding royalty, production payment, net profits interests, or other burden payable out of production created prior to the date of this agreement, and such burden is not shown on Exhibit "A," such burden also shall be deemed a Subsequently Created Interest to the extent such burden causes the burdens on such party's Lease or Interest to exceed the amount stipulated in Article III.B. above.

The party whose interest is burdened with the Subsequently Created Interest (the "Burdened Party") shall assume and alone bear, pay and discharge the Subsequently Created Interest and shall indemnify, defend and hold harmless the other parties from and against any liability therefor. Further, if the Burdened Party fails to pay, when due, its share of expenses chargeable hereunder, all provisions of Article VII.B. shall be enforceable against the Subsequently Created Interest in the same manner as they are enforceable against the working interest of the Burdened Party. If the Burdened Party is required under this agreement to assign or relinquish to any other party, or parties, all or a portion of its working interest and/or the production attributable thereto, said other party, or parties, shall receive said assignment and/or production free and clear of said Subsequently Created Interest, and the Burdened Party shall indemnify, defend and hold harmless said other party, or parties, from any and all claims and demands for payment asserted by owners of the Subsequently Created Interest.

### ARTICLE IV.
### TITLES

**A. Title Examination:**

Title examination shall be made on the Drillsite of any proposed well prior to commencement of drilling operations and, if a majority in interest of the Drilling Parties so request or Operator so elects, title examination shall be made on the entire Drilling Unit, or maximum anticipated Drilling Unit, of the well. The opinion will include the ownership of the working interest, minerals, royalty, overriding royalty and production payments under the applicable Leases. Each party contributing Leases and/or Oil and Gas Interests to be included in the Drillsite or Drilling Unit, if appropriate, shall furnish to Operator all abstracts (including federal lease status reports), title opinions, title papers and curative material in its possession free of charge. All such information not in the possession of or made available to Operator by the parties, but necessary for the examination of the title, shall be obtained by Operator. Operator shall cause title to be examined by attorneys on its staff or by outside attorneys. Copies of all title opinions shall be furnished to each Drilling Party. Costs incurred by Operator in procuring abstracts, fees paid outside attorneys for title examination (including preliminary, supplemental, shut-in royalty opinions and division order title opinions) and other direct charges as provided in Exhibit "C" shall be borne by the Drilling Parties in the proportion that the interest of each Drilling Party bears to the total interest of all Drilling Parties as such interests appear in Exhibit "A." Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above functions.

Each party / shall be responsible for securing curative matter and pooling amendments or agreements required in connection with Leases or Oil and Gas Interests contributed by / such party. Operator shall be responsible for the preparation and recording of pooling designations or declarations and communitization agreements as well as the conduct of hearings before governmental agencies for the securing of spacing or pooling orders or any other orders necessary or appropriate to the conduct of operations hereunder. This shall not prevent any party from appearing on its own behalf at such hearings. Costs incurred by Operator, including fees paid to outside attorneys, which are associated with hearings before governmental agencies, and which costs are necessary and proper for the activities contemplated under this agreement, shall be direct charges to the joint account and shall not be covered by the administrative overhead charges as provided in Exhibit "C."

- 2 -

Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above functions.

No well shall be drilled on the Contract Area until after (1) the title to the Drillsite or Drilling Unit, if appropriate, has been examined as above provided, and (2) the title has been approved by the examining attorney or title has been accepted by all of the Drilling Parties in such well.

**B. Loss or Failure of Title:**

1. Failure of Title: Should any Oil and Gas Interest or Oil and Gas Lease be lost through failure of title, which results in a reduction of interest from that shown on Exhibit "A," the party credited with contributing the affected Lease or Interest (including, if applicable, a successor in interest to such party) shall have ninety (90) days from final determination of title failure to acquire a new lease or other instrument curing the entirety of the title failure, which acquisition will not be subject to Article VIII.B., and failing to do so, this agreement, nevertheless, shall continue in force as to all remaining Oil and Gas Leases and Interests; and,

(a) The party credited with contributing the Oil and Gas Lease or Interest affected by the title failure (including, if applicable, a successor in interest to such party) shall bear alone the entire loss and it shall not be entitled to recover from Operator or the other parties any development or operating costs which it may have previously paid or incurred, but there shall be no additional liability on its part to the other parties hereto by reason of such title failure;

(b) There shall be no retroactive adjustment of expenses incurred or revenues received from the operation of the Lease or Interest which has failed, but the interests of the parties contained on Exhibit "A" shall be revised on an acreage basis, as of the time it is determined finally that title failure has occurred, so that the interest of the party whose Lease or Interest is affected by the title failure will thereafter be reduced in the Contract Area by the amount of the Lease or Interest failed;

(c) If the proportionate interest of the other parties hereto in any producing well previously drilled on the Contract Area is increased by reason of the title failure, the party who bore the costs incurred in connection with such well attributable to the Lease or Interest which has failed shall receive the proceeds attributable to the increase in such interest (less costs and burdens attributable thereto) until it has been reimbursed for unrecovered costs paid by it in connection with such well attributable to such failed Lease or Interest;

(d) Should any person not a party to this agreement, who is determined to be the owner of any Lease or Interest which has failed, pay in any manner any part of the cost of operation, development, or equipment, such amount shall be paid to the party or parties who bore the costs which are so refunded;

(e) Any liability to account to a person not a party to this agreement for prior production of Oil and Gas which arises by reason of title failure shall be borne severally by each party (including a predecessor to a current party) who received production for which such accounting is required based on the amount of such production received, and each such party shall severally indemnify, defend and hold harmless all other parties hereto for any such liability to account;

(f) No charge shall be made to the joint account for legal expenses, fees or salaries in connection with the defense of the Lease or Interest claimed to have failed, but if the party contributing such Lease or Interest hereto elects to defend its title it shall bear all expenses in connection therewith; and

(g) If any party is given credit on Exhibit "A" to a Lease or Interest which is limited solely to ownership of an interest in the wellbore of any well or wells and the production therefrom, such party's absence of interest in the remainder of the Contract Area shall be considered a Failure of Title as to such remaining Contract Area unless that absence of interest is reflected on Exhibit "A."

2. Loss by Non-Payment or Erroneous Payment of Amount Due: If, through mistake or oversight, any rental, shut-in well payment, minimum royalty or royalty payment, or other payment necessary to maintain all or a portion of an Oil and Gas Lease or interest is not paid or is erroneously paid, and as a result a Lease or Interest terminates, there shall be no monetary liability against the party who failed to make such payment. Unless the party who failed to make the required payment secures a new Lease or Interest covering the same interest within ninety (90) days from the discovery of the failure to make proper payment, which acquisition will not be subject to Article VIII.B., the interests of the parties reflected on Exhibit "A" shall be revised on an acreage basis, effective as of the date of termination of the Lease or Interest involved, and the party who failed to make proper payment will no longer be credited with an interest in the Contract Area on account of ownership of the Lease or Interest which has terminated. If the party who failed to make the required payment shall not have been fully reimbursed, at the time of the loss, from the proceeds of the sale of Oil and Gas attributable to the lost Lease or Interest, calculated on an acreage basis, for the development and operating costs previously paid on account of such Lease or Interest, it shall be reimbursed for unrecovered actual costs previously paid by it (but not for its share of the cost of any dry hole previously drilled or wells previously abandoned) from so much of the following as is necessary to effect reimbursement:

(a) Proceeds of Oil and Gas produced prior to termination of the Lease or Interest, less operating expenses and lease burdens chargeable hereunder to the person who failed to make payment, previously accrued to the credit of the lost Lease or Interest, on an acreage basis, up to the amount of unrecovered costs;

(b) Proceeds of Oil and Gas, less operating expenses and lease burdens chargeable hereunder to the person who failed to make payment, up to the amount of unrecovered costs attributable to that portion of Oil and Gas thereafter produced and marketed (excluding production from any wells thereafter drilled) which, in the absence of such Lease or Interest termination, would be attributable to the lost Lease or Interest on an acreage basis and which as a result of such Lease or Interest termination is credited to other parties, the proceeds of said portion of the Oil and Gas to be contributed by the other parties in proportion to their respective interests reflected on Exhibit "A"; and,

(c) Any monies, up to the amount of unrecovered costs, that may be paid by any party who is, or becomes, the owner of the Lease or Interest lost, for the privilege of participating in the Contract Area or becoming a party to this agreement.

3. Other Losses: All losses of Leases or Interests committed to this agreement, other than those set forth in Articles IV.B.1. and IV.B.2. above, shall be joint losses and shall be borne by all parties in proportion to their interests shown on Exhibit "A." This shall include but not be limited to the loss of any Lease or Interest through failure to develop or because express or implied covenants have not been performed (other than performance which requires only the payment of money), and the loss of any Lease by expiration at the end of its primary term if it is not renewed or extended. There shall be no readjustment of interests in the remaining portion of the Contract Area on account of any joint loss.

4. Curing Title: In the event of a Failure of Title under Article IV.B.1. or a loss of title under Article IV.B.2. above, any Lease or Interest acquired by any party hereto (other than the party whose interest has failed or was lost) during the ninety (90) day period provided by Article IV.B.1. and Article IV.B.2. above covering all or a portion of the interest that has failed or was lost shall be offered at cost to the party whose interest has failed or was lost, and the provisions of Article VIII.B. shall not apply to such acquisition.

## ARTICLE V.

## OPERATOR

**A. Designation and Responsibilities of Operator:**

    ___Sutherland Energy Co., LLC___ shall be the Operator of the Contract Area, and shall conduct and direct and have full control of all operations on the Contract Area as permitted and required by, and within the limits of this agreement. In its performance of services hereunder for the Non-Operators, Operator shall be an independent contractor not subject to the control or direction of the Non-Operators except as to the type of operation to be undertaken in accordance with the election procedures contained in this agreement. Operator shall not be deemed, or hold itself out as, the agent of the Non-Operators with authority to bind them to any obligation or liability assumed or incurred by Operator as to any third party. Operator shall conduct its activities under this agreement as a reasonable prudent operator, in a good and workmanlike manner, with due diligence and dispatch, in accordance with good oilfield practice, and in compliance with applicable law and regulation, but in no event shall it have any liability as Operator to the other parties for losses sustained or liabilities incurred except such as may result from gross negligence or willful misconduct.

**B. Resignation or Removal of Operator and Selection of Successor:**

    1. _Resignation or Removal of Operator:_ Operator may resign at any time by giving written notice thereof to Non-Operators. If Operator terminates its legal existence, no longer owns an interest hereunder in the Contract Area, or is no longer capable of serving as Operator, Operator shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. Operator may be removed only for good cause by the affirmative vote of Non-Operators owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of Operator; such vote shall not be deemed effective until a written notice has been delivered to the Operator by a Non-Operator detailing the alleged default and Operator has failed to cure the default within thirty (30) days from its receipt of the notice or, if the default concerns an operation then being conducted, within forty-eight (48) hours of its receipt of the notice. For purposes hereof, "good cause" shall mean not only gross negligence or willful misconduct but also the material breach of or inability to meet the standards of operation contained in Article V.A. or material failure or inability to perform its obligations under this agreement.

    Subject to Article VII.D.1., such resignation or removal shall not become effective until 7:00 o'clock A.M. on the first day of the calendar month following the expiration of ninety (90) days after the giving of notice of resignation by Operator or action by the Non-Operators to remove Operator, unless a successor Operator has been selected and assumes the duties of Operator at an earlier date. Operator, after effective date of resignation or removal, shall be bound by the terms hereof as a Non-Operator. A change of a corporate name or structure of Operator or transfer of Operator's interest to any single subsidiary, parent or successor corporation shall not be the basis for removal of Operator.

    2. _Selection of Successor Operator:_ Upon the resignation or removal of Operator under any provision of this agreement, a successor Operator shall be selected by the parties. The successor Operator shall be selected from the parties owning an interest in the Contract Area at the time such successor Operator is selected. The successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A"; provided, however, if an Operator which has been removed or is deemed to have resigned fails to vote or votes only to succeed itself, the successor Operator shall be selected by the affirmative vote of the party or parties owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of the Operator that was removed or resigned. The former Operator shall promptly deliver to the successor Operator all records and data relating to the operations conducted by the former Operator to the extent such records and data are not already in the possession of the successor operator. Any cost of obtaining or copying the former Operator's records and data shall be charged to the joint account.

    3. _Effect of Bankruptcy:_ If Operator becomes insolvent, bankrupt or is placed in receivership, it shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. If a petition for relief under the federal bankruptcy laws is filed by or against Operator, and the removal of Operator is prevented by the federal bankruptcy court, all Non-Operators and Operator shall comprise an interim operating committee to serve until Operator has elected to reject or assume this agreement pursuant to the Bankruptcy Code, and an election to reject this agreement by Operator as a debtor in possession, or by a trustee in bankruptcy, shall be deemed a resignation as Operator without any action by Non-Operators, except the selection of a successor. During the period of time the operating committee controls operations, all actions shall require the approval of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A." In the event there are only two (2) parties to this agreement, during the period of time the operating committee controls operations, a third party acceptable to Operator, Non-Operator and the federal bankruptcy court shall be selected as a member of the operating committee, and all actions shall require the approval of two (2) members of the operating committee without regard for their interest in the Contract Area based on Exhibit "A."

**C. Employees and Contractors:**

    The number of employees or contractors used by Operator in conducting operations hereunder, their selection, and the hours of labor and the compensation for services performed shall be determined by Operator, and all such employees or contractors shall be the employees or contractors of Operator.

**D. Rights and Duties of Operator:**

    1. _Competitive Rates and Use of Affiliates:_ All wells drilled on the Contract Area shall be drilled on a competitive contract basis at the usual rates prevailing in the area. If it so desires, Operator may employ its own tools and equipment in the drilling of wells, but its charges therefor shall not exceed the prevailing rates in the area and the rate of such charges shall be agreed upon by the parties in writing before drilling operations are commenced, and such work shall be performed by Operator under the same terms and conditions as are customary and usual in the area in contracts of independent contractors who are doing work of a similar nature. All work performed or materials supplied by affiliates or related parties of Operator shall be performed or supplied at competitive rates, pursuant to written agreement, and in accordance with customs and standards prevailing in the industry.

    2. _Discharge of Joint Account Obligations:_ Except as herein otherwise specifically provided, Operator shall promptly pay and discharge expenses incurred in the development and operation of the Contract Area pursuant to this agreement and shall charge each of the parties hereto with their respective proportionate shares upon the expense basis provided in Exhibit "C." Operator shall keep an accurate record of the joint account hereunder, showing expenses incurred and charges and credits made and received.

    3. _Protection from Liens:_ Operator shall pay, or cause to be paid, as and when they become due and payable, all accounts of contractors and suppliers and wages and salaries for services rendered or performed, and for materials supplied on, to or in respect of the Contract Area or any operations for the joint account thereof, and shall keep the Contract Area free from

liens and encumbrances resulting therefrom except for those resulting from a bona fide dispute as to services rendered or materials supplied.

4. Custody of Funds: Operator shall hold for the account of the Non-Operators any funds of the Non-Operators advanced or paid to the Operator, either for the conduct of operations hereunder or as a result of the sale of production from the Contract Area, and such funds shall remain the funds of the Non-Operators on whose account they are advanced or paid until used for their intended purpose or otherwise delivered to the Non-Operators or applied toward the payment of debts as provided in Article VII.B. Nothing in this paragraph shall be construed to establish a fiduciary relationship between Operator and Non-Operators for any purpose other than to account for Non-Operator funds as herein specifically provided. Nothing in this paragraph shall require the maintenance by Operator of separate accounts for the funds of Non-Operators unless the parties otherwise specifically agree.

5. Access to Contract Area and Records: Operator shall, except as otherwise provided herein, permit each Non-Operator or its duly authorized representative, at the Non-Operator's sole risk and cost, full and free access at all reasonable times to all operations of every kind and character being conducted for the joint account on the Contract Area and to the records of operations conducted thereon or production therefrom, including Operator's books and records relating thereto. Such access rights shall not be exercised in a manner interfering with Operator's conduct of an operation hereunder and shall not obligate Operator to furnish any geologic or geophysical data of an interpretive nature unless the cost of preparation of such interpretive data was charged to the joint account. Operator will furnish to each Non-Operator upon request copies of any and all reports and information obtained by Operator in connection with production and related items, including, without limitation, meter and chart reports, production purchaser statements, run tickets and monthly gauge reports, but excluding purchase contracts and pricing information to the extent not applicable to the production of the Non-Operator seeking the information. Any audit of Operator's records relating to amounts expended and the appropriateness of such expenditures shall be conducted in accordance with the audit protocol specified in Exhibit "C."

6. Filing and Furnishing Governmental Reports: Operator will file, and upon written request promptly furnish copies to each requesting Non-Operator not in default of its payment obligations, all operational notices, reports or applications required to be filed by local, State, Federal or Indian agencies or authorities having jurisdiction over operations hereunder. Each Non-Operator shall provide to Operator on a timely basis all information necessary to Operator to make such filings.

7. Drilling and Testing Operations: The following provisions shall apply to each well drilled hereunder, including but not limited to the Initial Well:

(a) Operator will promptly advise Non-Operators of the date on which the well is spudded, or the date on which drilling operations are commenced.

(b) Operator will send to Non-Operators such reports, test results and notices regarding the progress of operations on the well as the Non-Operators shall reasonably request, including, but not limited to, daily drilling reports, completion reports, and well logs.

(c) Operator shall adequately test all Zones encountered which may reasonably be expected to be capable of producing Oil and Gas in paying quantities as a result of examination of the electric log or any other logs or cores or tests conducted hereunder.

8. Cost Estimates: Upon request of any Consenting Party, Operator shall furnish estimates of current and cumulative costs incurred for the joint account at reasonable intervals during the conduct of any operation pursuant to this agreement. Operator shall not be held liable for errors in such estimates so long as the estimates are made in good faith.

9. Insurance: At all times while operations are conducted hereunder, Operator shall comply with the workers compensation law of the state where the operations are being conducted; provided, however, that Operator may be a self-insurer for liability under said compensation laws in which event the only charge that shall be made to the joint account shall be as provided in Exhibit "C." Operator shall also carry or provide insurance for the benefit of the joint account of the parties as outlined in Exhibit "D" attached hereto and made a part hereof. Operator shall require all contractors engaged in work on or for the Contract Area to comply with the workers compensation law of the state where the operations are being conducted and to maintain such other insurance as Operator may require.

In the event automobile liability insurance is specified in said Exhibit "D," or subsequently receives the approval of the parties, no direct charge shall be made by Operator for premiums paid for such insurance for Operator's automotive equipment.

## ARTICLE VI.
## DRILLING AND DEVELOPMENT

A. Initial Well:

On or before the __240th__ day of/ after signing the Seismic Exploration and Farmout Agreement _____, Operator shall commence the drilling of the Initial Well at the following location: Surface location must be within 2000' of the Dimock Operating Co.- Roy Hamrick No. 1 well surface Location.

and shall thereafter continue the drilling of the well with due diligence to a depth of at least eight thousand seven hundred (8700) vertical feet from the surface of the ground or sufficient to test the Chappel formation, whichever is less.

The drilling of the Initial Well and the participation therein by all parties is obligatory, subject to Article VI.C.1. as to participation in Completion operations and Article VI.F. as to termination of operations and Article XI as to occurrence of force majeure.

B. Subsequent Operations:

1. Proposed Operations: If any party hereto should desire to drill any well on the Contract Area other than the Initial Well, or if any party should desire to Rework, Sidetrack, Deepen, Recomplete or Plug Back a dry hole or a well no longer capable of producing in paying quantities in which such party has not otherwise relinquished its interest in the proposed objective Zone under this agreement, the party desiring to drill, Rework, Sidetrack, Deepen, Recomplete or Plug Back such a well shall give written notice of the proposed operation to the parties who have not otherwise relinquished their interest in such objective Zone

under this agreement and to all other parties in the case of a proposal for Sidetracking or Deepening, specifying the work to be performed, the location, proposed depth, objective Zone and the estimated cost of the operation. The parties to whom such a notice is delivered shall have thirty (30) days after receipt of the notice within which to notify the party proposing to do the work whether they elect to participate in the cost of the proposed operation. If a drilling rig is on location, notice of a proposal to Rework, Sidetrack, Recomplete, Plug Back or Deepen may be given by telephone and the response period shall be limited to ~~forty-eight (48)~~ twenty-four (24) / hours, ~~exclusive of Saturday, Sunday and legal holidays~~. Failure of a party to whom such notice is delivered to reply within the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation. Any proposal by a party to conduct an operation conflicting with the operation initially proposed shall be delivered to all parties within the time and in the manner provided in Article VI.B.6.

If all parties to whom such notice is delivered elect to participate in such a proposed operation, the parties shall be contractually committed to participate therein provided such operations are commenced within the time period hereafter set forth, and Operator shall, no later than ninety (90) days after expiration of the notice period of thirty (30) days (or as promptly as practicable after the expiration of the ~~forty-eight (48)~~ twenty-four (24) / hour period when a drilling rig is on location, as the case may be), actually commence the proposed operation and thereafter complete it with due diligence at the risk and expense of the parties participating therein; provided, however, said commencement date may be extended upon written notice of same by Operator to the other parties, for a period of up to thirty (30) additional days if, in the sole opinion of Operator, such additional time is reasonably necessary to obtain permits from governmental authorities, surface rights (including rights-of-way) or appropriate drilling equipment, or to complete title examination or curative matter required for title approval or acceptance. If the actual operation has not been commenced within the time provided (including any extension thereof as specifically permitted herein or in the force majeure provisions of Article XI) and if any party hereto still desires to conduct said operation, written notice proposing same must be resubmitted to the other parties in accordance herewith as if no prior proposal had been made. Those parties that did not participate in the drilling of a well for which a proposal to Deepen or Sidetrack is made hereunder shall, if such parties desire to participate in the proposed Deepening or Sidetracking operation, reimburse the Drilling Parties in accordance with Article VI.B.4. in the event of a Deepening operation and in accordance with Article VI.B.5. in the event of a Sidetracking operation.

2. Operations by Less Than All Parties:

(a) Determination of Participation. If any party to whom such notice is delivered as provided in Article VI.B.1. or VI.C.1. (Option No. 2) elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this Article, the party or parties giving the notice and such other parties as shall elect to participate in the operation shall, no later than ninety (90) days after the expiration of the notice period of thirty (30) days (or as promptly as practicable after the expiration of the ~~forty-eight (48)~~ twenty-four (24) / hour period when a drilling rig is on location, as the case may be) actually commence the proposed operation and complete it with due diligence. Operator shall perform all work for the account of the Consenting Parties; provided, however, if no drilling rig or other equipment is on location, and if Operator is a Non-Consenting Party, the Consenting Parties shall either: (i) request Operator to perform the work required by such proposed operation for the account of the Consenting Parties, or (ii) designate one of the Consenting Parties as Operator to perform such work. The rights and duties granted to and imposed upon the Operator under this agreement are granted to and imposed upon the party designated as Operator for an operation in which the original Operator is a Non-Consenting Party. Consenting Parties, when conducting operations on the Contract Area pursuant to this Article VI.B.2., shall comply with all terms and conditions of this agreement.

If less than all parties approve any proposed operation, the proposing party, immediately after the expiration of the applicable notice period, shall advise all Parties of the total interest of the parties approving such operation and its recommendation as to whether the Consenting Parties should proceed with the operation as proposed. Each Consenting Party, within forty-eight (48) hours (exclusive of Saturday, Sunday, and legal holidays) after delivery of such notice, shall advise the proposing party of its desire to (i) limit participation to such party's interest as shown on Exhibit "A" or (ii) carry only its proportionate part (determined by dividing such party's interest in the Contract Area by the interests of all Consenting Parties in the Contract Area) of Non-Consenting Parties' interests, or (iii) carry its proportionate part (determined as provided in (ii)) of Non-Consenting Parties' interests together with all or a portion of its proportionate part of any Non-Consenting Parties' interests that any Consenting Party did not elect to take. Any interest of Non-Consenting Parties that is not carried by a Consenting Party shall be deemed to be carried by the party proposing the operation if such party does not withdraw its proposal. Failure to advise the proposing party within the time required shall be deemed an election under (i). In the event a drilling rig is on location, notice may be given by telephone, and the time permitted for such a response shall not exceed a total of / ~~forty-eight (48)~~ twenty-four (24) hours ~~(exclusive of Saturday, Sunday and legal holidays)~~. The proposing party, at its election, may withdraw such proposal if there is less than 100% participation and shall notify all parties of such decision within ten (10) days, or within twenty-four (24) hours if a drilling rig is on location, following expiration of the applicable response period. If 100% subscription to the proposed operation is obtained, the proposing party shall promptly notify the Consenting Parties of their proportionate interests in the operation and the party serving as Operator shall commence such operation within the period provided in Article VI.B.1., subject to the same extension right as provided therein.

(b) Relinquishment of Interest for Non-Participation. The entire cost and risk of conducting such operations shall be borne by the Consenting Parties in the proportions they have elected to bear same under the terms of the preceding paragraph. Consenting Parties shall keep the leasehold estates involved in such operations free and clear of all liens and encumbrances of every kind created by or arising from the operations of the Consenting Parties. If such an operation results in a dry hole, then subject to Articles VI.B.6. and VI.E.3., the Consenting Parties shall plug and abandon the well and restore the surface location at their sole cost, risk and expense; provided, however, that those Non-Consenting Parties that participated in the drilling, Deepening or Sidetracking of the well shall remain liable for, and shall pay, their proportionate shares of the cost of plugging and abandoning the well and restoring the surface location insofar only as those costs were not increased by the subsequent operations of the Consenting Parties. If any well drilled, Reworked, Sidetracked, Deepened, Recompleted or Plugged Back under the provisions of this Article results in a well capable of producing Oil and/or Gas in paying quantities, the Consenting Parties shall Complete and equip the well to produce at their sole cost and risk, and the well shall then be turned over to Operator (if the Operator did not conduct the operation) and shall be operated by it at the expense and for the account of the Consenting Parties. Upon commencement of operations for the drilling, Reworking, Sidetracking, Recompleting, Deepening or Plugging Back of any such well by Consenting Parties in accordance with the provisions of this Article, each Non-Consenting Party shall be deemed to have relinquished to Consenting Parties, and the Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non-Consenting Party's interest in the well and share of production therefrom or, in the case of a Reworking, Sidetracking,

Deepening, Recompleting or Plugging Back, or a Completion pursuant to Article VI.C.1. Option No. 2, all of such Non-Consenting Party's interest in the production obtained from the operation in which the Non-Consenting Party did not elect to participate. Such relinquishment shall be effective until the proceeds of the sale of such share, calculated at the well, or market value thereof if such share is not sold (after deducting applicable ad valorem, production, severance, and excise taxes, royalty, overriding royalty and other interests not excepted by Article III.C. payable out of or measured by the production from such well accruing with respect to such interest until it reverts), shall equal the total of the following:

(i) __200__ % of each such Non-Consenting Party's share of the cost of any newly acquired surface equipment beyond the wellhead connections (including but not limited to stock tanks, separators, treaters, pumping equipment and piping), plus 100% of each such Non-Consenting Party's share of the cost of operation of the well commencing with first production and continuing until each such Non-Consenting Party's relinquished interest shall revert to it under other provisions of this Article, it being agreed that each Non-Consenting Party's share of such costs and equipment will be that interest which would have been chargeable to such Non-Consenting Party had it participated in the well from the beginning of the operations; and

(ii) __500__ % of (a) that portion of the costs and expenses of drilling, Reworking, Sidetracking, Deepening, Plugging Back, testing, Completing, and Recompleting, after deducting any cash contributions received under Article VIII.C., and of (b) that portion of the cost of newly acquired equipment in the well (to and including the wellhead connections), which would have been chargeable to such Non-Consenting Party if it had participated therein.

Notwithstanding anything to the contrary in this Article VI.B., if the well does not reach the deepest objective Zone described in the notice proposing the well for reasons other than the encountering of granite or practically impenetrable substance or other condition in the hole rendering further operations impracticable, Operator shall give notice thereof to each Non-Consenting Party who submitted or voted for an alternative proposal under Article VI.B.6. to drill the well to a shallower Zone than the deepest objective Zone proposed in the notice under which the well was drilled, and each such Non-Consenting Party shall have the option to participate in the initial proposed Completion of the well by paying its share of the cost of drilling the well to its actual depth, calculated in the manner provided in Article VI.B.4. (a). If any such Non-Consenting Party does not elect to participate in the first Completion proposed for such well, the relinquishment provisions of this Article VI.B.2. (b) shall apply to such party's interest.

(c) Reworking, Recompleting or Plugging Back. An election not to participate in the drilling, Sidetracking or Deepening of a well shall be deemed an election not to participate in any Reworking or Plugging Back operation proposed in such a well, or portion thereof, to which the initial non-consent election applied that is conducted at any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment amount. Similarly, an election not to participate in the Completing or Recompleting of a well shall be deemed an election not to participate in any Reworking operation proposed in such a well, or portion thereof, to which the initial non-consent election applied that is conducted at any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment amount. Any such Reworking, Recompleting or Plugging Back operation conducted during the recoupment period shall be deemed part of the cost of operation of said well and there shall be added to the sums to be recouped by the Consenting Parties __500__ % of that portion of the costs of the Reworking, Recompleting or Plugging Back operation which would have been chargeable to such Non-Consenting Party had it participated therein. If such a Reworking, Recompleting or Plugging Back operation is proposed during such recoupment period, the provisions of this Article VI.B. shall be applicable as between said Consenting Parties in said well.

(d) Recoupment Matters. During the period of time Consenting Parties are entitled to receive Non-Consenting Party's share of production, or the proceeds therefrom, Consenting Parties shall be responsible for the payment of all ad valorem, production, severance, excise, gathering and other taxes, and all royalty, overriding royalty and other burdens applicable to Non-Consenting Party's share of production not excepted by Article III.C.

In the case of any Reworking, Sidetracking, Plugging Back, Recompleting or Deepening operation, the Consenting Parties shall be permitted to use, free of cost, all casing, tubing and other equipment in the well, but the ownership of all such equipment shall remain unchanged; and upon abandonment of a well after such Reworking, Sidetracking, Plugging Back, Recompleting or Deepening, the Consenting Parties shall account for all such equipment to the owners thereof, with each party receiving its proportionate part in kind or in value, less cost of salvage.

Within ninety (90) days after the completion of any operation under this Article, the party conducting the operations for the Consenting Parties shall furnish each Non-Consenting Party with an inventory of the equipment in and connected to the well, and an itemized statement of the cost of drilling, Sidetracking, Deepening, Plugging Back, testing, Completing, Recompleting, and equipping the well for production; or, at its option, the operating party, in lieu of an itemized statement of such costs of operation, may submit a detailed statement of monthly billings. Each month / Annually thereafter, during the time the Consenting Parties are being reimbursed as provided above, the party conducting the operations for the Consenting Parties shall furnish the Non-Consenting Parties with an itemized statement of all costs and liabilities incurred in the operation of the well, together with a statement of the quantity of Oil and Gas produced from it and the amount of proceeds realized from the sale of the well's working interest production during the preceding month. In determining the quantity of Oil and Gas produced during any month, Consenting Parties shall use industry accepted methods such as but not limited to metering or periodic well tests. Any amount realized from the sale or other disposition of equipment newly acquired in connection with any such operation which would have been owned by a Non-Consenting Party had it participated therein shall be credited against the total unreturned costs of the work done and of the equipment purchased in determining when the interest of such Non-Consenting Party shall revert to it as above provided; and if there is a credit balance, it shall be paid to such Non-Consenting Party.

If and when the Consenting Parties recover from a Non-Consenting Party's relinquished interest the amounts provided for above, the relinquished interests of such Non-Consenting Party shall automatically revert to it as of 7:00 a.m. on the day following the day on which such recoupment occurs, and, from and after such reversion, such Non-Consenting Party shall own the same interest in such well, the material and equipment in or pertaining thereto, and the production therefrom as such Non-Consenting Party would have been entitled to had it participated in the drilling, Sidetracking, Reworking, Deepening, Recompleting or Plugging Back of said well. Thereafter, such Non-Consenting Party shall be charged with and shall pay its proportionate part of the further costs of the operation of said well in accordance with the terms of this agreement and Exhibit "C" attached hereto.

3. Stand-By Costs: When a well which has been drilled or Deepened has reached its authorized depth and all tests have been completed and the results thereof furnished to the parties, or when operations on the well have been otherwise terminated pursuant to Article VI.F., stand-by costs incurred pending response to a party's notice proposing a Reworking,

Sidetracking, Deepening, Recompleting, Plugging Back or Completing operation in such a well (including the period required under Article VI.B.6. to resolve competing proposals) shall be charged and borne as part of the drilling or Deepening operation just completed. Stand-by costs subsequent to all parties responding, or expiration of the response time permitted, whichever first occurs, and prior to agreement as to the participating interests of all Consenting Parties pursuant to the terms of the second grammatical paragraph of Article VI.B.2. (a), shall be charged to and borne as part of the proposed operation, but if the proposal is subsequently withdrawn because of insufficient participation, such stand-by costs shall be allocated between the Consenting Parties in the proportion each Consenting Party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all Consenting Parties.

In the event that notice for a Sidetracking operation is given while the drilling rig to be utilized is on location, any party may request and receive up to five (5) additional days after expiration of the ~~forty-eight~~ / twenty-four (24) hour response period specified in Article VI.B.1. within which to respond by paying for all stand-by costs and other costs incurred during such extended response period; Operator may require such party to pay the estimated stand-by time in advance as a condition to extending the response period. If more than one party elects to take such additional time to respond to the notice, standby costs shall be allocated between the parties taking additional time to respond on a day-to-day basis in the proportion each electing party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all the electing parties.

4. Deepening: If less than all parties elect to participate in a drilling, Sidetracking, or Deepening operation proposed pursuant to Article VI.B.1., the interest relinquished by the Non-Consenting Parties to the Consenting Parties under Article VI.B.2. shall relate only and be limited to the lesser of (i) the total depth actually drilled or (ii) the objective depth or Zone of which the parties were given notice under Article VI.B.1. ("Initial Objective"). Such well shall not be Deepened beyond the Initial Objective without first complying with this Article to afford the Non-Consenting Parties the opportunity to participate in the Deepening operation.

In the event any Consenting Party desires to drill or Deepen a Non-Consent Well to a depth below the Initial Objective, such party shall give notice thereof, complying with the requirements of Article VI.B.1., to all parties (including Non-Consenting Parties). Thereupon, Articles VI.B.1. and 2. shall apply and all parties receiving such notice shall have the right to participate or not participate in the Deepening of such well pursuant to said Articles VI.B.1. and 2. If a Deepening operation is approved pursuant to such provisions, and if any Non-Consenting Party elects to participate in the Deepening operation, such Non-Consenting party shall pay or make reimbursement (as the case may be) of the following costs and expenses.

(a) If the proposal to Deepen is made prior to the Completion of such well as a well capable of producing in paying quantities, such Non-Consenting Party shall pay (or reimburse Consenting Parties for, as the case may be) that share of costs and expenses incurred in connection with the drilling of said well from the surface to the Initial Objective which Non-Consenting Party would have paid had such Non-Consenting Party agreed to participate therein, plus the Non-Consenting Party's share of the cost of Deepening and of participating in any further operations on the well in accordance with the other provisions of this Agreement; provided, however, all costs for testing and Completion or attempted Completion of the well incurred by Consenting Parties prior to the point of actual operations to Deepen beyond the Initial Objective shall be for the sole account of Consenting Parties.

(b) If the proposal is made for a Non-Consent Well that has been previously Completed as a well capable of producing in paying quantities, but is no longer capable of producing in paying quantities, such Non-Consenting Party shall pay (or reimburse Consenting Parties for, as the case may be) its proportionate share of all costs of drilling, Completing, and equipping said well from the surface to the Initial Objective, calculated in the manner provided in paragraph (a) above, less those costs recouped by the Consenting Parties from the sale of production from the well. The Non-Consenting Party shall also pay its proportionate share of all costs of re-entering said well. The Non-Consenting Parties' proportionate part (based on the percentage of such well Non-Consenting Party would have owned had it previously participated in such Non-Consent Well) of the costs of salvable materials and equipment remaining in the hole and salvable surface equipment used in connection with such well shall be determined in accordance with Exhibit "C." If the Consenting Parties have recouped the cost of drilling, Completing, and equipping the well at the time such Deepening operation is conducted, then a Non-Consenting Party may participate in the Deepening of the well with no payment for costs incurred prior to re-entering the well for Deepening

The foregoing shall not imply a right of any Consenting Party to propose any Deepening for a Non-Consent Well prior to the drilling of such well to its Initial Objective without the consent of the other Consenting Parties as provided in Article VI.F.

5. Sidetracking: Any party having the right to participate in a proposed Sidetracking operation that does not own an interest in the affected wellbore at the time of the notice shall, upon electing to participate, tender to the wellbore owners its proportionate share (equal to its interest in the Sidetracking operation) of the value of that portion of the existing wellbore to be utilized as follows:

(a) If the proposal is for Sidetracking an existing dry hole, reimbursement shall be on the basis of the actual costs incurred in the initial drilling of the well down to the depth at which the Sidetracking operation is initiated.

(b) If the proposal is for Sidetracking a well which has previously produced, reimbursement shall be on the basis of such party's proportionate share of drilling and equipping costs incurred in the initial drilling of the well down to the depth at which the Sidetracking operation is conducted, calculated in the manner described in Article VI.B.4(b) above. Such party's proportionate share of the cost of the well's salvable materials and equipment down to the depth at which the Sidetracking operation is initiated shall be determined in accordance with the provisions of Exhibit "C."

6. Order of Preference of Operations. Except as otherwise specifically provided in this agreement, if any party desires to propose the conduct of an operation that conflicts with a proposal that has been made by a party under this Article VI, such party shall have fifteen (15) days from delivery of the initial proposal, in the case of a proposal to drill a well or to perform an operation on a well where no drilling rig is on location, or twenty-four (24) hours, exclusive of Saturday, Sunday and legal holidays, from delivery of the initial proposal, if a drilling rig is on location for the well on which such operation is to be conducted, to deliver to all parties entitled to participate in the proposed operation such party's alternative proposal, such alternate proposal to contain the same information required to be included in the initial proposal. Each party receiving such proposals shall elect by delivery of notice to Operator within five (5) days after expiration of the proposal period, or within twenty-four (24) hours ~~(exclusive of Saturday, Sunday and legal holidays)~~ if a drilling rig is on location for the well that is the subject of the proposals, to participate in one of the competing proposals. Any party not electing within the time required shall be deemed not to have voted. The proposal receiving the vote of parties owning the largest aggregate percentage interest of the parties voting shall have priority over all other competing proposals; in the case of a tie vote, the

initial proposal shall prevail. Operator shall deliver notice of such result to all parties entitled to participate in the operation within five (5) days after expiration of the election period (or within twenty-four (24) hours, exclusive of Saturday, Sunday and legal holidays, if a drilling rig is on location). Each party shall then have two (2) days (or twenty-four (24) hours if a rig is on location) from receipt of such notice to elect by delivery of notice to Operator to participate in such operation or to relinquish interest in the affected well pursuant to the provisions of Article VI.B.2.; failure by a party to deliver notice within such period shall be deemed an election not to participate in the prevailing proposal.

7. Conformity to Spacing Pattern. Notwithstanding the provisions of this Article VI.B.2., it is agreed that no wells shall be proposed to be drilled to or Completed in or produced from a Zone from which a well located elsewhere on the Contract Area is producing, unless such well conforms to the then-existing well spacing pattern for such Zone.

8. Paying Wells. No party shall conduct any Reworking, Deepening, Plugging Back, Completion, Recompletion, or Sidetracking operation under this agreement with respect to any well then capable of producing in paying quantities except with the consent of all parties that have not relinquished interests in the well at the time of such operation.

**C. Completion of Wells; Reworking and Plugging Back:**

1. Completion: Without the consent of all parties, no well shall be drilled, Deepened or Sidetracked, except any well drilled, Deepened or Sidetracked pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the drilling, Deepening or Sidetracking shall include:

☐ Option No. 1: All necessary expenditures for the drilling, Deepening or Sidetracking, testing, Completing and equipping of the well, including necessary tankage and/or surface facilities.

☑ Option No. 2: All necessary expenditures for the drilling, Deepening or Sidetracking and testing of the well. When such well has reached its authorized depth, and all logs, cores and other tests have been completed, and the results thereof furnished to the parties, Operator shall give immediate notice to the Non-Operators having the right to participate in a Completion attempt whether or not Operator recommends attempting to Complete the well, together with Operator's AFE for Completion costs if not previously provided. The parties receiving such notice shall have forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) in which to elect by delivery of notice to Operator to participate in a recommended Completion attempt or to make a Completion proposal with an accompanying AFE. Operator shall deliver any such Completion proposal, or any Completion proposal conflicting with Operator's proposal, to the other parties entitled to participate in such Completion in accordance with the procedures specified in Article VI.B.6. Election to participate in a Completion attempt shall include consent to all necessary expenditures for the Completing and equipping of such well, including necessary tankage and/or surface facilities but excluding any stimulation operation not contained on the Completion AFE. Failure of any party receiving such notice to reply within the period above fixed shall constitute an election by that party not to participate in the cost of the Completion attempt; provided, that Article VI.B.6. shall control in the case of conflicting Completion proposals. If one or more, but less than all of the parties, elect to attempt a Completion, the provision of Article VI.B.2. hereof (the phrase "Reworking, Sidetracking, Deepening, Recompleting or Plugging Back" as contained in Article VI.B.2. shall be deemed to include "Completing") shall apply to the operations thereafter conducted by less than all parties; provided, however, that Article VI.B.2. shall apply separately to each separate Completion or Recompletion attempt undertaken hereunder, and an election to become a Non-Consenting Party as to one Completion or Recompletion attempt shall not prevent a party from becoming a Consenting Party in subsequent Completion or Recompletion attempts regardless whether the Consenting Parties as to earlier Completions or Recompletion have recouped their costs pursuant to Article VI.B.2.; provided further, that any recoupment of costs by a Consenting Party shall be made solely from the production attributable to the Zone in which the Completion attempt is made. Election by a previous Non-Consenting party to participate in a subsequent Completion or Recompletion attempt shall require such party to pay its proportionate share of the cost of salvable materials and equipment installed in the well pursuant to the previous Completion or Recompletion attempt, insofar and only insofar as such materials and equipment benefit the Zone in which such party participates in a Completion attempt.

2. Rework, Recomplete or Plug Back: No well shall be Reworked, Recompleted or Plugged Back except a well Reworked, Recompleted, or Plugged Back pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the Reworking, Recompleting or Plugging Back of a well shall include all necessary expenditures in conducting such operations and Completing and equipping of said well, including necessary tankage and/or surface facilities.

**D. Other Operations:**

Operator shall not undertake any single project reasonably estimated to require an expenditure in excess of _____ twenty-five thousand _____ Dollars ($ 25,000.00 _____ ) except in connection with the drilling, Sidetracking, Reworking, Deepening, Completing, Recompleting or Plugging Back of a well that has been previously authorized by or pursuant to this agreement; provided, however, that, in case of explosion, fire, flood or other sudden emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion are required to deal with the emergency to safeguard life and property but Operator, as promptly as possible, shall report the emergency to the other parties. If Operator prepares an AFE for its own use, Operator shall furnish any Non-Operator so requesting an information copy thereof for any single project costing in excess of _twenty-five thousand_____ Dollars ($ 25,000.00 _____ ). Any party who has not relinquished its interest in a well shall have the right to propose that Operator perform repair work or undertake the installation of artificial lift equipment or ancillary production facilities such as salt water disposal wells or to conduct additional work with respect to a well drilled hereunder or other similar project (but not including the installation of gathering lines or other transportation or marketing facilities, the installation of which shall be governed by separate agreement between the parties) reasonably estimated to require an expenditure in excess of the amount first set forth above in this Article VI.D. (except in connection with an operation required to be proposed under Articles VI.B.1. or VI.C.1. Option No. 2, which shall be governed exclusively by those Articles). Operator shall deliver such proposal to all parties entitled to participate therein. If within thirty (30) days thereof Operator secures the written consent of any party or parties owning at least ____ 50 ____% of the interests of the parties entitled to participate in such operation, each party having the right to participate in such project shall be bound by the terms of such proposal and shall be obligated to pay its proportionate share of the costs of the proposed project as if it had consented to such project pursuant to the terms of the proposal.

**E. Abandonment of Wells:**

1. Abandonment of Dry Holes: Except for any well drilled or Deepened pursuant to Article VI.B.2., any well which has been drilled or Deepened under the terms of this agreement and is proposed to be completed as a dry hole shall not be

plugged and abandoned without the consent of all parties. Should Operator, after diligent effort, be unable to contact any party, or should any party fail to reply within ~~forty-eight (48)~~ / twenty-four (24) hours ~~(exclusive of Saturday, Sunday and legal holidays)~~ after delivery of notice of the proposal to plug and abandon such well, such party shall be deemed to have consented to the proposed abandonment. All such wells shall be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of the parties who participated in the cost of drilling or Deepening such well. Any party who objects to plugging and abandoning such well by notice delivered to Operator within ~~forty-eight (48)~~ / twenty-four (24) hours ~~(exclusive of Saturday, Sunday and legal holidays)~~ after delivery of notice of the proposed plugging shall take over the well as of the end of such ~~forty-eight (48)~~ / twenty-four (24) hour notice period and conduct further operations in search of Oil and/or Gas subject to the provisions of Article VI.B.; failure of such party to provide proof reasonably satisfactory to Operator of its financial capability to conduct such operations or to take over the well within such period or thereafter to conduct operations on such well or plug and abandon such well shall entitle Operator to retain or take possession of the well and plug and abandon the well. The party taking over the well shall indemnify Operator (if Operator is an abandoning party) and the other abandoning parties against liability for any further operations conducted on such well except for the costs of plugging and abandoning the well and restoring the surface, for which the abandoning parties shall remain proportionately liable.

2. Abandonment of Wells That Have Produced: Except for any well in which a Non-Consent operation has been conducted hereunder for which the Consenting Parties have not been fully reimbursed as herein provided, any well which has been completed as a producer shall not be plugged and abandoned without the consent of all parties. If all parties consent to such abandonment, the well shall be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of all the parties hereto. Failure of a party to reply within sixty (60) days of delivery of notice of proposed abandonment shall be deemed an election to consent to the proposal. If, within sixty (60) days after delivery of notice of the proposed abandonment of any well, all parties do not agree to the abandonment of such well, those wishing to continue its operation from the Zone then open to production shall be obligated to take over the well as of the expiration of the applicable notice period and shall indemnify Operator (if Operator is an abandoning party) and the other abandoning parties against liability for any further operations on the well conducted by such parties. Failure of such party or parties to provide proof reasonably satisfactory to Operator of their financial capability to conduct such operations or to take over the well within the required period or thereafter to conduct operations on such well shall entitle operator to retain or take possession of such well and plug and abandon the well.

Parties taking over a well as provided herein shall tender to each of the other parties its proportionate share of the value of the well's salvable material and equipment, determined in accordance with the provisions of Exhibit "C," less the estimated cost of salvaging and the estimated cost of plugging and abandoning and restoring the surface; provided, however, that in the event the estimated plugging and abandoning and surface restoration costs and the estimated cost of salvaging are higher than the value of the well's salvable material and equipment, each of the abandoning parties shall tender to the parties continuing operations their proportionate shares of the estimated excess cost. Each abandoning party shall assign to the non-abandoning parties, without warranty, express or implied, as to title or as to quantity, or fitness for use of the equipment and material, all of its interest in the wellbore of the well and related equipment, together with its interest in the Leasehold insofar and only insofar as such Leasehold covers the right to obtain production from that wellbore in the Zone then open to production. If the interest of the abandoning party is or includes and Oil and Gas Interest, such party shall execute and deliver to the non-abandoning party or parties an oil and gas lease, limited to the wellbore and the Zone then open to production, for a term of one (1) year and so long thereafter as Oil and/or Gas is produced from the Zone covered thereby, such lease to be on the form attached as Exhibit "B." The assignments or leases so limited shall encompass the Drilling Unit upon which the well is located. The payments by, and the assignments or leases to, the assignees shall be in a ratio based upon the relationship of their respective percentage of participation in the Contract Area to the aggregate of the percentages of participation in the Contract Area of all assignees. There shall be no readjustment of interests in the remaining portions of the Contract Area.

Thereafter, abandoning parties shall have no further responsibility, liability, or interest in the operation of or production from the well in the Zone then open other than the royalties retained in any lease made under the terms of this Article. Upon request, Operator shall continue to operate the assigned well for the account of the non-abandoning parties at the rates and charges contemplated by this agreement, plus any additional cost and charges which may arise as the result of the separate ownership of the assigned well. Upon proposed abandonment of the producing Zone assigned or leased, the assignor or lessor shall then have the option to repurchase its prior interest in the well (using the same valuation formula) and participate in further operations therein subject to the provisions hereof.

3. Abandonment of Non-Consent Operations: The provisions of Article VI.E.1. or VI.E.2. above shall be applicable as between Consenting Parties in the event of the proposed abandonment of any well excepted from said Articles; provided, however, no well shall be permanently plugged and abandoned unless and until all parties having the right to conduct further operations therein have been notified of the proposed abandonment and afforded the opportunity to elect to take over the well in accordance with the provisions of this Article VI.E.; and provided further, that Non-Consenting Parties who own an interest in a portion of the well shall pay their proportionate shares of abandonment and surface restoration cost for such well as provided in Article VI.B.2.(b).

F. Termination of Operations:

Upon the commencement of an operation for the drilling, Reworking, Sidetracking, Plugging Back, Deepening, testing, Completion or plugging of a well, including but not limited to the Initial Well, such operation shall not be terminated without consent of parties bearing _____51_____% of the costs of such operation; provided, however, that in the event granite or other practically impenetrable substance or condition in the hole is encountered which renders further operations impractical, Operator may discontinue operations and give notice of such condition in the manner provided in Article VI.B.1, and the provisions of Article VI.B. or VI.E. shall thereafter apply to such operation, as appropriate.

G. Taking Production in Kind:

☐ Option No. 1: Gas Balancing Agreement Attached

Each party shall take in kind or separately dispose of its proportionate share of all Oil and Gas produced from the Contract Area, exclusive of production which may be used in development and producing operations and in preparing and treating Oil and Gas for marketing purposes and production unavoidably lost. Any extra expenditure incurred in the taking in kind or separate disposition by any party of its proportionate share of the production shall be borne by such party. Any party taking its share of production in kind shall be required to pay for only its proportionate share of such part of Operator's surface facilities which it uses.

Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in production from the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment

directly from the purchaser thereof for its share of all production.

If any party fails to make the arrangements necessary to take in kind or separately dispose of its proportionate share of the Oil produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it, but not the obligation, to purchase such Oil or sell it to others at any time and from time to time, for the account of the non-taking party. Any such purchase or sale by Operator may be terminated by Operator upon at least ten (10) days written notice to the owner of said production and shall be subject always to the right of the owner of the production upon at least ten (10) days written notice to Operator to exercise at any time its right to take in kind, or separately dispose of, its share of all Oil not previously delivered to a purchaser. Any purchase or sale by Operator of any other party's share of Oil shall be only for such reasonable periods of time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess of one (1) year.

Any such sale by Operator shall be in a manner commercially reasonable under the circumstances but Operator shall have no duty to share any existing market or to obtain a price equal to that received under any existing market. The sale or delivery by Operator of a non-taking party's share of Oil under the terms of any existing contract of Operator shall not give the non-taking party any interest in or make the non-taking party a party to said contract. No purchase shall be made by Operator without first giving the non-taking party at least ten (10) days written notice of such intended purchase and the price to be paid or the pricing basis to be used.

All parties shall give timely written notice to Operator of their Gas marketing arrangements for the following month, excluding price, and shall notify Operator immediately in the event of a change in such arrangements. Operator shall maintain records of all marketing arrangements, and of volumes actually sold or transported, which records shall be made available to Non-Operators upon reasonable request.

In the event one or more parties' separate disposition of its share of the Gas causes split-stream deliveries to separate pipelines and/or deliveries which on a day-to-day basis for any reason are not exactly equal to a party's respective proportionate share of total Gas sales to be allocated to it, the balancing or accounting between the parties shall be in accordance with any Gas balancing agreement between the parties hereto, whether such an agreement is attached as Exhibit "E" or is a separate agreement. Operator shall give notice to all parties of the first sales of Gas from any well under this agreement.

☑ **Option No. 2: No Gas Balancing Agreement:**

Each party shall take in kind or separately dispose of its proportionate share of all Oil and Gas produced from the Contract Area, exclusive of production which may be used in development and producing operations and in preparing and treating Oil and Gas for marketing purposes and production unavoidably lost. Any extra expenditures incurred in the taking in kind or separate disposition by any party of its proportionate share of the production shall be borne by such party. Any party taking its share of production in kind shall be required to pay for only its proportionate share of such part of Operator's surface facilities which it uses.

Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in production from the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment directly from the purchaser thereof for its share of all production.

If any party fails to make the arrangements necessary to take in kind or separately dispose of its proportionate share of the Oil and/or Gas produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it, but not the obligation, to purchase such Oil and/or Gas or sell it to others at any time and from time to time, for the account of the non-taking party. Any such purchase or sale by Operator may be terminated by Operator upon at least ten (10) days written notice to the owner of said production and shall be subject always to the right of the owner of the production upon at least ten (10) days written notice to Operator to exercise its right to take in kind, or separately dispose of, its share of all Oil and/or Gas not previously delivered to a purchaser; provided, however, that the effective date of any such revocation may be deferred at Operator's election for a period not to exceed ninety (90) days if Operator has committed such production to a purchase contract having a term extending beyond such ten (10) -day period. Any purchase or sale by Operator of any other party's share of Oil and/or Gas shall be only for such reasonable periods of time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess of one (1) year.

Any such sale by Operator shall be in a manner commercially reasonable under the circumstances, but Operator shall have no duty to share any existing market or transportation arrangement or to obtain a price or transportation fee equal to that received under any existing market or transportation arrangement. The sale or delivery by Operator of a non-taking party's share of production under the terms of any existing contract of Operator shall not give the non-taking party any interest in or make the non-taking party a party to said contract. No purchase of Oil and Gas and no sale of Gas shall be made by Operator without first giving the non-taking party ten days written notice of such intended purchase or sale and the price to be paid or the pricing basis to be used. Operator shall give notice to all parties of the first sale of Gas from any well under this Agreement.

All parties shall give timely written notice to Operator of their Gas marketing arrangements for the following month, excluding price, and shall notify Operator immediately in the event of a change in such arrangements. Operator shall maintain records of all marketing arrangements, and of volumes actually sold or transported, which records shall be made available to Non-Operators upon reasonable request.

## ARTICLE VII.
## EXPENDITURES AND LIABILITY OF PARTIES

**A. Liability of Parties:**

The liability of the parties shall be several, not joint or collective. Each party shall be responsible only for its obligations, and shall be liable only for its proportionate share of the costs of developing and operating the Contract Area. Accordingly, the liens granted among the parties in Article VII.B. are given to secure only the debts of each severally, and no party shall have any liability to third parties hereunder to satisfy the default of any other party in the payment of any expense or obligation hereunder. It is not the intention of the parties to create, nor shall this agreement be construed as creating, a mining or other partnership, joint venture, agency relationship or association, or to render the parties liable as partners, co-venturers, or principals. In their relations with each other under this agreement, the parties shall not be considered fiduciaries or to have established a confidential relationship but rather shall be free to act on an arm's-length basis in accordance with their own respective self-interest, subject, however, to the obligation of the parties to act in good faith in their dealings with each other with respect to activities hereunder.

- 11 -

**B. Liens and Security Interests:**

See Article XVI- Other Provisions, Note 1

Each party grants to the other parties hereto a lien upon any interest it now owns / or hereafter acquires in Oil and Gas Leases and Oil and Gas Interests in the Contract Area, and a security interest and/or purchase money security interest in any interest it now owns or hereafter acquires in the personal property and fixtures on or used or obtained for use in connection therewith, to secure performance of all of its obligations under this agreement including but not limited to payment of expense, interest and fees, the proper disbursement of all monies paid hereunder, the assignment or relinquishment of interest in Oil and Gas Leases as required hereunder, and the proper performance of operations hereunder. Such lien and security interest granted by each party hereto shall include such party's leasehold interests, working interests, operating rights, and royalty and overriding royalty interests in the Contract Area now owned or hereafter acquired and in lands pooled or unitized therewith or otherwise becoming subject to this agreement, the Oil and Gas when extracted therefrom and equipment situated thereon or used or obtained for use in connection therewith (including, without limitation, all wells, tools, and tubular goods), and accounts (including, without limitation, accounts arising from gas imbalances or from the sale of Oil and/or Gas at the wellhead), contract rights, inventory and general intangibles relating thereto or arising therefrom, and all proceeds and products of the foregoing.

To perfect the lien and security agreement provided herein, each party hereto shall execute and acknowledge the recording supplement and/or any financing statement prepared and submitted by any party hereto in conjunction herewith or at any time following execution hereof, and Operator is authorized to file this agreement or the recording supplement executed herewith as a lien or mortgage in the applicable real estate records and as a financing statement with the proper officer under the Uniform Commercial Code in the state in which the Contract Area is situated and such other states as Operator shall deem appropriate to perfect the security interest granted hereunder. Any party may file this agreement, the recording supplement executed herewith, or such other documents as it deems necessary as a lien or mortgage in the applicable real estate records and/or a financing statement with the proper officer under the Uniform Commercial Code.

Each party represents and warrants to the other parties hereto that the lien and security interest granted by such party to the other parties shall be a first and prior lien, and each party hereby agrees to maintain the priority of said lien and security interest against all persons acquiring an interest in Oil and Gas Leases and Interests covered by this agreement by, through or under such party. All parties acquiring an interest in Oil and Gas Leases and Oil and Gas Interests covered by this agreement, whether by assignment, merger, mortgage, operation of law, or otherwise, shall be deemed to have taken subject to the lien and security interest granted by this Article VII.B. as to all obligations attributable to such interest hereunder whether or not such obligations arise before or after such interest is acquired.

To the extent that parties have a security interest under the Uniform Commercial Code of the state in which the Contract Area is situated, they shall be entitled to exercise the rights and remedies of a secured party under the Code. The bringing of a suit and the obtaining of judgment by a party for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien rights or security interest as security for the payment thereof. In addition, upon default by any party in the payment of its share of expenses, interests or fees, or upon the improper use of funds by the Operator, the other parties shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from the sale of such defaulting party's share of Oil and Gas until the amount owed by such party, plus interest as provided in "Exhibit C," has been received, and shall have the right to offset the amount owed against the proceeds from the sale of such defaulting party's share of Oil and Gas. All purchasers of production may rely on a notification of default from the non-defaulting party or parties stating the amount due as a result of the default, and all parties waive any recourse available against purchasers for releasing production proceeds as provided in this paragraph.

If any party fails to pay its share of cost within one hundred twenty (120) days after rendition of a statement therefor by Operator, the non-defaulting parties, including Operator, shall upon request by Operator, pay the unpaid amount in the proportion that the interest of each such party bears to the interest of all such parties. The amount paid by each party so paying its share of the unpaid amount shall be secured by the liens and security rights described in Article VII.B., and each paying party may independently pursue any remedy available hereunder or otherwise.

If any party does not perform all of its obligations hereunder, and the failure to perform subjects such party to foreclosure or execution proceedings pursuant to the provisions of this agreement, to the extent allowed by governing law, the defaulting party waives any available right of redemption from and after the date of judgment, any required valuation or appraisement of the mortgaged or secured property prior to sale, any available right to stay execution or to require a marshaling of assets and any required bond in the event a receiver is appointed. In addition, to the extent permitted by applicable law, each party hereby grants to the other parties a power of sale as to any property that is subject to the lien and security rights granted hereunder, such power to be exercised in the manner provided by applicable law or otherwise in a commercially reasonable manner and upon reasonable notice.

Each party agrees that the other parties shall be entitled to utilize the provisions of Oil and Gas lien law or other lien law of any state in which the Contract Area is situated to enforce the obligations of each party hereunder. Without limiting the generality of the foregoing, to the extent permitted by applicable law, Non-Operators agree that Operator may invoke or utilize the mechanics' or materialmen's lien law of the state in which the Contract Area is situated in order to secure the payment to Operator of any sum due hereunder for services performed or materials supplied by Operator.

**C. Advances:**

Operator, at its election, shall have the right from time to time to demand and receive from one or more of the other parties payment in advance of their respective shares of the estimated amount of the expense to be incurred in operations hereunder during the next succeeding month, which right may be exercised only by submission to each such party of an itemized statement of such estimated expense, together with an invoice for its share thereof. Each such statement and invoice for the payment in advance of estimated expense shall be submitted on or before the 20th day of the next preceding month. Each party shall pay to Operator its proportionate share of such estimate within fifteen (15) days after such estimate and invoice is received. If any party fails to pay its share of said estimate within said time, the amount due shall bear interest as provided in Exhibit "C" until paid. Proper adjustment shall be made monthly between advances and actual expense to the end that each party shall bear and pay its proportionate share of actual expenses incurred, and no more.

**D. Defaults and Remedies:**

If any party fails to discharge any financial obligation under this agreement, including without limitation the failure to make any advance under the preceding Article VII.C. or any other provision of this agreement, within the period required for such payment hereunder, then in addition to the remedies provided in Article VII.B. or elsewhere in this agreement, the remedies specified below shall be applicable. For purposes of this Article VII.D., all notices and elections shall be delivered

only by Operator, except that Operator shall deliver any such notice and election requested by a non-defaulting Non-Operator, and when Operator is the party in default, the applicable notices and elections can be delivered by any Non-Operator. Election of any one or more of the following remedies shall not preclude the subsequent use of any other remedy specified below or otherwise available to a non-defaulting party.

1. <u>Suspension of Rights</u>: Any party may deliver to the party in default a Notice of Default, which shall specify the default, specify the action to be taken to cure the default, and specify that failure to take such action will result in the exercise of one or more of the remedies provided in this Article. If the default is not cured within thirty (30) days of the delivery of such Notice of Default, all of the rights of the defaulting party granted by this agreement may upon notice be suspended until the default is cured, without prejudice to the right of the non-defaulting party or parties to continue to enforce the obligations of the defaulting party previously accrued or thereafter accruing under this agreement. If Operator is the party in default, the Non-Operators shall have in addition the right, by vote of Non-Operators owning a majority in interest in the Contract Area after excluding the voting interest of Operator, to appoint a new Operator effective immediately. The rights of a defaulting party that may be suspended hereunder at the election of the non-defaulting parties shall include, without limitation, the right to receive information as to any operation conducted hereunder during the period of such default, the right to elect to participate in an operation proposed under Article VI.B. of this agreement, the right to participate in an operation being conducted under this agreement even if the party has previously elected to participate in such operation, and the right to receive proceeds of production from any well subject to this agreement.

2. <u>Suit for Damages</u>: Non-defaulting parties or Operator for the benefit of non-defaulting parties may sue (at joint account expense) to collect the amounts in default, plus interest accruing on the amounts recovered from the date of default until the date of collection at the rate specified in Exhibit "C" attached hereto. Nothing herein shall prevent any party from suing any defaulting party to collect consequential damages accruing to such party as a result of the default.

3. <u>Deemed Non-Consent</u>: The non-defaulting party may deliver a written Notice of Non-Consent Election to the defaulting party at any time after the expiration of the thirty-day cure period following delivery of the Notice of Default, in which event if the billing is for the drilling a new well or the Plugging Back, Sidetracking, Reworking or Deepening of a well which is to be or has been plugged as a dry hole, or for the Completion or Recompletion of any well, the defaulting party will be conclusively deemed to have elected not to participate in the operation and to be a Non-Consenting Party with respect thereto under Article VI.B. or VI.C., as the case may be, to the extent of the costs unpaid by such party, notwithstanding any election to participate theretofore made. If election is made to proceed under this provision, then the non-defaulting parties may not elect to sue for the unpaid amount pursuant to Article VII.D.2.

Until the delivery of such Notice of Non-Consent Election to the defaulting party, such party shall have the right to cure its default by paying its unpaid share of costs plus interest at the rate set forth in Exhibit "C," provided, however, such payment shall not prejudice the rights of the non-defaulting parties to pursue remedies for damages incurred by the non-defaulting parties as a result of the default. Any interest relinquished pursuant to this Article VII.D.3. shall be offered to the non-defaulting parties in proportion to their interests, and the non-defaulting parties electing to participate in the ownership of such interest shall be required to contribute their shares of the defaulted amount upon their election to participate therein.

4. <u>Advance Payment</u>: If a default is not cured within thirty (30) days of the delivery of a Notice of Default, Operator, or Non-Operators if Operator is the defaulting party, may thereafter require advance payment from the defaulting party of such defaulting party's anticipated share of any item of expense for which Operator, or Non-Operators, as the case may be, would be entitled to reimbursement under any provision of this agreement, whether or not such expense was the subject of the previous default. Such right includes, but is not limited to, the right to require advance payment for the estimated costs of drilling a well or Completion of a well as to which an election to participate in drilling or Completion has been made. If the defaulting party fails to pay the required advance payment, the non-defaulting parties may pursue any of the remedies provided in the Article VII.D. or any other default remedy provided elsewhere in this agreement. Any excess of funds advanced remaining when the operation is completed and all costs have been paid shall be promptly returned to the advancing party.

5. <u>Costs and Attorneys' Fees</u>: In the event any party is required to bring legal proceedings to enforce any financial obligation of a party hereunder, the prevailing party in such action shall be entitled to recover all court costs, costs of collection, and a reasonable attorney's fee, which the lien provided for herein shall also secure.

E. **Rentals, Shut-In Well Payments and Minimum Royalties:**

Rentals, shut-in well payments and minimum royalties which may be required under the terms of any lease shall be paid by the party or parties who subjected such lease to this agreement at its or their expense. In the event two or more parties own and have contributed interests in the same lease to this agreement, such parties may designate one of such parties to make said payments for and on behalf of all such parties. Any party may request, and shall be entitled to receive, proper evidence of all such payments. In the event of failure to make proper payment of any rental, shut-in well payment or minimum royalty through mistake or oversight where such payment is required to continue the lease in force, any loss which results from such non-payment shall be borne in accordance with the provisions of Article IV.B.2.

Operator shall notify Non-Operators of the anticipated completion of a shut-in well, or the shutting in or return to production of a producing well, at least five (5) days (excluding Saturday, Sunday, and legal holidays) prior to taking such action, or at the earliest opportunity permitted by circumstances, but assumes no liability for failure to do so. In the event of failure by Operator to so notify Non-Operators, the loss of any lease contributed hereto by Non-Operators for failure to make timely payments of any shut-in well payment shall be borne jointly by the parties hereto under the provisions of Article IV.B.3.

F. **Taxes:**

Beginning with the first calendar year after the effective date hereof, Operator shall render for ad valorem taxation all property subject to this agreement which by law should be rendered for such taxes, and it shall pay all such taxes assessed thereon before they become delinquent. Prior to the rendition date, each Non-Operator shall furnish Operator information as to burdens (to include, but not be limited to, royalties, overriding royalties and production payments) on Leases and Oil and Gas Interests contributed by such Non-Operator. If the assessed valuation of any Lease is reduced by reason of its being subject to outstanding excess royalties, overriding royalties or production payments, the reduction in ad valorem taxes resulting therefrom shall inure to the benefit of the owner or owners of such Lease, and Operator shall adjust the charge to such owner or owners so as to reflect the benefit of such reduction. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding anything to the contrary herein, charges to the joint account shall be made and paid by the parties hereto in accordance with the tax value generated by each party's working interest. Operator shall bill the other parties for their proportionate shares of all tax payments in the manner provided in Exhibit "C."

If Operator considers any tax assessment improper, Operator may, at its discretion, protest within the time and manner prescribed by law, and prosecute the protest to a final determination, unless all parties agree to abandon the protest prior to final determination. During the pendency of administrative or judicial proceedings, Operator may elect to pay, under protest, all such taxes and any interest and penalty. When any such protested assessment shall have been finally determined, Operator shall pay the tax for the joint account, together with any interest and penalty accrued, and the total cost shall then be assessed against the parties, and be paid by them, as provided in Exhibit "C."

Each party shall pay or cause to be paid all production, severance, excise, gathering and other taxes imposed upon or with respect to the production or handling of such party's share of Oil and Gas produced under the terms of this agreement.

## ARTICLE VIII.
## ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST

A. Surrender of Leases:

The Leases covered by this agreement, insofar as they embrace acreage in the Contract Area, shall not be surrendered in whole or in part unless all parties consent thereto.

However, should any party desire to surrender its interest in any Lease or in any portion thereof, such party shall give written notice of the proposed surrender to all parties, and the parties to whom such notice is delivered shall have thirty (30) days after delivery of the notice within which to notify the party proposing the surrender whether they elect to consent thereto. Failure of a party to whom such notice is delivered to reply within said 30-day period shall constitute a consent to the surrender of the Leases described in the notice. If all parties do not agree or consent thereto, the party desiring to surrender shall assign, without express or implied warranty of title, all of its interest in such Lease, or portion thereof, and any well, material and equipment which may be located thereon and any rights in production thereafter secured, to the parties not consenting to such surrender. If the interest of the assigning party is or includes an Oil and Gas Interest, the assigning party shall execute and deliver to the party or parties not consenting to such surrender an oil and gas lease covering such Oil and Gas Interest for a term of one (1) year and so long thereafter as Oil and/or Gas is produced from the land covered thereby, such lease to be on the form attached hereto as Exhibit "B." Upon such assignment or lease, the assigning party shall be relieved from all obligations thereafter accruing, but not theretofore accrued, with respect to the interest assigned or leased and the operation of any well attributable thereto, and the assigning party shall have no further interest in the assigned or leased premises and its equipment and production other than the royalties retained in any lease made under the terms of this Article. The party assignee or lessee shall pay to the party assignor or lessor the reasonable salvage value of the latter's interest in any well's salvable materials and equipment attributable to the assigned or leased acreage. The value of all salvable materials and equipment shall be determined in accordance with the provisions of Exhibit "C," less the estimated cost of salvaging and the estimated cost of plugging and abandoning and restoring the surface. If such value is less than such costs, then the party assignor or lessor shall pay to the party assignee or lessee the amount of such deficit. If the assignment or lease is in favor of more than one party, the interest shall be shared by such parties in the proportions that the interest of each bears to the total interest of all such parties. If the interest of the parties to whom the assignment is to be made varies according to depth, then the interest assigned shall similarly reflect such variances.

Any assignment, lease or surrender made under this provision shall not reduce or change the assignor's, lessor's or surrendering party's interest as it was immediately before the assignment, lease or surrender in the balance of the Contract Area; and the acreage assigned, leased or surrendered, and subsequent operations thereon, shall not thereafter be subject to the terms and provisions of this agreement but shall be deemed subject to an Operating Agreement in the form of this agreement.

B. Renewal or Extension of Leases:

If any party secures a renewal or replacement of an Oil and Gas Lease or Interest subject to this agreement, then all other parties shall be notified promptly upon such acquisition or, in the case of a replacement Lease taken before expiration of an existing Lease, promptly upon expiration of the existing Lease. The parties notified shall have the right for a period of thirty (30) days following delivery of such notice in which to elect to participate in the ownership of the renewal or replacement Lease, insofar as such Lease affects lands within the Contract Area, by paying to the party who acquired it their proportionate shares of the acquisition cost allocated to that part of such Lease within the Contract Area, which shall be in proportion to the interest held at that time by the parties in the Contract Area. Each party who participates in the purchase of a renewal or replacement Lease shall be given an assignment of its proportionate interest therein by the acquiring party.

If some, but less than all, of the parties elect to participate in the purchase of a renewal or replacement Lease, it shall be owned by the parties who elect to participate therein, in a ratio based upon the relationship of their respective percentage of participation in the Contract Area to the aggregate of the percentages of participation in the Contract Area of all parties participating in the purchase of such renewal or replacement Lease. The acquisition of a renewal or replacement Lease by any or all of the parties hereto shall not cause a readjustment of the interests of the parties stated in Exhibit "A," but any renewal or replacement Lease in which less than all parties elect to participate shall not be subject to this agreement but shall be deemed subject to a separate Operating Agreement in the form of this agreement.

If the interests of the parties in the Contract Area vary according to depth, then their right to participate proportionately in renewal or replacement Leases and their right to receive an assignment of interest shall also reflect such depth variances.

The provisions of this Article shall apply to renewal or replacement Leases whether they are for the entire interest covered by the expiring Lease or cover only a portion of its area or an interest therein. Any renewal or replacement Lease taken before the expiration of its predecessor Lease, or taken or contracted for or becoming effective within six (6) months after the expiration of the existing Lease, shall be subject to this provision so long as this agreement is in effect at the time of such acquisition or at the time the renewal or replacement Lease becomes effective; but any Lease taken or contracted for more than six (6) months after the expiration of an existing Lease shall not be deemed a renewal or replacement Lease and shall not be subject to the provisions of this agreement.

The provisions in this Article shall also be applicable to extensions of Oil and Gas Leases.

C. Acreage or Cash Contributions:

While this agreement is in force, if any party contracts for a contribution of cash towards the drilling of a well or any other operation on the Contract Area, such contribution shall be paid to the party who conducted the drilling or other operation and shall be applied by it against the cost of such drilling or other operation. If the contribution be in the form of acreage, the party to whom the contribution is made shall promptly tender an assignment of the acreage, without warranty of title, to the Drilling Parties in the proportions said Drilling Parties shared the cost of drilling the well. Such acreage shall become a separate Contract Area and, to the extent possible, be governed by provisions identical to this agreement. Each party shall promptly notify all other parties of any acreage or cash contributions it may obtain in support of any well or any other operation on the Contract Area. The above provisions shall also be applicable to optional rights to earn acreage outside the Contract Area which are in support of well drilled inside Contract Area.

If any party contracts for any consideration relating to disposition of such party's share of substances produced hereunder, such consideration shall not be deemed a contribution as contemplated in this Article VIII.C.

**D. Assignment; Maintenance of Uniform Interest:**

For the purpose of maintaining uniformity of ownership in the Contract Area in the Oil and Gas Leases, Oil and Gas Interests, wells, equipment and production covered by this agreement no party shall sell, encumber, transfer or make other disposition of its interest in the Oil and Gas Leases and Oil and Gas Interests embraced within the Contract Area or in wells, equipment and production unless such disposition covers either:

    1. the entire interest of the party in all Oil and Gas Leases, Oil and Gas Interests, wells, equipment and production; or

    2. an equal undivided percent of the party's present interest in all Oil and Gas Leases, Oil and Gas Interests, wells, equipment and production in the Contract Area.

Every sale, encumbrance, transfer or other disposition made by any party shall be made expressly subject to this agreement and shall be made without prejudice to the right of the other parties, and any transferee of an ownership interest in any Oil and Gas Lease or Interest shall be deemed a party to this agreement as to the interest conveyed from and after the effective date of the transfer of ownership; provided, however, that the other parties shall not be required to recognize any such sale, encumbrance, transfer or other disposition for any purpose hereunder until thirty (30) days after they have received a copy of the instrument of transfer or other satisfactory evidence thereof in writing from the transferor or transferee. No assignment or other disposition of interest by a party shall relieve such party of obligations previously incurred by such party hereunder with respect to the interest transferred, including without limitation the obligation of a party to pay all costs attributable to an operation conducted hereunder in which such party has agreed to participate prior to making such assignment, and the lien and security interest granted by Article VII.B. shall continue to burden the interest transferred to secure payment of any such obligations.

If, at any time the interest of any party is divided among and owned by four or more co-owners, Operator, at its discretion, may require such co-owners to appoint a single trustee or agent with full authority to receive notices, approve expenditures, receive billings for and approve and pay such party's share of the joint expenses, and to deal generally with, and with power to bind, the co-owners of such party's interest within the scope of the operations embraced in this agreement; however, all such co-owners shall have the right to enter into and execute all contracts or agreements for the disposition of their respective shares of the Oil and Gas produced from the Contract Area and they shall have the right to receive, separately, payment of the sale proceeds thereof.

**E. Waiver of Rights to Partition:**

If permitted by the laws of the state or states in which the property covered hereby is located, each party hereto owning an undivided interest in the Contract Area waives any and all rights it may have to partition and have set aside to it in severalty its undivided interest therein.

~~**F. Preferential Right to Purchase:**~~

☐ (Optional; Check if applicable.)

Should any party desire to sell all or any part of its interests under this agreement, or its rights and interests in the Contract Area, it shall promptly give written notice to the other parties, with full information concerning its proposed disposition, which shall include the name and address of the prospective transferee (who must be ready, willing and able to purchase), the purchase price, a legal description sufficient to identify the property, and all other terms of the offer. The other parties shall then have an optional prior right, for a period of ten (10) days after the notice is delivered, to purchase for the stated consideration on the same terms and conditions the interest which the other party proposes to sell; and, if this optional right is exercised, the purchasing parties shall share the purchased interest in the proportions that the interest of each bears to the total interest of all purchasing parties. However, there shall be no preferential right to purchase in those cases where any party wishes to mortgage its interests, or to transfer title to its interests to its mortgagee in lieu of or pursuant to foreclosure of a mortgage of its interests, or to dispose of its interests by merger, reorganization, consolidation, or by sale of all or substantially all of its Oil and Gas assets to any party, or by transfer of its interests to a subsidiary or parent company or to a subsidiary of a parent company, or to any company in which such party owns a majority of the stock.

<div align="center">

**ARTICLE IX.**

**INTERNAL REVENUE CODE ELECTION**

</div>

If, for federal income tax purposes, this agreement and the operations hereunder are regarded as a partnership, and if the parties have not otherwise agreed to form a tax partnership pursuant to Exhibit "G" or other agreement between them, each party thereby affected elects to be excluded from the application of all of the provisions of Subchapter "K," Chapter 1, Subtitle "A," of the Internal Revenue Code of 1986, as amended ("Code"), as permitted and authorized by Section 761 of the Code and the regulations promulgated thereunder. Operator is authorized and directed to execute on behalf of each party hereby affected such evidence of this election as may be required by the Secretary of the Treasury of the United States or the Federal Internal Revenue Service, including specifically, but not by way of limitation, all of the returns, statements, and the data required by Treasury Regulation §1.761. Should there be any requirement that each party hereby affected give further evidence of this election, each such party shall execute such documents and furnish such other evidence as may be required by the Federal Internal Revenue Service or as may be necessary to evidence this election. No such party shall give any notices or take any other action inconsistent with the election made hereby. If any present or future income tax laws of the state or states in which the Contract Area is located or any future income tax laws of the United States contain provisions similar to those in Subchapter "K," Chapter 1, Subtitle "A," of the Code, under which an election similar to that provided by Section 761 of the Code is permitted, each party hereby affected shall make such election as may be permitted or required by such laws. In making the foregoing election, each such party states that the income derived by such party from operations hereunder can be adequately determined without the computation of partnership taxable income.

<div align="center">

**ARTICLE X.**

**CLAIMS AND LAWSUITS**

</div>

Operator may settle any single uninsured third party damage claim or suit arising from operations hereunder if the expenditure does not exceed __ten thousand__ Dollars ($__10,000.00__) and if the payment is in complete settlement of such claim or suit. If the amount required for settlement exceeds the above amount, the parties hereto shall assume and take over the further handling of the claim or suit, unless such authority is delegated to Operator. All costs and expenses of handling settling, or otherwise discharging such claim or suit shall be a the joint expense of the parties participating in the operation from which the claim or suit arises. If a claim is made against any party or if any party is sued on account of any matter arising from operations hereunder over which such individual has no control because of the rights given Operator by this agreement, such party shall immediately notify all other parties, and the claim or suit shall be treated as any other claim or suit involving operations hereunder.

## ARTICLE XI.
## FORCE MAJEURE

If any party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this agreement, other than the obligation to indemnify or make money payments or furnish security, that party shall give to all other parties prompt written notice of the force majeure with reasonably full particulars concerning it; thereupon, the obligations of the party giving the notice, so far as they are affected by the force majeure, shall be suspended during, but no longer than, the continuance of the force majeure. The term "force majeure," as here employed, shall mean an act of God, strike, lockout, or other industrial disturbance, act of the public enemy, war, blockade, public riot, lightening, fire, storm, flood or other act of nature, explosion, governmental action, governmental delay, restraint or inaction, unavailability of equipment, and any other cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the party claiming suspension.

The affected party shall use all reasonable diligence to remove the force majeure situation as quickly as practicable. The requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts, or other labor difficulty by the party involved, contrary to its wishes; how all such difficulties shall be handled shall be entirely within the discretion of the party concerned.

## ARTICLE XII.
## NOTICES

All notices authorized or required between the parties by any of the provisions of this agreement, unless otherwise specifically provided, shall be in writing and delivered in person or by United States mail, courier service, telegram, telex, telecopier or any other form of facsimile, postage or charges prepaid, and addressed to such parties at the addresses listed on Exhibit "A." All telephone or oral notices permitted by this agreement shall be confirmed immediately thereafter by written notice. The originating notice given under any provision hereof shall be deemed delivered only when received by the party to whom such notice is directed, and the time for such party to deliver any notice in response thereto shall run from the date the originating notice is received. "Receipt" for purposes of this agreement with respect to written notice delivered hereunder shall be actual delivery of the notice to the address of the party to be notified specified in accordance with this agreement, or to the telecopy, facsimile or telex machine of such party. The second or any responsive notice shall be deemed delivered when deposited in the United States mail or at the office of the courier or telegraph service, or upon transmittal by telex, telecopy or facsimile, or when personally delivered to the party to be notified, provided, that when response is required within 24 or 48 hours, such response shall be given orally or by telephone, telex, telecopy or other facsimile within such period. Each party shall have the right to change its address at any time, and from time to time, by giving written notice thereof to all other parties. If a party is not available to receive notice orally or by telephone when a party attempts to deliver a notice required to be delivered within 24 or 48 hours, the notice may be delivered in writing by any other method specified herein and shall be deemed delivered in the same manner provided above for any responsive notice.

## ARTICLE XIII.
## TERM OF AGREEMENT

This agreement shall remain in full force and effect as to the Oil and Gas Leases and/or Oil and Gas Interests subject hereto for the period of time selected below; provided, however, no party hereto shall ever be construed as having any right, title or interest in or to any Lease or Oil and Gas Interest contributed by any other party beyond the term of this agreement.

☐ Option No. 1: So long as any of the Oil and Gas Leases subject to this agreement remain or are continued in force as to any part of the Contract Area, whether by production, extension, renewal or otherwise.

☑ Option No. 2: In the event the well described in Article VI.A., or any subsequent well drilled under any provision of this agreement, results in the Completion of a well as a well capable of production of Oil and/or Gas in paying quantities, this agreement shall continue in force so long as any such well is capable of production, and for an additional period of __90__ days thereafter; provided, however, if, prior to the expiration of such additional period, one or more of the parties hereto are engaged in drilling, Reworking, Deepening, Sidetracking, Plugging Back, testing or attempting to Complete or Re-complete a well or wells hereunder, this agreement shall continue in force until such operations have been completed and if production results therefrom, this agreement shall continue in force as provided herein. In the event the well described in Article VI.A., or any subsequent well drilled hereunder, results in a dry hole, and no other well is capable of producing Oil and/or Gas from the and the three year term of the Seismic Exploration and Farmout Agreement has not expired, Contract Area, / this agreement shall terminate unless drilling, Deepening, Sidetracking, Completing, Re-completing, Plugging Back or Reworking operations are commenced within _____90_____ days from the date of abandonment of said well. "Abandonment" for such purposes shall mean either (i) a decision by all parties not to conduct any further operations on the well or (ii) the elapse of 180 days from the conduct of any operations on the well, whichever first occurs.

The termination of this agreement shall not relieve any party hereto from any expense, liability or other obligation or any remedy therefor which has accrued or attached prior to the date of such termination.

Upon termination of this agreement and the satisfaction of all obligations hereunder, in the event a memorandum of this Operating Agreement has been filed of record, Operator is authorized to file of record in all necessary recording offices a notice of termination, and each party hereto agrees to execute such a notice of termination as to Operator's interest, upon request of Operator, if Operator has satisfied all its financial obligations.

## ARTICLE XIV.
## COMPLIANCE WITH LAWS AND REGULATIONS

**A. Laws, Regulations and Orders:**

This agreement shall be subject to the applicable laws of the state in which the Contract Area is located, to the valid rules, regulations, and orders of any duly constituted regulatory body of said state; and to all other applicable federal, state, and local laws, ordinances, rules, regulations and orders.

**B. Governing Law:**

This agreement and all matters pertaining hereto, including but not limited to matters of performance, non-performance, breach, remedies, procedures, rights, duties, and interpretation or construction, shall be governed and determined by the law of the state in which the Contract Area is located. If the Contract Area is in two or more states, the law of the state of __Texas__ shall govern.

**C. Regulatory Agencies:**

Nothing herein contained shall grant, or be construed to grant, Operator the right or authority to waive or release any rights, privileges, or obligations which Non-Operators may have under federal or state laws or under rules, regulations or

orders promulgated under such laws in reference to oil, gas and mineral operations, including the location, operation, or production of wells, on tracts offsetting or adjacent to the Contract Area.

With respect to the operations hereunder, Non-Operators agree to release Operator from any and all losses, damages, injuries, claims and causes of action arising out of, incident to or resulting directly or indirectly from Operator's interpretation or application of rules, rulings, regulations or orders of the Department of Energy or Federal Energy Regulatory Commission or predecessor or successor agencies to the extent such interpretation or application was made in good faith and does not constitute gross negligence. Each Non-Operator further agrees to reimburse Operator for such Non-Operator's share of production or any refund, fine, levy or other governmental sanction that Operator may be required to pay as a result of such an incorrect interpretation or application, together with interest and penalties thereon owing by Operator as a result of such incorrect interpretation or application.

## ARTICLE XV.
## MISCELLANEOUS

A. **Execution:**

This agreement shall be binding upon each Non-Operator when this agreement or a counterpart thereof has been executed by such Non-Operator and Operator notwithstanding that this agreement is not then or thereafter executed by all of the parties to which it is tendered or which are listed on Exhibit "A" as owning an interest in the Contract Area or which own, in fact, an interest in the Contract Area. Operator may, however, by written notice to all Non-Operators who have become bound by this agreement as aforesaid, given at any time prior to the actual spud date of the Initial Well but in no event later than five days prior to the date specified in Article VI.A. for commencement of the Initial Well, terminate this agreement if Operator in its sole discretion determines that there is insufficient participation to justify commencement of drilling operations. In the event of such a termination by Operator, all further obligations of the parties hereunder shall cease as of such termination. In the event any Non-Operator has advanced or prepaid any share of drilling or other costs hereunder, all sums so advanced shall be returned to such Non-Operator without interest. In the event Operator proceeds with drilling operations for the Initial Well without the execution hereof by all persons listed on Exhibit "A" as having a current working interest in such well, Operator shall indemnify Non-Operators with respect to all costs incurred for the Initial Well which would have been charged to such person under this agreement if such person had executed the same and Operator shall receive all revenues which would have been received by such person under this agreement if such person had executed the same.

B. **Successors and Assigns:**

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, devisees, legal representatives, successors and assigns, and the terms hereof shall be deemed to run with the Leases or Interests included within the Contract Area.

C. **Counterparts:**

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

D. **Severability:**

For the purposes of assuming or rejecting this agreement as an executory contract pursuant to federal bankruptcy laws, this agreement shall not be severable, but rather must be assumed or rejected in its entirety, and the failure of any party to this agreement to comply with all of its financial obligations provided herein shall be a material default.

## ARTICLE XVI.
## OTHER PROVISIONS

NOTE 1: Article VII B – Liens and Security Interests does not apply to Non-Operator for any type of interest owned in the Roy Hamrick No. 1, Mabry-Hamrick Unit 2 Well No. 1, Mabry SWD No. 1, and Georgia-Pacific Well No. 1.

IN WITNESS WHEREOF, this agreement shall be effective as of the __20th__ day of __November__ , __2012__ .

__Rod A. Sutherland__ , who has prepared and circulated this form for execution, represents and warrants that the form was printed from and, with the exception(s) listed below, is identical to the AAPL Form 610-1989 Model Form Operating Agreement, as published in computerized form by Forms On-A-Disk, Inc. No changes, alterations, or modifications, other than those made by strikethrough and/or insertion and that are clearly recognizable as changes in Articles __(almost all the Articles)__ , have been made to the form.

**ATTEST OR WITNESS:**

**OPERATOR**

__Sutherland Energy Co., LLC__

By __Rod A. Sutherland__

__Rod A. Sutherland__
Type or print name

Title __President__

Date __November 20, 2012__

Tax ID or S.S. No. __90-0713507__

**NON-OPERATORS**

__Dimock Operating Company, including Joe W. Dimock and Dimock Petroleum__

By _____

__Joe W. Dimock__   _Joe W Dimock_
Type or print name

Title __Individually and DBA Dimock Petroleum And as President of Dimock Operating Company__

Date __November 20, 2012__

Tax ID or S.S. No. __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__

By _____

Type or print name

Title _____

Date _____

Tax ID or S.S. No. _____

By _____

Type or print name

Title _____

Date _____

Tax ID or S.S. No. _____

## ACKNOWLEDGMENTS

Note: The following forms of acknowledgment are the short forms approved by the Uniform Law on Notarial Acts.

The validity and effect of these forms in any state will depend upon the statutes of that state.

Individual acknowledgment:

State of ____Texas____ )

                 ) ss.

County of ___Dallas___ )

    This instrument was acknowledged before me on

__11/20/12__      by _Jennifer L Neria_____

(Seal, if any)

            JENNIFER L NERIA      Title (and Rank) _Notary Public_____

          My Commission Expires      My commission expires: _June 5, 2016_____

             June 5, 2016

Acknowledgment in representative capacity:

State of _Texas_ )

                 ) ss.

County of _Wichita_ )

    This instrument was acknowledged before me on

__11/22/12__      by __Shirah Sharp_____ as

_____ of _____ .

(Seal, if any)          _Shirah Sharp_____

                     Title (and Rank) _Notary Public_____

          SHIRAH SHARP      My commission expires: _Aug 13, 2016_____

      Notary Public, State of Texas

       My Commission Expires

          August 13, 2016

# EXHIBIT A

## TO MODEL FORM OPERATING AGREEMENT

Between Dimock Operating Company, including Joe W. Dimock and also dba Dimock
Petroleum and Sutherland Energy Co., LLC dated November 20, 2012

## DESCRIPTION OF LANDS SUBJECT TO AGREEMENT

The contract area contains the following Sections of Block H of the W. & NW. RR. Co. Survey: 122-124, 143-148, 167-169, and 174-176.

The leases and Oil and Gas Interests subject to this agreement are described as follows:

All leases, to all depths, pertaining to the following wells in Hardeman County, Texas:

1.    Roy Hamrick Well No. 1
2.    Mabry-Hamrick Unit 2 Well No. 1, and
3.    Georgia-Pacific Well No. 1.

The wells are located in Sections 144, 147, and 168 of Block H of the W. & NW. R.R. Co. Survey.

## PARTIES TO AGREEMENT

For purposes of this agreement the addresses and telephone numbers for notice purposes are as follows:

Operator:  Mr. Rod Sutherland          Non-Operator:   Dimock Operating Co.
           Sutherland Energy Co., LLC                  Mr. Joe W. Dimock or
           500 Lamar Court                             4245 Kemp Blvd., Suite 518
           Irving, TX 75038                            Wichita Falls, TX 76308
           (469) 586-4393                              (940) 761-1071

Operator or Non-Operator may change their address at any time by furnishing a written notice of change of address to the other party.


# EXHIBIT "C"
## ACCOUNTING PROCEDURE
## JOINT OPERATIONS

Attached to and made part of __Operating Agreement dated November 20th, 2012 between Sutherland Energy Co., LLC (Operator) and__ __Dimock Operating Company, including Joe W. Dimock and also dba Dimock Petroleum (Non-Operator) covering Sections 122-124,__ __143-148, 167-169, and 174-176 in Hardeman County, Texas.__

## I. GENERAL PROVISIONS

IF THE PARTIES FAIL TO SELECT EITHER ONE OF COMPETING "ALTERNATIVE" PROVISIONS, OR SELECT ALL THE COMPETING "ALTERNATIVE" PROVISIONS, ALTERNATIVE 1 IN EACH SUCH INSTANCE SHALL BE DEEMED TO HAVE BEEN ADOPTED BY THE PARTIES AS A RESULT OF ANY SUCH OMISSION OR DUPLICATE NOTATION.

IN THE EVENT THAT ANY "OPTIONAL" PROVISION OF THIS ACCOUNTING PROCEDURE IS NOT ADOPTED BY THE PARTIES TO THE AGREEMENT BY A TYPED, PRINTED OR HANDWRITTEN INDICATION, SUCH PROVISION SHALL NOT FORM A PART OF THIS ACCOUNTING PROCEDURE, AND NO INFERENCE SHALL BE MADE CONCERNING THE INTENT OF THE PARTIES IN SUCH EVENT.

1. **DEFINITIONS**

   All terms used in this Accounting Procedure shall have the following meaning, unless otherwise expressly defined in the Agreement:

   "Affiliate" means for a person, another person that controls, is controlled by, or is under common control with that person. In this definition, (a) control means the ownership by one person, directly or indirectly, of more than fifty percent (50%) of the voting securities of a corporation or, for other persons, the equivalent ownership interest (such as partnership interests), and (b) "person" means an individual, corporation, partnership, trust, estate, unincorporated organization, association, or other legal entity.

   "Agreement" means the operating agreement, farmout agreement, or other contract between the Parties to which this Accounting Procedure is attached.

   "Controllable Material" means Material that, at the time of acquisition or disposition by the Joint Account, as applicable, is so classified in the Material Classification Manual most recently recommended by the Council of Petroleum Accountants Societies (COPAS).

   "Equalized Freight" means the procedure of charging transportation cost to the Joint Account based upon the distance from the nearest Railway Receiving Point to the property.

   "Excluded Amount" means a specified excluded trucking amount most recently recommended by COPAS.

   "Field Office" means a structure, or portion of a structure, whether a temporary or permanent installation, the primary function of which is to directly serve daily operation and maintenance activities of the Joint Property and which serves as a staging area for directly chargeable field personnel.

   "First Level Supervision" means those employees whose primary function in Joint Operations is the direct oversight of the Operator's field employees and/or contract labor directly employed On-site in a field operating capacity. First Level Supervision functions may include, but are not limited to:

   - Responsibility for field employees and contract labor engaged in activities that can include field operations, maintenance, construction, well remedial work, equipment movement and drilling
   - Responsibility for day-to-day direct oversight of rig operations
   - Responsibility for day-to-day direct oversight of construction operations
   - Coordination of job priorities and approval of work procedures
   - Responsibility for optimal resource utilization (equipment, Materials, personnel)
   - Responsibility for meeting production and field operating expense targets
   - Representation of the Parties in local matters involving community, vendors, regulatory agents and landowners, as an incidental part of the supervisor's operating responsibilities
   - Responsibility for all emergency responses with field staff
   - Responsibility for implementing safety and environmental practices
   - Responsibility for field adherence to company policy
   - Responsibility for employment decisions and performance appraisals for field personnel
   - Oversight of sub-groups for field functions such as electrical, safety, environmental, telecommunications, which may have group or team leaders.

   "Joint Account" means the account showing the charges paid and credits received in the conduct of the Joint Operations that are to be shared by the Parties, but does not include proceeds attributable to hydrocarbons and by-products produced under the Agreement.

   "Joint Operations" means all operations necessary or proper for the exploration, appraisal, development, production, protection, maintenance, repair, abandonment, and restoration of the Joint Property.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



"**Joint Property**" means the real and personal property subject to the Agreement.

"**Laws**" means any laws, rules, regulations, decrees, and orders of the United States of America or any state thereof and all other governmental bodies, agencies, and other authorities having jurisdiction over or affecting the provisions contained in or the transactions contemplated by the Agreement or the Parties and their operations, whether such laws now exist or are hereafter amended, enacted, promulgated or issued.

"**Material**" means personal property, equipment, supplies, or consumables acquired or held for use by the Joint Property.

"**Non-Operators**" means the Parties to the Agreement other than the Operator.

"**Offshore Facilities**" means platforms, surface and subsea development and production systems, and other support systems such as oil and gas handling facilities, living quarters, offices, shops, cranes, electrical supply equipment and systems, fuel and water storage and piping, heliport, marine docking installations, communication facilities, navigation aids, and other similar facilities necessary in the conduct of offshore operations, all of which are located offshore.

"**Off-site**" means any location that is not considered On-site as defined in this Accounting Procedure.

"**On-site**" means on the Joint Property when in direct conduct of Joint Operations. The term "On-site" shall also include that portion of Offshore Facilities, Shore Base Facilities, fabrication yards, and staging areas from which Joint Operations are conducted, or other facilities that directly control equipment on the Joint Property, regardless of whether such facilities are owned by the Joint Account.

"**Operator**" means the Party designated pursuant to the Agreement to conduct the Joint Operations.

"**Parties**" means legal entities signatory to the Agreement or their successors and assigns. Parties shall be referred to individually as "Party."

"**Participating Interest**" means the percentage of the costs and risks of conducting an operation under the Agreement that a Party agrees, or is otherwise obligated, to pay and bear.

"**Participating Party**" means a Party that approves a proposed operation or otherwise agrees, or becomes liable, to pay and bear a share of the costs and risks of conducting an operation under the Agreement.

"**Personal Expenses**" means reimbursed costs for travel and temporary living expenses.

"**Railway Receiving Point**" means the railhead nearest the Joint Property for which freight rates are published, even though an actual railhead may not exist.

"**Shore Base Facilities**" means onshore support facilities that during Joint Operations provide such services to the Joint Property as a receiving and transshipment point for Materials; debarkation point for drilling and production personnel and services; communication, scheduling and dispatching center; and other associated functions serving the Joint Property.

"**Supply Store**" means a recognized source or common stock point for a given Material item.

"**Technical Services**" means services providing specific engineering, geoscience, or other professional skills, such as those performed by engineers, geologists, geophysicists, and technicians, required to handle specific operating conditions and problems for the benefit of Joint Operations; provided, however, Technical Services shall not include those functions specifically identified as overhead under the second paragraph of the introduction of Section III (*Overhead*). Technical Services may be provided by the Operator, Operator's Affiliate, Non-Operator, Non-Operator Affiliates, and/or third parties.

2. **STATEMENTS AND BILLINGS**

The Operator shall bill Non-Operators on or before the last day of the month for their proportionate share of the Joint Account for the preceding month. Such bills shall be accompanied by statements that identify the AFE (authority for expenditure), lease or facility, and all charges and credits summarized by appropriate categories of investment and expense. Controllable Material shall be separately identified and fully described in detail, or at the Operator's option, Controllable Material may be summarized by major Material classifications. Intangible drilling costs, audit adjustments, and unusual charges and credits shall be separately and clearly identified.

The Operator may make available to Non-Operators any statements and bills required under Section I.2 and/or Section I.3.A (*Advances and Payments by the Parties*) via email, electronic data interchange, internet websites or other equivalent electronic media in lieu of paper copies. The Operator shall provide the Non-Operators instructions and any necessary information to access and receive the statements and bills within the timeframes specified herein. A statement or billing shall be deemed as delivered twenty-four (24) hours (exclusive of weekends and holidays) after the Operator notifies the Non-Operator that the statement or billing is available on the website and/or sent via email or electronic data interchange transmission. Each Non-Operator individually shall elect to receive statements and billings electronically, if available from the Operator, or request paper copies. Such election may be changed upon thirty (30) days prior written notice to the Operator.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



c o p a s

## 3. ADVANCES AND PAYMENTS BY THE PARTIES

A. Unless otherwise provided for in the Agreement, the Operator may require the Non-Operators to advance their share of the estimated cash outlay for the succeeding month's operations within fifteen (15) days after receipt of the advance request or by the first day of the month for which the advance is required, whichever is later. The Operator shall adjust each monthly billing to reflect advances received from the Non-Operators for such month. If a refund is due, the Operator shall apply the amount to be refunded to the subsequent month's billing or advance, unless the Non-Operator sends the Operator a written request for a cash refund. The Operator shall remit the refund to the Non-Operator within fifteen (15) days of receipt of such written request.

B. Except as provided below, each Party shall pay its proportionate share of all bills in full within fifteen (15) days of receipt date. If payment is not made within such time, the unpaid balance shall bear interest compounded monthly at the prime rate published by the *Wall Street Journal* on the first day of each month the payment is delinquent, plus three percent (3%), per annum, or the maximum contract rate permitted by the applicable usury Laws governing the Joint Property, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts. If the *Wall Street Journal* ceases to be published or discontinues publishing a prime rate, the unpaid balance shall bear interest compounded monthly at the prime rate published by the Federal Reserve plus three percent (3%), per annum. Interest shall begin accruing on the first day of the month in which the payment was due. Payment shall not be reduced or delayed as a result of inquiries or anticipated credits unless the Operator has agreed. Notwithstanding the foregoing, the Non-Operator may reduce payment, provided it furnishes documentation and explanation to the Operator at the time payment is made, to the extent such reduction is caused by:

(1) being billed at an incorrect working interest or Participating Interest that is higher than such Non-Operator's actual working interest or Participating Interest, as applicable; or
(2) being billed for a project or AFE requiring approval of the Parties under the Agreement that the Non-Operator has not approved or is not otherwise obligated to pay under the Agreement; or
(3) being billed for a property in which the Non-Operator no longer owns a working interest, provided the Non-Operator has furnished the Operator a copy of the recorded assignment or letter in-lieu. Notwithstanding the foregoing, the Non-Operator shall remain responsible for paying bills attributable to the interest it sold or transferred for any bills rendered during the thirty (30) day period following the Operator's receipt of such written notice; or
(4) charges outside the adjustment period, as provided in Section I.4 (*Adjustments*).

## 4. ADJUSTMENTS

A. Payment of any such bills shall not prejudice the right of any Party to protest or question the correctness thereof; however, all bills and statements, including payout statements, rendered during any calendar year shall conclusively be presumed to be true and correct, with respect only to expenditures, after twenty-four (24) months following the end of any such calendar year, unless within said period a Party takes specific detailed written exception thereto making a claim for adjustment. The Operator shall provide a response to all written exceptions, whether or not contained in an audit report, within the time periods prescribed in Section I.5 (*Expenditure Audits*).

B. All adjustments initiated by the Operator, except those described in items (1) through (4) of this Section I.4.B, are limited to the twenty-four (24) month period following the end of the calendar year in which the original charge appeared or should have appeared on the Operator's Joint Account statement or payout statement. Adjustments that may be made beyond the twenty-four (24) month period are limited to adjustments resulting from the following:

(1) a physical inventory of Controllable Material as provided for in Section V (*Inventories of Controllable Material*), or
(2) an offsetting entry (whether in whole or in part) that is the direct result of a specific joint interest audit exception granted by the Operator relating to another property, or
(3) a government/regulatory audit, or
(4) a working interest ownership or Participating Interest adjustment.

## 5. EXPENDITURE AUDITS

A. A Non-Operator, upon written notice to the Operator and all other Non-Operators, shall have the right to audit the Operator's accounts and records relating to the Joint Account within the twenty-four (24) month period following the end of such calendar year in which such bill was rendered; however, conducting an audit shall not extend the time for the taking of written exception to and the adjustment of accounts as provided for in Section I.4 (*Adjustments*). Any Party that is subject to payout accounting under the Agreement shall have the right to audit the accounts and records of the Party responsible for preparing the payout statements, or of the Party furnishing information to the Party responsible for preparing payout statements. Audits of payout accounts may include the volumes of hydrocarbons produced and saved and proceeds received for such hydrocarbons as they pertain to payout accounting required under the Agreement. Unless otherwise provided in the Agreement, audits of a payout account shall be conducted within the twenty-four (24) month period following the end of the calendar year in which the payout statement was rendered.

Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct a joint audit in a manner that will result in a minimum of inconvenience to the Operator. The Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator. The audits shall not be conducted more than once each year without prior approval of the Operator, except upon the resignation or removal of the Operator, and shall be made at the expense of

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)


those Non-Operators approving such audit.

The Non-Operator leading the audit (hereinafter "lead audit company") shall issue the audit report within ninety (90) days after completion of the audit testing and analysis; however, the ninety (90) day time period shall not extend the twenty-four (24) month requirement for taking specific detailed written exception as required in Section I.4.A (*Adjustments*) above. All claims shall be supported with sufficient documentation.

A timely filed written exception or audit report containing written exceptions (hereinafter "written exceptions") shall, with respect to the claims made therein, preclude the Operator from asserting a statute of limitations defense against such claims, and the Operator hereby waives its right to assert any statute of limitations defense against such claims for so long as any Non-Operator continues to comply with the deadlines for resolving exceptions provided in this Accounting Procedure. If the Non-Operators fail to comply with the additional deadlines in Section I.5.B or I.5.C, the Operator's waiver of its rights to assert a statute of limitations defense against the claims brought by the Non-Operators shall lapse, and such claims shall then be subject to the applicable statute of limitations, provided that such waiver shall not lapse in the event that the Operator has failed to comply with the deadlines in Section I.5.B or I.5.C.

B. The Operator shall provide a written response to all exceptions in an audit report within one hundred eighty (180) days after Operator receives such report. Denied exceptions should be accompanied by a substantive response. If the Operator fails to provide substantive response to an exception within this one hundred eighty (180) day period, the Operator will owe interest on that exception or portion thereof, if ultimately granted, from the date it received the audit report. Interest shall be calculated using the rate set forth in Section I.3.B (*Advances and Payments by the Parties*).

C. The lead audit company shall reply to the Operator's response to an audit report within ninety (90) days of receipt, and the Operator shall reply to the lead audit company's follow-up response within ninety (90) days of receipt; provided, however, each Non-Operator shall have the right to represent itself if it disagrees with the lead audit company's position or believes the lead audit company is not adequately fulfilling its duties. Unless otherwise provided for in Section I.5.E, if the Operator fails to provide substantive response to an exception within this ninety (90) day period, the Operator will owe interest on that exception or portion thereof, if ultimately granted, from the date it received the audit report. Interest shall be calculated using the rate set forth in Section I.3.B (*Advances and Payments by the Parties*).

D. If any Party fails to meet the deadlines in Sections I.5.B or I.5.C or if any audit issues are outstanding fifteen (15) months after Operator receives the audit report, the Operator or any Non-Operator participating in the audit has the right to call a resolution meeting, as set forth in this Section I.5.D or it may invoke the dispute resolution procedures included in the Agreement, if applicable. The meeting will require one month's written notice to the Operator and all Non-Operators participating in the audit. The meeting shall be held at the Operator's office or mutually agreed location, and shall be attended by representatives of the Parties with authority to resolve such outstanding issues. Any Party who fails to attend the resolution meeting shall be bound by any resolution reached at the meeting. The lead audit company will make good faith efforts to coordinate the response and positions of the Non-Operator participants throughout the resolution process; however, each Non-Operator shall have the right to represent itself. Attendees will make good faith efforts to resolve outstanding issues, and each Party will be required to present substantive information supporting its position. A resolution meeting may be held as often as agreed to by the Parties. Issues unresolved at one meeting may be discussed at subsequent meetings until each such issue is resolved.

If the Agreement contains no dispute resolution procedures and the audit issues cannot be resolved by negotiation, the dispute shall be submitted to mediation. In such event, promptly following one Party's written request for mediation, the Parties to the dispute shall choose a mutually acceptable mediator and share the costs of mediation services equally. The Parties shall each have present at the mediation at least one individual who has the authority to settle the dispute. The Parties shall make reasonable efforts to ensure that the mediation commences within sixty (60) days of the date of the mediation request. Notwithstanding the above, any Party may file a lawsuit or complaint (1) if the Parties are unable after reasonable efforts, to commence mediation within sixty (60) days of the date of the mediation request, (2) for statute of limitations reasons, or (3) to seek a preliminary injunction or other provisional judicial relief, if in its sole judgment an injunction or other provisional relief is necessary to avoid irreparable damage or to preserve the status quo. Despite such action, the Parties shall continue to try to resolve the dispute by mediation.

E. ☐ *(Optional Provision—Forfeiture Penalties)*
*If the Non-Operators fail to meet the deadline in Section I.5.C, any unresolved exceptions that were not addressed by the Non-Operators within one (1) year following receipt of the last substantive response of the Operator shall be deemed to have been withdrawn by the Non-Operators. If the Operator fails to meet the deadlines in Section I.5.B or I.5.C, any unresolved exceptions that were not addressed by the Operator within one (1) year following receipt of the audit report or receipt of the last substantive response of the Non-Operators, whichever is later, shall be deemed to have been granted by the Operator and adjustments shall be made, without interest, to the Joint Account.*

6. APPROVAL BY PARTIES

A. GENERAL MATTERS

Where an approval or other agreement of the Parties or Non-Operators is expressly required under other Sections of this Accounting Procedure and if the Agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, the

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



Operator shall notify all Non-Operators of the Operator's proposal and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.

This Section 1.6.A applies to specific situations of limited duration where a Party proposes to change the accounting for charges from that prescribed in this Accounting Procedure. This provision does not apply to amendments to this Accounting Procedure, which are covered by Section 1.6.B.

B.  AMENDMENTS

If the Agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, this Accounting Procedure can be amended by an affirmative vote of _____two_____ ( __2__ ) or more Parties, one of which is the Operator, having a combined working interest of at least _____fifty_____ percent ( _50_ %), which approval shall be binding on all Parties, provided, however, approval of at least one (1) Non-Operator shall be required.

C.  AFFILIATES

For the purpose of administering the voting procedures of Sections 1.6.A and 1.6.B, if Parties to this Agreement are Affiliates of each other, then such Affiliates shall be combined and treated as a single Party having the combined working interest or Participating Interest of such Affiliates.

For the purposes of administering the voting procedures in Section 1.6.A, if a Non-Operator is an Affiliate of the Operator, votes under Section 1.6.A shall require the majority in interest of the Non-Operator(s) after excluding the interest of the Operator's Affiliate.

## II. DIRECT CHARGES

The Operator shall charge the Joint Account with the following items:

1.  **RENTALS AND ROYALTIES**

Lease rentals and royalties paid by the Operator, on behalf of all Parties, for the Joint Operations.

2.  **LABOR**

A.  Salaries and wages, including incentive compensation programs as set forth in COPAS MFI-37 ("Chargeability of Incentive Compensation Programs"), for:

(1)  Operator's field employees directly employed On-site in the conduct of Joint Operations,

(2)  Operator's employees directly employed on Shore Base Facilities, Offshore Facilities, or other facilities serving the Joint Property if such costs are not charged under Section II.6 (*Equipment and Facilities Furnished by Operator*) or are not a function covered under Section III (*Overhead*),

(3)  Operator's employees providing First Level Supervision,

(4)  Operator's employees providing On-site Technical Services for the Joint Property if such charges are excluded from the overhead rates in Section III (*Overhead*),

(5)  Operator's employees providing Off-site Technical Services for the Joint Property if such charges are excluded from the overhead rates in Section III (*Overhead*).

Charges for the Operator's employees identified in Section II.2.A may be made based on the employee's actual salaries and wages, or in lieu thereof, a day rate representing the Operator's average salaries and wages of the employee's specific job category.

Charges for personnel chargeable under this Section II.2.A who are foreign nationals shall not exceed comparable compensation paid to an equivalent U.S. employee pursuant to this Section II.2, unless otherwise approved by the Parties pursuant to Section 1.6.A (*General Matters*).

B.  Operator's cost of holiday, vacation, sickness, and disability benefits, and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Section II.2.A, excluding severance payments or other termination allowances. Such costs under this Section II.2.B may be charged on a "when and as-paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Section II.2.A. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

C.  Expenditures or contributions made pursuant to assessments imposed by governmental authority that are applicable to costs chargeable to the Joint Account under Sections II.2.A and B.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



D. Personal Expenses of personnel whose salaries and wages are chargeable to the Joint Account under Section II.2.A when the expenses are incurred in connection with directly chargeable activities.

E. Reasonable relocation costs incurred in transferring to the Joint Property personnel whose salaries and wages are chargeable to the Joint Account under Section II.2.A. Notwithstanding the foregoing, relocation costs that result from reorganization or merger of a Party, or that are for the primary benefit of the Operator, shall not be chargeable to the Joint Account. Extraordinary relocation costs, such as those incurred as a result of transfers from remote locations, such as Alaska or overseas, shall not be charged to the Joint Account unless approved by the Parties pursuant to Section I.6.A (*General Matters*).

F. Training costs as specified in COPAS MFI-35 ("Charging of Training Costs to the Joint Account") for personnel whose salaries and wages are chargeable under Section II.2.A. This training charge shall include the wages, salaries, training course cost, and Personal Expenses incurred during the training session. The training cost shall be charged or allocated to the property or properties directly benefiting from the training. The cost of the training course shall not exceed prevailing commercial rates, where such rates are available.

G. Operator's current cost of established plans for employee benefits, as described in COPAS MFI-27 ("Employee Benefits Chargeable to Joint Operations and Subject to Percentage Limitation"), applicable to the Operator's labor costs chargeable to the Joint Account under Sections II.2.A and B based on the Operator's actual cost not to exceed the employee benefits limitation percentage most recently recommended by COPAS.

H. Award payments to employees, in accordance with COPAS MFI-49 ("Awards to Employees and Contractors") for personnel whose salaries and wages are chargeable under Section II.2.A.

3. **MATERIAL**

Material purchased or furnished by the Operator for use on the Joint Property in the conduct of Joint Operations as provided under Section IV (Material *Purchases, Transfers, and Dispositions*). Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use or is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

4. **TRANSPORTATION**

A. Transportation of the Operator's, Operator's Affiliate's, or contractor's personnel necessary for Joint Operations.

B. Transportation of Material between the Joint Property and another property, or from the Operator's warehouse or other storage point to the Joint Property, shall be charged to the receiving property using one of the methods listed below. Transportation of Material from the Joint Property to the Operator's warehouse or other storage point shall be paid for by the Joint Property using one of the methods listed below:

   (1) If the actual trucking charge is less than or equal to the Excluded Amount the Operator may charge actual trucking cost or a theoretical charge from the Railway Receiving Point to the Joint Property. The basis for the theoretical charge is the per hundred weight charge plus fuel surcharges from the Railway Receiving Point to the Joint Property. The Operator shall consistently apply the selected alternative.

   (2) If the actual trucking charge is greater than the Excluded Amount, the Operator shall charge Equalized Freight. Accessorial charges such as loading and unloading costs, split pick-up costs, detention, call out charges, and permit fees shall be charged directly to the Joint Property and shall not be included when calculating the Equalized Freight.

5. **SERVICES**

The cost of contract services, equipment, and utilities used in the conduct of Joint Operations, except for contract services, equipment, and utilities covered by Section III (*Overhead*), or Section II.7 (*Affiliates*), or excluded under Section II.9 (*Legal Expense*). Awards paid to contractors shall be chargeable pursuant to COPAS MFI-49 ("Awards to Employees and Contractors").

The costs of third party Technical Services are chargeable to the extent excluded from the overhead rates under Section III (*Overhead*).

6. **EQUIPMENT AND FACILITIES FURNISHED BY OPERATOR**

In the absence of a separately negotiated agreement, equipment and facilities furnished by the Operator will be charged as follows:

A. The Operator shall charge the Joint Account for use of Operator-owned equipment and facilities, including but not limited to production facilities, Shore Base Facilities, Offshore Facilities, and Field Offices, at rates commensurate with the costs of ownership and operation. The cost of Field Offices shall be chargeable to the extent the Field Offices provide direct service to personnel who are chargeable pursuant to Section II.2.A (*Labor*). Such rates may include labor, maintenance, repairs, other operating expense, insurance, taxes, depreciation using straight line depreciation method, and interest on gross investment less accumulated depreciation not to exceed _____ percent (_____%) per annum; provided, however, depreciation shall not be charged when the

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



~~equipment and facilities investment have been fully depreciated. The rate may include an element of the estimated cost for abandonment, reclamation, and dismantlement. Such rates shall not exceed the average commercial rates currently prevailing in the immediate area of the Joint Property.~~

B. In lieu of charges in Section II.6.A above, the Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property, less twenty percent (20%). If equipment and facilities are charged under this Section II.6.B, the Operator shall adequately document and support commercial rates and shall periodically review and update the rate and the supporting documentation. For automotive equipment, the Operator may elect to use rates published by the Petroleum Motor Transport Association (PMTA) or such other organization recognized by COPAS as the official source of rates.

7. **AFFILIATES**

A. Charges for an Affiliate's goods and/or services used in operations requiring an AFE or other authorization from the Non-Operators may be made without the approval of the Parties provided (i) the Affiliate is identified and the Affiliate goods and services are specifically detailed in the approved AFE or other authorization, and (ii) the total costs for such Affiliate's goods and services billed to such individual project do not exceed $ 100,000          If the total costs for an Affiliate's goods and services charged to such individual project are not specifically detailed in the approved AFE or authorization or exceed such amount, charges for such Affiliate shall require approval of the Parties, pursuant to Section I.6.A (*General Matters*).

B. For an Affiliate's goods and/or services used in operations not requiring an AFE or other authorization from the Non-Operators, charges for such Affiliate's goods and services shall require approval of the Parties, pursuant to Section I.6.A (*General Matters*), if the charges exceed $ 10,000          in a given calendar year.

C. The cost of the Affiliate's goods or services shall not exceed average commercial rates prevailing in the area of the Joint Property, unless the Operator obtains the Non-Operators' approval of such rates. The Operator shall adequately document and support commercial rates and shall periodically review and update the rate and the supporting documentation; provided, however, documentation of commercial rates shall not be required if the Operator obtains Non-Operator approval of its Affiliate's rates or charges prior to billing Non-Operators for such Affiliate's goods and services. Notwithstanding the foregoing, direct charges for Affiliate-owned communication facilities or systems shall be made pursuant to Section II.12 (*Communications*).

If the Parties fail to designate an amount in Sections II.7.A or II.7.B, in each instance the amount deemed adopted by the Parties as a result of such omission shall be the amount established as the Operator's expenditure limitation in the Agreement. If the Agreement does not contain an Operator's expenditure limitation, the amount deemed adopted by the Parties as a result of such omission shall be zero dollars ($ 0.00).

8. **DAMAGES AND LOSSES TO JOINT PROPERTY**

All costs or expenses necessary for the repair or replacement of Joint Property resulting from damages or losses incurred, except to the extent such damages or losses result from a Party's or Parties' gross negligence or willful misconduct, in which case such Party or Parties shall be solely liable.

The Operator shall furnish the Non-Operator written notice of damages or losses incurred as soon as practicable after a report has been received by the Operator.

9. **LEGAL EXPENSE**

Recording fees and costs of handling, settling, or otherwise discharging litigation, claims, and liens incurred in or resulting from operations under the Agreement, or necessary to protect or recover the Joint Property, to the extent permitted under the Agreement. Costs of the Operator's or Affiliate's legal staff or outside attorneys, including fees and expenses, are not chargeable unless approved by the Parties pursuant to Section I.6.A (*General Matters*) or otherwise provided for in the Agreement.

Notwithstanding the foregoing paragraph, costs for procuring abstracts, fees paid to outside attorneys for title examinations (including preliminary, supplemental, shut-in royalty opinions, division order title opinions), and curative work shall be chargeable to the extent permitted as a direct charge in the Agreement.

10. **TAXES AND PERMITS**

All taxes and permitting fees of every kind and nature, assessed or levied upon or in connection with the Joint Property, or the production therefrom, and which have been paid by the Operator for the benefit of the Parties, including penalties and interest, except to the extent the penalties and interest result from the Operator's gross negligence or willful misconduct.

If ad valorem taxes paid by the Operator are based in whole or in part upon separate valuations of each Party's working interest, then notwithstanding any contrary provisions, the charges to the Parties will be made in accordance with the tax value generated by each Party's working interest.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



Costs of tax consultants or advisors, the Operator's employees, or Operator's Affiliate employees in matters regarding ad valorem or other tax matters, are not permitted as direct charges unless approved by the Parties pursuant to Section I.6.A (*General Matters*).

Charges to the Joint Account resulting from sales/use tax audits, including extrapolated amounts and penalties and interest, are permitted, provided the Non-Operator shall be allowed to review the invoices and other underlying source documents which served as the basis for tax charges and to determine that the correct amount of taxes were charged to the Joint Account. If the Non-Operator is not permitted to review such documentation, the sales/use tax amount shall not be directly charged unless the Operator can conclusively document the amount owed by the Joint Account.

## 11. INSURANCE

Net premiums paid for insurance required to be carried for Joint Operations for the protection of the Parties. If Joint Operations are conducted at locations where the Operator acts as self-insurer in regard to its worker's compensation and employer's liability insurance obligation, the Operator shall charge the Joint Account manual rates for the risk assumed in its self-insurance program as regulated by the jurisdiction governing the Joint Property. In the case of offshore operations in federal waters, the manual rates of the adjacent state shall be used for personnel performing work On-site, and such rates shall be adjusted for offshore operations by the U.S. Longshoreman and Harbor Workers (USL&H) or Jones Act surcharge, as appropriate.

## 12. COMMUNICATIONS

Costs of acquiring, leasing, installing, operating, repairing, and maintaining communication facilities or systems, including satellite, radio and microwave facilities, between the Joint Property and the Operator's office(s) directly responsible for field operations in accordance with the provisions of COPAS MFI-44 ("Field Computer and Communication Systems"). If the communications facilities or systems serving the Joint Property are Operator-owned, charges to the Joint Account shall be made as provided in Section II.6 (*Equipment and Facilities Furnished by Operator*). If the communication facilities or systems serving the Joint Property are owned by the Operator's Affiliate, charges to the Joint Account shall not exceed average commercial rates prevailing in the area of the Joint Property. The Operator shall adequately document and support commercial rates and shall periodically review and update the rate and the supporting documentation.

## 13. ECOLOGICAL, ENVIRONMENTAL, AND SAFETY

Costs incurred for Technical Services and drafting to comply with ecological, environmental and safety Laws or standards recommended by Occupational Safety and Health Administration (OSHA) or other regulatory authorities. All other labor and functions incurred for ecological, environmental and safety matters, including management, administration, and permitting, shall be covered by Sections II.2 (*Labor*), II.5 (*Services*), or Section III (*Overhead*), as applicable.

Costs to provide or have available pollution containment and removal equipment plus actual costs of control and cleanup and resulting responsibilities of oil and other spills as well as discharges from permitted outfalls as required by applicable Laws, or other pollution containment and removal equipment deemed appropriate by the Operator for prudent operations, are directly chargeable.

## 14. ABANDONMENT AND RECLAMATION

Costs incurred for abandonment and reclamation of the Joint Property, including costs required by lease agreements or by Laws.

## 15. OTHER EXPENDITURES

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II (*Direct Charges*), or in Section III (*Overhead*) and which is of direct benefit to the Joint Property and is incurred by the Operator in the necessary and proper conduct of the Joint Operations. Charges made under this Section II.15 shall require approval of the Parties, pursuant to Section I.6.A (*General Matters*).

## III. OVERHEAD

As compensation for costs not specifically identified as chargeable to the Joint Account pursuant to Section II (*Direct Charges*), the Operator shall charge the Joint Account in accordance with this Section III.

Functions included in the overhead rates regardless of whether performed by the Operator, Operator's Affiliates or third parties and regardless of location, shall include, but not be limited to, costs and expenses of:

- warehousing, other than for warehouses that are jointly owned under this Agreement
- design and drafting (except when allowed as a direct charge under Sections II.13, III.1.A(ii), and III.2, Option B)
- inventory costs not chargeable under Section V (*Inventories of Controllable Material*)
- procurement
- administration
- accounting and auditing
- gas dispatching and gas chart integration

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)


- human resources
- management
- supervision not directly charged under Section II.2 (*Labor*)
- legal services not directly chargeable under Section II.9 (*Legal Expense*)
- taxation, other than those costs identified as directly chargeable under Section II.10 (*Taxes and Permits*)
- preparation and monitoring of permits and certifications; preparing regulatory reports; appearances before or meetings with governmental agencies or other authorities having jurisdiction over the Joint Property, other than On-site inspections; reviewing, interpreting, or submitting comments on or lobbying with respect to Laws or proposed Laws.

Overhead charges shall include the salaries or wages plus applicable payroll burdens, benefits, and Personal Expenses of personnel performing overhead functions, as well as office and other related expenses of overhead functions.

1. **OVERHEAD—DRILLING AND PRODUCING OPERATIONS**

   As compensation for costs incurred but not chargeable under Section II (*Direct Charges*) and not covered by other provisions of this Section III, the Operator shall charge on either:

   ☑ (Alternative 1) Fixed Rate Basis, Section III.1.B.
   ☐ (Alternative 2) Percentage Basis, Section III.1.C.

   A. TECHNICAL SERVICES

      (i) Except as otherwise provided in Section II.13 (*Ecological Environmental, and Safety*) and Section III.2 (*Overhead – Major Construction and Catastrophe*), or by approval of the Parties pursuant to Section I.6.A (*General Matters*), the salaries, wages, related payroll burdens and benefits, and Personal Expenses for On-site Technical Services, including third party Technical Services:

         ☑ (Alternative 1 – Direct) shall be charged <u>direct</u> to the Joint Account.

         ☐ (Alternative 2 – Overhead) shall be covered by the <u>overhead</u> rates.

      (ii) Except as otherwise provided in Section II.13 (*Ecological, Environmental, and Safety*) and Section III.2 (*Overhead – Major Construction and Catastrophe*), or by approval of the Parties pursuant to Section I.6.A (*General Matters*), the salaries, wages, related payroll burdens and benefits, and Personal Expenses for Off-site Technical Services, including third party Technical Services:

         ☐ (Alternative 1 – All Overhead) shall be covered by the <u>overhead</u> rates.

         ☐ (Alternative 2 – All Direct) shall be charged <u>direct</u> to the Joint Account.

         ☑ (Alternative 3 – Drilling Direct) shall be charged <u>direct</u> to the Joint Account, <u>only</u> to the extent such Technical Services are directly attributable to drilling, redrilling, deepening, or sidetracking operations, through completion, temporary abandonment, or abandonment if a dry hole. Off-site Technical Services for all other operations, including workover, recompletion, abandonment of producing wells, and the construction or expansion of fixed assets not covered by Section III.2 (*Overhead - Major Construction and Catastrophe*) shall be covered by the overhead rates.

   Notwithstanding anything to the contrary in this Section III, Technical Services provided by Operator's Affiliates are subject to limitations set forth in Section II.7 (*Affiliates*). Charges for Technical personnel performing non-technical work shall not be governed by this Section III.1.A, but instead governed by other provisions of this Accounting Procedure relating to the type of work being performed.

   B. OVERHEAD—FIXED RATE BASIS

      (1) The Operator shall charge the Joint Account at the following rates per well per month:

         Drilling Well Rate per month $ _5000.00_____ (prorated for less than a full month)

         Producing Well Rate per month $_500.00_____

      (2) Application of Overhead—Drilling Well Rate shall be as follows:

         (a) Charges for onshore drilling wells shall begin on the spud date and terminate on the date the drilling and/or completion equipment used on the well is released, whichever occurs later. Charges for offshore and inland waters drilling wells shall begin on the date the drilling or completion equipment arrives on location and terminate on the date the drilling or completion equipment moves off location, or is released, whichever occurs first. No charge shall be made during suspension of drilling and/or completion operations for fifteen (15) or more consecutive calendar days.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



**c o p a s**

(b) Charges for any well undergoing any type of workover, recompletion, and/or abandonment for a period of five (5) or more consecutive work–days shall be made at the Drilling Well Rate. Such charges shall be applied for the period from date operations, with rig or other units used in operations, commence through date of rig or other unit release, except that no charges shall be made during suspension of operations for fifteen (15) or more consecutive calendar days.

(3) Application of Overhead—Producing Well Rate shall be as follows:

    (a) An active well that is produced, injected into for recovery or disposal, or used to obtain water supply to support operations for any portion of the month shall be considered as a one-well charge for the entire month.

    (b) Each active completion in a multi-completed well shall be considered as a one-well charge provided each completion is considered a separate well by the governing regulatory authority.

    (c) A one-well charge shall be made for the month in which plugging and abandonment operations are completed on any well, unless the Drilling Well Rate applies, as provided in Sections III.1.B.(2)(a) or (b). This one-well charge shall be made whether or not the well has produced.

    (d) An active gas well shut in because of overproduction or failure of a purchaser, processor, or transporter to take production shall be considered as a one-well charge provided the gas well is directly connected to a permanent sales outlet.

    (e) Any well not meeting the criteria set forth in Sections III.1.B.(3) (a), (b), (c), or (d) shall not qualify for a producing overhead charge.

(4) The well rates shall be adjusted on the first day of April each year following the effective date of the Agreement; provided, however, if this Accounting Procedure is attached to or otherwise governing the payout accounting under a farmout agreement, the rates shall be adjusted on the first day of April each year following the effective date of such farmout agreement. The adjustment shall be computed by applying the adjustment factor most recently published by COPAS. The adjusted rates shall be the initial or amended rates agreed to by the Parties increased or decreased by the adjustment factor described herein, for each year from the effective date of such rates, in accordance with COPAS MFI-47 ("Adjustment of Overhead Rates").

~~C. OVERHEAD—PERCENTAGE BASIS~~

~~(1) Operator shall charge the Joint Account at the following rates:~~

~~(a) Development Rate _____ percent (_____) % of the cost of development of the Joint Property, exclusive of costs provided under Section II.9 (Legal Expense) and all Material salvage credits.~~

~~(b) Operating Rate _____ percent (_____%) of the cost of operating the Joint Property, exclusive of costs provided under Sections II.1 (Rentals and Royalties) and II.9 (Legal Expense); all Material salvage credits; the value of substances purchased for enhanced recovery; all property and ad valorem taxes, and any other taxes and assessments that are levied, assessed, and paid upon the mineral interest in and to the Joint Property.~~

~~(2) Application of Overhead—Percentage Basis shall be as follows:~~

~~(a) The Development Rate shall be applied to all costs in connection with:~~

~~[i] drilling, redrilling, sidetracking, or deepening of a well~~
~~[ii] a well undergoing plugback or workover operations for a period of five (5) or more consecutive work–days~~
~~[iii] preliminary expenditures necessary in preparation for drilling~~
~~[iv] expenditures incurred in abandoning when the well is not completed as a producer~~
~~[v] construction or installation of fixed assets, the expansion of fixed assets and any other project clearly discernible as a fixed asset, other than Major Construction or Catastrophe as defined in Section III.2 (Overhead—Major Construction and Catastrophe).~~

~~(b) The Operating Rate shall be applied to all other costs in connection with Joint Operations, except those subject to Section III.2 (Overhead—Major Construction and Catastrophe).~~

2. **OVERHEAD—MAJOR CONSTRUCTION AND CATASTROPHE**

To compensate the Operator for overhead costs incurred in connection with a Major Construction project or Catastrophe, the Operator shall either negotiate a rate prior to the beginning of the project, or shall charge the Joint Account for overhead based on the following rates for any Major Construction project in excess of the Operator's expenditure limit under the Agreement, or for any Catastrophe regardless of the amount. If the Agreement to which this Accounting Procedure is attached does not contain an expenditure limit, Major Construction Overhead shall be assessed for any single Major Construction project costing in excess of $100,000 gross.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



Major Construction shall mean the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, or in the dismantlement, abandonment, removal, and restoration of platforms, production equipment, and other operating facilities.

Catastrophe is defined as a sudden calamitous event bringing damage, loss, or destruction to property or the environment, such as an oil spill, blowout, explosion, fire, storm, hurricane, or other disaster. The overhead rate shall be applied to those costs necessary to restore the Joint Property to the equivalent condition that existed prior to the event.

A.    If the Operator absorbs the engineering, design and drafting costs related to the project:

(1)    ___5___% of total costs if such costs are less than $100,000; plus

(2)    ___5___% of total costs in excess of $100,000 but less than $1,000,000; plus

(3)    ___5___% of total costs in excess of $1,000,000.

B.    If the Operator charges engineering, design and drafting costs related to the project directly to the Joint Account:

(1)    ___5___% of total costs if such costs are less than $100,000; plus

(2)    ___5___% of total costs in excess of $100,000 but less than $1,000,000; plus

(3)    ___5___% of total costs in excess of $1,000,000.

Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single Major Construction project shall not be treated separately, and the cost of drilling and workover wells and purchasing and installing pumping units and downhole artificial lift equipment shall be excluded. For Catastrophes, the rates shall be applied to all costs associated with each single occurrence or event.

On each project, the Operator shall advise the Non-Operator(s) in advance which of the above options shall apply.

For the purposes of calculating Catastrophe Overhead, the cost of drilling relief wells, substitute wells, or conducting other well operations directly resulting from the catastrophic event shall be included. Expenditures to which these rates apply shall not be reduced by salvage or insurance recoveries. Expenditures that qualify for Major Construction or Catastrophe Overhead shall not qualify for overhead under any other overhead provisions.

In the event of any conflict between the provisions of this Section III.2 and the provisions of Sections II.2 (*Labor*), II.5 (*Services*), or II.7 (*Affiliates*), the provisions of this Section III.2 shall govern.

3.    AMENDMENT OF OVERHEAD RATES

The overhead rates provided for in this Section III may be amended from time to time if, in practice, the rates are found to be insufficient or excessive, in accordance with the provisions of Section I.6.B (*Amendments*).

## IV. MATERIAL PURCHASES, TRANSFERS, AND DISPOSITIONS

The Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for direct purchases, transfers, and dispositions. The Operator shall provide all Material for use in the conduct of Joint Operations; however, Material may be supplied by the Non-Operators, at the Operator's option. Material furnished by any Party shall be furnished without any express or implied warranties as to quality, fitness for use, or any other matter.

1.    DIRECT PURCHASES

Direct purchases shall be charged to the Joint Account at the price paid by the Operator after deduction of all discounts received. The Operator shall make good faith efforts to take discounts offered by suppliers, but shall not be liable for failure to take discounts except to the extent such failure was the result of the Operator's gross negligence or willful misconduct. A direct purchase shall be deemed to occur when an agreement is made between an Operator and a third party for the acquisition of Material for a specific well site or location. Material provided by the Operator under "vendor stocking programs," where the initial use is for a Joint Property and title of the Material does not pass from the manufacturer, distributor, or agent until usage, is considered a direct purchase. If Material is found to be defective or is returned to the manufacturer, distributor, or agent for any other reason, credit shall be passed to the Joint Account within sixty (60) days after the Operator has received adjustment from the manufacturer, distributor, or agent.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



**C O P A S**

## 2. TRANSFERS

A transfer is determined to occur when the Operator (i) furnishes Material from a storage facility or from another operated property, (ii) has assumed liability for the storage costs and changes in value, and (iii) has previously secured and held title to the transferred Material. Similarly, the removal of Material from the Joint Property to a storage facility or to another operated property is also considered a transfer; provided, however, Material that is moved from the Joint Property to a storage location for safe-keeping pending disposition may remain charged to the Joint Account and is not considered a transfer. Material shall be disposed of in accordance with Section IV.3 (*Disposition of Surplus*) and the Agreement to which this Accounting Procedure is attached.

### A. PRICING

The value of Material transferred to/from the Joint Property should generally reflect the market value on the date of physical transfer. Regardless of the pricing method used, the Operator shall make available to the Non-Operators sufficient documentation to verify the Material valuation. When higher than specification grade or size tubulars are used in the conduct of Joint Operations, the Operator shall charge the Joint Account at the equivalent price for well design specification tubulars, unless such higher specification grade or sized tubulars are approved by the Parties pursuant to Section I.6.A (*General Matters*). Transfers of new Material will be priced using one of the following pricing methods; provided, however, the Operator shall use consistent pricing methods, and not alternate between methods for the purpose of choosing the method most favorable to the Operator for a specific transfer:

(1) Using published prices in effect on date of movement as adjusted by the appropriate COPAS Historical Price Multiplier (HPM) or prices provided by the COPAS Computerized Equipment Pricing System (CEPS).

    (a) For oil country tubulars and line pipe, the published price shall be based upon eastern mill carload base prices (Houston, Texas, for special end) adjusted as of date of movement, plus transportation cost as defined in Section IV.2.B (*Freight*).

    (b) For other Material, the published price shall be the published list price in effect at date of movement, as listed by a Supply Store nearest the Joint Property where like Material is normally available, or point of manufacture plus transportation costs as defined in Section IV.2.B (*Freight*).

(2) Based on a price quotation from a vendor that reflects a current realistic acquisition cost.

(3) Based on the amount paid by the Operator for like Material in the vicinity of the Joint Property within the previous twelve (12) months from the date of physical transfer.

(4) As agreed to by the Participating Parties for Material being transferred to the Joint Property, and by the Parties owning the Material for Material being transferred from the Joint Property.

### B. FREIGHT

Transportation costs shall be added to the Material transfer price using the method prescribed by the COPAS Computerized Equipment Pricing System (CEPS). If not using CEPS, transportation costs shall be calculated as follows:

(1) Transportation costs for oil country tubulars and line pipe shall be calculated using the distance from eastern mill to the Railway Receiving Point based on the carload weight basis as recommended by the COPAS MFI-38 ("Material Pricing Manual") and other COPAS MFIs in effect at the time of the transfer.

(2) Transportation costs for special mill items shall be calculated from that mill's shipping point to the Railway Receiving Point. For transportation costs from other than eastern mills, the 30,000-pound interstate truck rate shall be used. Transportation costs for macaroni tubing shall be calculated based on the interstate truck rate per weight of tubing transferred to the Railway Receiving Point.

(3) Transportation costs for special end tubular goods shall be calculated using the interstate truck rate from Houston, Texas, to the Railway Receiving Point.

(4) Transportation costs for Material other than that described in Sections IV.2.B.(1) through (3), shall be calculated from the Supply Store or point of manufacture, whichever is appropriate, to the Railway Receiving Point.

Regardless of whether using CEPS or manually calculating transportation costs, transportation costs from the Railway Receiving Point to the Joint Property are in addition to the foregoing, and may be charged to the Joint Account based on actual costs incurred. All transportation costs are subject to Equalized Freight as provided in Section II.4 (*Transportation*) of this Accounting Procedure.

### C. TAXES

Sales and use taxes shall be added to the Material transfer price using either the method contained in the COPAS Computerized Equipment Pricing System (CEPS) or the applicable tax rate in effect for the Joint Property at the time and place of transfer. In either case, the Joint Account shall be charged or credited at the rate that would have governed had the Material been a direct purchase.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



D.  CONDITION

(1)  Condition "A" – New and unused Material in sound and serviceable condition shall be charged at one hundred percent (100%) of the price as determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*). Material transferred from the Joint Property that was not placed in service shall be credited as charged without gain or loss; provided, however, any unused Material that was charged to the Joint Account through a direct purchase will be credited to the Joint Account at the original cost paid less restocking fees charged by the vendor. New and unused Material transferred from the Joint Property may be credited at a price other than the price originally charged to the Joint Account provided such price is approved by the Parties owning such Material, pursuant to Section I.6.A (*General Matters*). All refurbishing costs required or necessary to return the Material to original condition or to correct handling, transportation, or other damages will be borne by the divesting property. The Joint Account is responsible for Material preparation, handling, and transportation costs for new and unused Material charged to the Joint Property either through a direct purchase or transfer. Any preparation costs incurred, including any internal or external coating and wrapping, will be credited on new Material provided these services were not repeated for such Material for the receiving property.

(2)  Condition "B" – Used Material in sound and serviceable condition and suitable for reuse without reconditioning shall be priced by multiplying the price determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*) by seventy-five percent (75%).

Except as provided in Section IV.2.D(3), all reconditioning costs required to return the Material to Condition "B" or to correct handling, transportation or other damages will be borne by the divesting property.

If the Material was originally charged to the Joint Account as used Material and placed in service for the Joint Property, the Material will be credited at the price determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*) multiplied by sixty-five percent (65%).

Unless otherwise agreed to by the Parties that paid for such Material, used Material transferred from the Joint Property that was not placed in service on the property shall be credited as charged without gain or loss.

(3)  Condition "C" – Material that is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced by multiplying the price determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*) by fifty percent (50%).

The cost of reconditioning may be charged to the receiving property to the extent Condition "C" value, plus cost of reconditioning, does not exceed Condition "B" value.

(4)  Condition "D" – Material that (i) is no longer suitable for its original purpose but useable for some other purpose, (ii) is obsolete, or (iii) does not meet original specifications but still has value and can be used in other applications as a substitute for items with different specifications, is considered Condition "D" Material. Casing, tubing, or drill pipe used as line pipe shall be priced as Grade A and B seamless line pipe of comparable size and weight. Used casing, tubing, or drill pipe utilized as line pipe shall be priced at used line pipe prices. Casing, tubing, or drill pipe used as higher pressure service lines than standard line pipe, e.g., power oil lines, shall be priced under normal pricing procedures for casing, tubing, or drill pipe. Upset tubular goods shall be priced on a non-upset basis. For other items, the price used should result in the Joint Account being charged or credited with the value of the service rendered or use of the Material, or as agreed to by the Parties pursuant to Section 1.6.A (*General Matters*).

(5)  Condition "E" – Junk shall be priced at prevailing scrap value prices.

E.  OTHER PRICING PROVISIONS

(1)  Preparation Costs

Subject to Section II (*Direct Charges*) and Section III (*Overhead*) of this Accounting Procedure, costs incurred by the Operator in making Material serviceable including inspection, third party surveillance services, and other similar services will be charged to the Joint Account at prices which reflect the Operator's actual costs of the services. Documentation must be provided to the Non-Operators upon request to support the cost of service. New coating and/or wrapping shall be considered a component of the Materials and priced in accordance with Sections IV.1 (*Direct Purchases*) or IV.2.A (*Pricing*), as applicable. No charges or credits shall be made for used coating or wrapping. Charges and credits for inspections shall be made in accordance with COPAS MFI-38 ("Material Pricing Manual").

(2)  Loading and Unloading Costs

Loading and unloading costs related to the movement of the Material to the Joint Property shall be charged in accordance with the methods specified in COPAS MFI-38 ("Material Pricing Manual").

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)


3. **DISPOSITION OF SURPLUS**

Surplus Material is that Material, whether new or used, that is no longer required for Joint Operations. The Operator may purchase, but shall be under no obligation to purchase, the interest of the Non-Operators in surplus Material.

Dispositions for the purpose of this procedure are considered to be the relinquishment of title of the Material from the Joint Property to either a third party, a Non-Operator, or to the Operator. To avoid the accumulation of surplus Material, the Operator should make good faith efforts to dispose of surplus within twelve (12) months through buy/sale agreements, trade, sale to a third party, division in kind, or other dispositions as agreed to by the Parties.

Disposal of surplus Materials shall be made in accordance with the terms of the Agreement to which this Accounting Procedure is attached. If the Agreement contains no provisions governing disposal of surplus Material, the following terms shall apply:

- The Operator may, through a sale to an unrelated third party or entity, dispose of surplus Material having a gross sale value that is less than or equal to the Operator's expenditure limit as set forth in the Agreement to which this Accounting Procedure is attached without the prior approval of the Parties owning such Material.

- If the gross sale value exceeds the Agreement expenditure limit, the disposal must be agreed to by the Parties owning such Material.

- Operator may purchase surplus Condition "A" or "B" Material without approval of the Parties owning such Material, based on the pricing methods set forth in Section IV.2 (*Transfers*).

- Operator may purchase Condition "C" Material without prior approval of the Parties owning such Material if the value of the Materials, based on the pricing methods set forth in Section IV.2 (*Transfers*), is less than or equal to the Operator's expenditure limitation set forth in the Agreement. The Operator shall provide documentation supporting the classification of the Material as Condition C.

- Operator may dispose of Condition "D" or "E" Material under procedures normally utilized by Operator without prior approval of the Parties owning such Material.

4. **SPECIAL PRICING PROVISIONS**

A. PREMIUM PRICING

Whenever Material is available only at inflated prices due to national emergencies, strikes, government imposed foreign trade restrictions, or other unusual causes over which the Operator has no control, for direct purchase the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, making it suitable for use, and moving it to the Joint Property. Material transferred or disposed of during premium pricing situations shall be valued in accordance with Section IV.2 (*Transfers*) or Section IV.3 (*Disposition of Surplus*), as applicable.

B. SHOP-MADE ITEMS

Items fabricated by the Operator's employees, or by contract laborers under the direction of the Operator, shall be priced using the value of the Material used to construct the item plus the cost of labor to fabricate the item. If the Material is from the Operator's scrap or junk account, the Material shall be priced at either twenty-five percent (25%) of the current price as determined in Section IV.2.A (*Pricing*) or scrap value, whichever is higher. In no event shall the amount charged exceed the value of the item commensurate with its use.

C. MILL REJECTS

Mill rejects purchased as "limited service" casing or tubing shall be priced at eighty percent (80%) of K-55/J-55 price as determined in Section IV.2 (*Transfers*). Line pipe converted to casing or tubing with casing or tubing couplings attached shall be priced as K-55/J-55 casing or tubing at the nearest size and weight.

**V. INVENTORIES OF CONTROLLABLE MATERIAL**

The Operator shall maintain records of Controllable Material charged to the Joint Account, with sufficient detail to perform physical inventories.

Adjustments to the Joint Account by the Operator resulting from a physical inventory of Controllable Material shall be made within twelve (12) months following the taking of the inventory or receipt of Non-Operator inventory report. Charges and credits for overages or shortages will be valued for the Joint Account in accordance with Section IV.2 (*Transfers*) and shall be based on the Condition "B" prices in effect on the date of physical inventory unless the inventorying Parties can provide sufficient evidence another Material condition applies.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



**c o p a s**

## 1. DIRECTED INVENTORIES

Physical inventories shall be performed by the Operator upon written request of a majority in working interests of the Non-Operators (hereinafter, "directed inventory"); provided, however, the Operator shall not be required to perform directed inventories more frequently than once every five (5) years. Directed inventories shall be commenced within one hundred eighty (180) days after the Operator receives written notice that a majority in interest of the Non-Operators has requested the inventory. All Parties shall be governed by the results of any directed inventory.

Expenses of directed inventories will be borne by the Joint Account; provided, however, costs associated with any post-report follow-up work in settling the inventory will be absorbed by the Party incurring such costs. The Operator is expected to exercise judgment in keeping expenses within reasonable limits. Any anticipated disproportionate or extraordinary costs should be discussed and agreed upon prior to commencement of the inventory. Expenses of directed inventories may include the following:

A.   A per diem rate for each inventory person, representative of actual salaries, wages, and payroll burdens and benefits of the personnel performing the inventory or a rate agreed to by the Parties pursuant to Section 1.6.A (*General Matters*). The per diem rate shall also be applied to a reasonable number of days for pre-inventory work and report preparation.

B.   Actual transportation costs and Personal Expenses for the inventory team.

C.   Reasonable charges for report preparation and distribution to the Non-Operators.

## 2. NON-DIRECTED INVENTORIES

A.   OPERATOR INVENTORIES

Physical inventories that are not requested by the Non-Operators may be performed by the Operator, at the Operator's discretion. The expenses of conducting such Operator-initiated inventories shall not be charged to the Joint Account.

B.   NON-OPERATOR INVENTORIES

Subject to the terms of the Agreement to which this Accounting Procedure is attached, the Non-Operators may conduct a physical inventory at reasonable times at their sole cost and risk after giving the Operator at least ninety (90) days prior written notice. The Non-Operator inventory report shall be furnished to the Operator in writing within ninety (90) days of completing the inventory fieldwork.

C.   SPECIAL INVENTORIES

The expense of conducting inventories other than those described in Sections V.1 (*Directed Inventories*), V.2.A (*Operator Inventories*), or V.2.B (*Non-Operator Inventories*), shall be charged to the Party requesting such inventory; provided, however, inventories required due to a change of Operator shall be charged to the Joint Account in the same manner as described in Section V.1 (*Directed Inventories*).

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

**CAUSE NO. 11098**

| | | |
|---|---|---|
| SUTHERLAND ENERGY CO., LLC | § | IN THE DISTRICT COURT |
| | § | |
| **Plaintiff** | § | |
| | § | |
| VS | § | |
| | § | HARDEMAN COUNTY, TEXAS |
| DIMOCK OPERATING COMPANY | § | |
| and JOE W. DIMOCK D/B/A | § | |
| DIMOCK PETROLEUM | § | |
| | § | |
| **Defendant** | § | 46TH JUDICIAL DISTRICT |

## ORDER GRANTING PLAINTIFF SUTHERLAND ENERGY, CO., LLC'S PARTIAL MOTION FOR SUMMARY JUDGMENT

On September 22, 2014, the Court heard Plaintiff Sutherland Energy Co., LLC's Partial Motion for Summary Judgment. The Court, having considered the pleadings, motion, responses, replies, evidence on file, and arguments of counsel, is of the opinion and finds that Plaintiff is entitled to partial summary judgment as a matter of law on its action for declaratory judgment.

It is, therefore, **ORDERED, ADJUDGED AND DECREED** that Plaintiff's Partial Motion for Summary Judgment is GRANTED. The Court finds as follows:

1. The parties' Seismic Exploration and Farmout Agreement (the "Agreement") gives Plaintiff the sole, exclusive and irrevocable right to conduct seismic exploration operations on, under, and in the Subject Leases (as that term is defined in the Agreement) during the term of the Agreement;

2. The Agreement gives Plaintiff the sole discretion to determine the type, nature, timing, and extent of all seismic exploration operations.

3. Plaintiff's costs incurred for land and seismic operations for the Hammick Area 3D Shoot

FILED

The _22nd_ day of _December_ 20 _14_

at _7:00_ o'clock _a_ M.

ELLEN LONDON

Clerk Dist. Court Hardeman County, Texas

By _Sara Edwards_

are "capital costs" to be considered in determining "project payout" under the Agreement.

4. Plaintiff's ability to incur capital costs for land and seismic operations for the Hamrick Area 3D Shoot is not restricted by the parties' joint operating agreement.


Signed this ___19___ day of ___Dec___, 2014.


_____
JUDGE PRESIDING

Sutherland Energy Co., LLC
2013 Lease Operating Statement

HAMRICK #3

Quanah (Chappel 8295) Field

Hardeman County, TX

| | June | July | August | September | October | November | December | Yearly Total |
|---|---|---|---|---|---|---|---|---|
| **VOLUMES** | | | | | | | | |
| Oil Sales- BBLS | 704.88 | 2907.06 | 3278.47 | 3082.08 | 3288.05 | 3487.22 | 2384.18 | 19131.94 |
| Gas Sales- MCF | | | | | | | | 0.00 |
| **OIL & GAS INCOME** | | | | | | | | |
| Gross Oil Income ($) | 65707.76 | 297851.54 | 344645.87 | 323942.00 | 327456.91 | 320831.23 | 227341.11 | 1907776.42 |
| Average Price ($/BBL) | 93.22 | 102.46 | 105.12 | 105.11 | 99.59 | 92.00 | 95.35 | 138.57 |
| Gross Gas Income ($) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Total Oil & Gas Income ($) | 65707.76 | 297851.54 | 344645.87 | 323942.00 | 327456.91 | 320831.23 | 227341.11 | 1907776.42 |
| **TAXES & ROYALTY** | | | | | | | | |
| Oil Severance Tax ($) | 3028.28 | 13724.78 | 15880.34 | 14926.36 | 15089.73 | 14786.56 | 10477.06 | 87913.11 |
| Gas Severance Tax ($) | | | | | | | | 0.00 |
| Royalty ($) | 9947.30 | 45091.20 | 52175.42 | 49041.09 | 49572.98 | 48569.60 | 34416.54 | 288814.13 |
| Total Income Less Taxes & Royalty($) | 52732.18 | 239035.56 | 276590.11 | 259974.55 | 262794.20 | 257475.07 | 182447.51 | 1531049.18 |
| **LEASE OPERATING EXPENSES (LOE)** | | | | | | | | |
| Pumper | 57.55 | 400.00 | 400.00 | | 400.00 | 400.00 | 400.00 | 2057.55 |
| Electricity | | | 46.49 | 55.63 | 56.99 | 59.72 | 66.54 | 285.37 |
| Chemicals | | | | | | | | 0.00 |
| Materials & Supplies | | | | | | 304.29 | | 304.29 |
| Routabout Services | | | | | | | | 0.00 |
| Backhoe/Dozer | | | | | | | | 0.00 |
| Saltwater Disposal | | | | | | | | 0.00 |
| Pump Truck | | | | | | | | 0.00 |
| Roads & Location | | | | | | | | 0.00 |
| Well Service Rig | | | | | | | | 0.00 |
| Administrative Overhead | | 537.00 | 537.00 | 537.00 | 537.00 | 537.00 | 537.00 | 3222.00 |
| First Level Supervision | 109.38 | 109.38 | 109.38 | 109.38 | 109.38 | 109.38 | 109.38 | 765.66 |
| Engineering/Geological | | | | | | | | 0.00 |
| Insurance- General Liability | | | | | | | | 0.00 |
| Insurance- Control of Well | | | | | | | | 0.00 |
| Advalorem Taxes | | | | | | | | 0.00 |
| Miscellaneous | | | | | 225.00 | 208.80 | 150.00 | 583.80 |
| Total LOE ($) | 166.93 | 1046.38 | 1092.87 | 702.01 | 1328.37 | 1619.19 | 1262.92 | 7218.67 |
| Operating Income/(Loss) | $52,565 | $237,989 | $275,497 | $259,273 | $261,466 | $255,856 | $181,185 | $1,523,831 |



tabbles

EXHIBIT
A

## Sutherland Energy Co., LLC
## 2014 Lease Operating Statement

HAMRICK #3

Quanah (Chappel 8295) Field

Hardeman County, TX

| | January | February | March | April | May | June | Yearly Total |
|---|---|---|---|---|---|---|---|
| **VOLUMES** | | | | | | | |
| Oil Sales- BBLS | 2378.95 | 3074.20 | 3301.41 | 3848.00 | | | 12602.56 |
| Gas Sales- MCF | | | | | | | |
| **OIL & GAS INCOME** | | | | | | | |
| Gross Oil Income ($) | 219941.06 | 302110.88 | 327869.64 | 388436.34 | | | 1238357.92 |
| Average Price ($/BBL) | 92.45 | 98.27 | 99.31 | 100.95 | | | 98.26 |
| Gross Gas Income ($) | | | | | | | |
| Total Oil & Gas Income ($) | 219941.06 | 302110.88 | 327869.64 | 388436.34 | 0.00 | 0.00 | 1238357.92 |
| **TAXES & ROYALTY** | | | | | | | |
| Oil Severance Tax ($) | 10136.63 | 13922.08 | 15108.83 | 17899.33 | | | 57066.87 |
| Gas Severance Tax ($) | | | | | | | |
| Royalty ($) | 33296.17 | 45735.85 | 49635.45 | 58804.59 | | | 187472.07 |
| Total Income Less Taxes & Royalty($) | 176508.26 | 242452.95 | 263125.36 | 311732.42 | 0.00 | 0.00 | 993818.98 |
| **LEASE OPERATING EXPENSES (LOE)** | | | | | | | |
| Pumper | 400.00 | 400.00 | 400.00 | 400.00 | | | 1600.00 |
| Electricity | 66.20 | 63.98 | 62.80 | 65.74 | | | 258.72 |
| Chemicals | | | 467.00 | | | | 467.00 |
| Materials & Supplies | | 70.24 | 816.81 | 1429.17 | 23.97 | | 2340.19 |
| Routabout Services | 750.00 | | 3020.00 | | | | 3770.00 |
| Backhoe/Dozer | | | | | | | 0.00 |
| Saltwater Disposal | | | | | | | 0.00 |
| Pump Truck | | 540.00 | 905.18 | 270.00 | | | 1715.18 |
| Roads & Location | 585.00 | | | 225.00 | | | 810.00 |
| Well Service Rig | | | | | | | 0.00 |
| Administrative Overhead | 537.00 | 537.00 | 537.00 | 550.43 | | | 2161.43 |
| First Level Supervision | 109.38 | 109.38 | 109.38 | 109.38 | | | 437.52 |
| Engineering/Geological | | | | | | | 0.00 |
| Insurance- General Liability | | | | | | | 0.00 |
| Insurance- Control of Well | | | | | | | 0.00 |
| Advalorem Taxes | | | | | | | 0.00 |
| Miscellaneous | 80.00 | 80.00 | 80.00 | 5080.00 | | | 5320.00 |
| Total LOE ($) | 2527.58 | 1800.60 | 6398.17 | 8129.72 | 23.97 | 0.00 | 18880.04 |
| Operating Income/(Loss) | $173,980.68 | $240,652.35 | $256,727.19 | $303,602.70 | -$23.97 | $0.00 | $974,938.94 |

# SUTHERLAND ENERGY CO., LLC
## Drilling and Completion
## Authority For Expenditure

| | | |
|---|---|---|
| WELL: | Hamrick #3 | AFE NUMBER: |
| LOCATION: | Section 168 W & NW RR Co. Survey Block H | PREPARED BY: RAS |
| COUNTY: | Hardeman    STATE:    Texas | DATE:    3-18-14 |
| DESCRIPTION: | Drill and complete an 8600' vertical well to test the Chappel formation. Includes cost to equip as a flowing oil well. | |

**Actual Incurred Costs.**

| | | ESTIMATED COST | | |
|---|---|---|---|---|
| CODE | INTANGIBLES | DRY HOLE | COMPLETION | TOTAL |
| 1 | Survey & Permits | $1,780 | | $1,780 |
| 2 | Regulatory, Legal, & Curative | | 2100 | 2100 |
| 3 | Damages | 1500 | | 1500 |
| 4 | Roads, Location Prep., & Restoration | 17210 | 66107 | 83318 |
| 5 | Misc. Preparation (rathole, mousehole, cellar) | 14351 | | 14351 |
| 6 | Water Pump & Line | 8669 | | 8669 |
| 7 | Rig Mob/Demob | 20000 | | 20000 |
| 8 | Drilling- Day Rate | 263304 | | 263304 |
| 9 | Drilling- Footage | | | 0 |
| 10 | Fuel | | | 0 |
| 11 | Field Housing, Camp, & Utilities | 2040 | 3240 | 5280 |
| 12 | Bits & Stabilizers | 17571 | | 17571 |
| 13 | Drilling Fluids & Services | 49405 | | 49405 |
| 14 | Oil & ABO for Mud | | | 0 |
| 15 | Solids Control | | | 0 |
| 16 | Mud Logging | 20375 | | 20375 |
| 17 | Downhole Rentals | 3464 | 4281 | 7745 |
| 18 | Rental Drill Pipe | | | 0 |
| 19 | Surface Rentals (generator, reverse unit, frac tanks) | 2277 | 17003 | 19279 |
| 20 | Formation Evaluation (DST, coring & evalation) | | | 0 |
| 21 | Open Hole Logging | 12601 | | 12601 |
| 22 | Cement- Surface Casing | 19729 | | 19729 |
| 23 | Cement- Inter/Production Casing | | 18919 | 18919 |
| 24 | Cement- Kickoff Plug | | | 0 |
| 25 | Cement- Remedial | | | 0 |
| 26 | Casing Crew | 4650 | 6784 | 11434 |
| 27 | Tubular Inspections | | 2595 | 2595 |
| 28 | Directional Drillers, Tools, & Housing | | | 0 |
| 29 | Fishing Services | | | 0 |
| 30 | Extra Labor (welder, roustabouts) | 205 | 1500 | 1705 |
| 35 | Company Supervision & Labor | 53000 | 42799 | 95799 |
| 36 | Contract Supervison & Labor | | | 0 |
| 37 | Overhead | 3222 | 3222 | 6444 |
| 38 | Engineering | | | 0 |
| 39 | Geological | | | 0 |
| 40 | Well Control Insurance (OEE) | 4770 | | 4770 |
| 41 | Well Service/Completion Rig | | 23701 | 23701 |
| 42 | Completion Logging & Perforating | | 17018 | 17018 |
| 43 | Wireline Services | | 2562 | 2562 |
| 44 | Well Control Equipment (snubbing, ect.) | | | 0 |
| 45 | Plugging & Abandonment | | | 0 |
| 47 | Drilling Water & Completion Fluids | 5185 | 2195 | 7380 |
| 48 | Coiled Tubing & Tools | | | 0 |
| 50 | Mud & Fluids Disposal | | | 0 |
| 53 | Trucking & Transportation | 390 | 2887 | 3277 |
| 54 | Stimulation- Fracturing | | | 0 |
| 55 | Stimulation- Other | | | 0 |
| 56 | Construction- Well Equipment | | | 0 |
| 57 | Construction- Lease Equipment | | | 0 |
| 58 | Construction- Pipelines | | | 0 |
| 59 | Miscellaneous Expenses | 78 | 868 | 946 |
| | Contingency | | | 0 |
| | **TOTAL INTANGIBLES** | $525,775 | $217,779 | $743,554 |
| | **TANGIBLES** | | | |
| 80 | Conductor Pipe | 4,607 | | 4,607 |
| 81 | Surface Casing | 10,667 | | 10,667 |
| 82 | Intermediate Casing | | | 0 |
| 83 | Production Casing | | 87,971 | 87,971 |
| 84 | Liner | | | 0 |
| 85 | Float Equipment & Stage Tools | 1,560 | 6,334 | 7,894 |
| 86 | Tubing | | 28,076 | 28,076 |
| 87 | Packers, Sleeves, & Completion Tools | | 12,775 | 12,775 |
| 88 | Non-controllable Well Equipment | | | 0 |
| 90 | Wellhead, Tree, & Choke | 2,020 | 2,341 | 4,361 |
| 91 | Pumping Unit, Prime Mover, etc | | | 0 |
| 92 | Downhole Lift Equipment (pump, anchor, rods) | | | 0 |
| 93 | Tanks, Stairway, & Landing | | 24,289 | 24,289 |
| 94 | Production Equipment (separator, treater, flare) | | 2,891 | 2,891 |
| 95 | Valves & Connections | | | 0 |
| 96 | Flowline and Piping | | | 0 |
| 97 | Sales Pipeline | | | 0 |
| 98 | Non-controllable Lease Equipment | | 38,275 | 38,275 |
| 100 | Labor | | 38,714 | 38,714 |
| 101 | Miscellaneous | | 446 | 446 |
| | Contingency | | | 0 |
| | **TOTAL TANGIBLES** | $18,855 | $242,112 | $260,967 |
| | **TOTAL ESTIMATED COST** | $544,629 | $459,891 | $1,004,521 |

This AFE is only an estimate. By returning one signed copy the undersigned hereby agrees to pay its share of the actual cost in this operation.

COMPANY: _____     SIGNATURE: _____

DATE: _____     PRINTED NAME: _____

## Sutherland Energy Co., LLC
### Drilling & Completion AFE- Coding Sheet

**Intangibles**

| Code | Description | Code | Description | Code | Description |
|---|---|---|---|---|---|
| 1 | Survey & Permits | 21 | Open Hole Logging | 41 | Well Service/Completion Rig (anchors) |
| 2 | Regulatory, Legal, & Curative | 22 | Cement- Surface Casing | 42 | Completion Logging & Perforating |
| 3 | Damages | 23 | Cement- Inter/Production Casing | 43 | Wireline Services |
| 4 | Roads, Location Prep., & Restoration | 24 | Cement- Kickoff Plug | 44 | Well Control Equipment (snubbing, ect.) |
| 5 | Misc. Preparation (rathole, mousehole, cellar) | 25 | Cement- Remedial | 45 | Plugging & Abandonment |
| 6 | Water, Pump & Line (water well services) | 26 | Casing Crew | | |
| 7 | Rig Mob/Demob | 27 | Tubular Inspections | 47 | Drilling Water & Completion Fluids |
| 8 | Drilling- Day Rate | 28 | Directional Drillers, Tools, & Housing | 48 | Coiled Tubing & Tools |
| 9 | Drilling- Footage | 29 | Fishing Services | | |
| 10 | Fuel | 30 | Extra Labor (welder, roustabouts) | 50 | Mud & Fluids Disposal |
| 11 | Field Housing, Camp, & Utilities | 31 | Pump truck | | |
| 12 | Bits & Stabilizers | | | | |
| 13 | Drilling Fluids & Services | | | 53 | Trucking & Transportation |
| 14 | Oil & ABO for Mud | | | 54 | Stimulation- Fracturing |
| 15 | Solids Control | 35 | Company Supervision & Labor | 55 | Stimulation- Other |
| 16 | Mud Logging | 36 | Contract Supervison & Labor | 56 | Construction- Well Equipment |
| 17 | Downhole Rentals | 37 | Overhead | 57 | Construction- Lease Equipment |
| 18 | Rental Drill Pipe  PVT | 38 | Engineering | 58 | Construction- Pipelines |
| 19 | Surface Rentals (lights, generators, choke, forklift, frac tanks) | 39 | Geological | 59 | Miscellaneous Expenses |
| 20 | Formation Evaluation (DST, coring & evalation) | 40 | Well Control Insurance (OEE) & other Insurance | | |

**Tangibles**

| Code | Description |
|---|---|
| 80 | Conductor Pipe |
| 81 | Surface Casing |
| 82 | Intermediate Casing |
| 83 | Production Casing |
| 84 | Liner |
| 85 | Float Equipment & Stage Tools |
| 86 | Tubing |
| 87 | Packers, Sleeves, & Completion Tools |
| 88 | Non-controllable Well Equipment |
| 90 | Wellhead, Tree, & Choke |
| 91 | Pumping Unit, Prime Mover, etc |
| 92 | Downhole Lift Equipment (pump, anchor, rods) |
| 93 | Tanks, Stairway, & Landing |
| 94 | Production Equipment (separator, treater, flare) |
| 95 | Valves & Connections |
| 96 | Flowline and Piping |
| 97 | Sales Pipeline |
| 98 | Non-controllable Lease Equipment (electronic monitoring equip.) |
| 100 | Labor |
| 101 | Miscellaneous |

Sutherland Energy Co., LLC
Hamrick #3 Drilling & Completion
Invoices listed and totaled by AFE Code

| Vendor Name | Vendor Number | Invoice Date | Invoice Number | Invoice Amount | Check Number | Check Date | Drilling-1 Compl.-2 | AFE Code | Code Sub-total $ |
|---|---|---|---|---|---|---|---|---|---|
| Engineering Surveys | | 4/29/2013 | | 750.00 | 1113 | 5/1/2013 | 1 | 1 | |
| Railroad Commission of Texas | | 5/8/2013 | 057335 | 1030.00 | | 5/8/2013 | 1 | 1 | 1780.00 |
| Gyp Rock Ranch | | 5/29/2013 | | 1500.00 | 1140 | | 1 | 3 | 1500.00 |
| S&W Oilfield Services | | 5/27/2013 | 11643 | 8225.00 | 1141 | 5/30/2013 | 1 | 4 | |
| H&H Oilfield Construction | | 6/11/2013 | 514465 | 480.00 | 1209 | 8/26/2013 | 1 | 4 | |
| Flusche Supply | | 7/8/2013 | 106379 | 263.51 | 1204 | 8/17/2013 | 1 | 4 | |
| STRC Oilfield Technologies, LLC | | 7/24/2013 | 11 | 1596.69 | 1126 | 8/21/2013 | 1 | 4 | |
| H&H Oilfield Construction | | 10/7/2013 | 141802 | 570.00 | 1246 | 11/4/2013 | 1 | 4 | |
| S&W Oilfield Services | | 11/10/2013 | 11709 | 2565.00 | 1260 | 11/5/2013 | 1 | 4 | |
| S&W Oilfield Services | | 12/15/2013 | 11715 | 3510.00 | 1284 | 12/19/2013 | 1 | 4 | 17210.20 |
| Express Energy Services | | 5/29/2013 | PJI_00010675 | 14350.63 | 1156 | 6/10/2013 | 1 | 5 | 14350.63 |
| WP Drilling | | 5/7/2013 | | 1500.00 | 1118 | 5/7/2013 | 1 | 6 | |
| Flusche Supply | | 5/7/2013 | 85037 | 4111.58 | 1135 | 5/21/2013 | 1 | 6 | |
| Flusche Supply | | 5/15/2013 | 85147 | 982.91 | 1135 | 5/22/2013 | 1 | 6 | |
| WP Drilling | | 5/21/2013 | 521673 | 1829.00 | 1138 | 5/29/2013 | 1 | 6 | |
| Flusche Supply | | 5/21/2013 | 105804 | 245.94 | 1193 | 7/22/2013 | 1 | 6 | 8669.43 |
| MCG Drilling & Completing, LLC | | 6/11/2013 | 130163 | 20000.00 | 1150 | 6/11/2013 | 1 | 7 | 20000.00 |
| MCG Drilling & Completing, LLC | | 6/10/2013 | 130163 | 150000.00 | 1117 | 5/6/2013 | 1 | 8 | |
| MCG Drilling & Completing, LLC | | 6/10/2013 | 130163 | 105900.00 | 1150 | 6/10/2013 | 1 | 8 | |
| MCG Drilling & Completing, LLC | | 6/12/2013 | 130166 | 7403.70 | 1158 | 6/12/2013 | 1 | 8 | 263303.70 |
| Sutherland Energy Co., LLC | | 7/15/2013 | | 2040.00 | | | 1 | 11 | 2040.00 |
| USA Rockbit, Inc. | | 5/30/2013 | 18475 | 1623.75 | 1145 | 1/1/1900 | 1 | 12 | |
| Ulterra | | 6/10/2013 | 232204 | 9452.39 | 1151 | 6/10/2013 | 1 | 12 | |
| National Oilwell Varco | | 6/13/2013 | 2212043 | 6495.00 | 1143 | 5/31/2013 | 1 | 12 | 17571.14 |
| KT Drilling Fluids LP | | 6/19/2013 | 1949 | 49405.19 | 1168 | 6/20/2013 | 1 | 13 | 49405.19 |
| NW Grimes Geological LLC | | 6/5/2013 | 1597 | 20375.00 | 1154 | 6/10/2013 | 1 | 16 | 20375.00 |
| Red Snapper Rentals, Inc. | | 5/22/2013 | 26996 | 3464.00 | 1210 | 8/31/2013 | 1 | 17 | 3464.00 |
| Portable Toilets of Altus | | 5/16/2013 | SEC-0513 | 390.80 | 1123 | 5/19/2013 | 1 | 19 | |
| Bridgeport Fishing & Rental Tools, Inc. | | 6/17/2013 | 45895 | 963.43 | 1166 | 6/20/2013 | 1 | 19 | |
| Portable Toilets of Altus | | 6/25/2013 | SEC-0613 | 162.36 | 1124 | 8/19/2013 | 1 | 19 | |
| Sutherland Energy Co., LLC | | 7/15/2013 | | 760.00 | | | 1 | 19 | 2276.59 |
| Tucker Energy Services, Inc. | | 6/14/2013 | OH003817 | 12600.94 | 1162 | 6/14/2013 | 1 | 21 | 12600.94 |
| Basic Energy Services | | 5/13/2013 | 1711-91186805 | 13326.62 | 1121 | 5/13/2013 | 1 | 22 | $4933.11 paid by wire transfer 5-8-13. |
| OK Concrete Co. | | 5/14/2013 | | 430.84 | Debit | 5/14/2013 | 1 | 22 | |
| Quasar Energy Serices, Inc. | | 5/30/2013 | 112863 | 5971.50 | 1146 | 6/2/2013 | 1 | 22 | 19728.96 |
| Byrd Oilfield Services LLC | | 5/23/2013 | 20761 | 4650.00 | 1147 | 6/2/2013 | 1 | 26 | 4650.00 |
| Rock-N-R Construction | | 5/29/2013 | 52913 | 205.00 | 1139 | 5/29/2013 | 1 | 30 | 205.00 |
| Sutherland Energy Co., LLC | | 7/1/2014 | | 53000.00 | | | 1 | 35 | 53000.00 |
| Sutherland Energy Co., LLC | | 7/15/2013 | | 3222.06 | | | 1 | 37 | 3222.06 |
| Boley-Featherston Insurance | | 5/20/2013 | | 4769.50 | 1131-2 | 5/20/2013 | 1 | 40 | 4769.50 |
| Gyp Rock Ranch | | 5/29/2013 | | 3500.00 | 1140 | | 1 | 47 | |
| Loveless Tank Trucks, LLC | | 6/3/2013 | 8657 | 1685.00 | 1149 | 6/6/2013 | 1 | 47 | 5185.00 |
| CD Consulting & Operating Co. | | 5/24/2013 | 82702 | 390.00 | 1144 | 6/2/2013 | 1 | 53 | 390.00 |
| TXU Energy | | 5/11/2013 | 056475127635 | 43.10 | 1130 | 5/20/2013 | 1 | 59 | |
| Flusche Supply | | 6/6/2013 | 105879 | 34.46 | 1193 | 7/22/2013 | 1 | 59 | 77.56 |
| Express Energy Services | | 5/29/2013 | PJI_00010674 | 4607.13 | 1137 | 5/24/2013 | 1 | 80 | 4607.13 |
| Trident Steel Corporation | | 5/23/2013 | P226S | 11413.67 | 1133 | 5/21/2013 | 1 | 81 | |
| CD Consulting & Operating Co. | | 6/7/2013 | 82902 | 410.00 | 1155 | 6/10/2013 | 1 | 81 | |
| Sutherland Energy Co., LLC | | 7/1/2014 | | -1156.30 | | | 1 | 81 | 10667.37 |
| Quasar Energy Serices, Inc. | | 5/30/2013 | 112863 | 1560.25 | 1146 | 6/2/2013 | 1 | 85 | 1560.25 |

| Vendor | Date | Invoice | Amount | Ref | Date | | | Total |
|---|---|---|---|---|---|---|---|---|
| Flusche Supply | 5/21/2013 | 85173 | 2019.80 | 1135 | 5/23/2013 | 1 | 90 | 2019.80 |
| Brinkerhoff, David A. | 10/11/2013 | | 2100.00 | 1239 | 10/15/2013 | 2 | 2 | 2100.00 |
| North Texas Compression Inc. | 6/14/2013 | 9954 | 7680.00 | 1170 | 6/23/2013 | 2 | 4 | |
| CD Consulting & Operating Co. | 6/20/2013 | 83056 | 14326.64 | 1169 | 6/23/2013 | 2 | 4 | |
| James Trucking | 6/23/2013 | 600 | 1272.35 | 1172 | 6/27/2013 | 2 | 4 | |
| James Trucking | 6/23/2013 | 601 | 9682.86 | 1172 | 6/27/2013 | 2 | 4 | |
| James Trucking | 6/23/2013 | 602 | 23778.09 | 1172 | 6/27/2013 | 2 | 4 | |
| S&W Oilfield Services | 6/26/2013 | 11653 | 5980.00 | 1175 | 7/1/2013 | 2 | 4 | |
| James Trucking | 8/17/2013 | 617 | 2502.39 | 1213 | 8/31/2013 | 2 | 4 | |
| S&W Oilfield Services | 9/2/2013 | 11685 | 885.00 | 1220 | 9/8/2013 | 2 | 4 | 66107.33 |
| Sutherland Energy Co., LLC | 7/15/2013 | | 3240.00 | | | 2 | 11 | 3240.00 |
| Reliable Well Service, LLC | 7/1/2013 | 613552 | 4280.68 | 1182 | 7/3/2013 | 2 | 17 | 4280.68 |
| L&S Hot Oil Service, Inc. | 6/26/2013 | 15620 | 1070.00 | 1179 | 7/2/2013 | 2 | 19 | |
| Reliable Well Service, LLC | 7/1/2013 | 613552 | 13962.50 | 1182 | 7/3/2013 | 2 | 19 | |
| L&S Hot Oil Service, Inc. | 7/9/2013 | 15678 | 1510.00 | 1189 | 7/13/2013 | 2 | 19 | |
| L&S Hot Oil Service, Inc. | 8/1/2013 | 15752 | 460.00 | 1196 | 8/4/2013 | 2 | 19 | 17002.50 |
| Quasar Energy Serices, Inc. | 6/12/2013 | 112988 | 18918.75 | 1157 | 6/13/2013 | 2 | 23 | 18918.75 |
| Express Energy Services | 8/19/2013 | PJI_00019550 | 6783.55 | 1208 | 8/26/2013 | 2 | 26 | 6783.55 |
| Express Energy Services | 8/27/2013 | PJI_00020681 | 2594.56 | 1224 | 9/16/2013 | 2 | 27 | 2594.56 |
| Kieschnick Welding | 6/13/2013 | 199335 | 1500.00 | 1165 | 6/20/2013 | 2 | 30 | 1500.00 |
| Sutherland Energy Co., LLC | 7/1/2014 | | 42798.65 | | | 2 | 35 | 42798.65 |
| Sutherland Energy Co., LLC | 7/15/2013 | | 3222.06 | | | 2 | 37 | 3222.06 |
| Texas Digger Service, Inc. | 6/15/2013 | 376593 | 1461.37 | 1167 | 6/20/2013 | 2 | 41 | |
| Reliable Well Service, LLC | 6/27/2013 | 613539 | 22239.46 | 1176 | 7/1/2013 | 2 | 41 | 23700.83 |
| Mustang Wireline Services, LLC | 6/18/2013 | 8230 | 1950.00 | 1171 | 6/23/2013 | 2 | 42 | |
| Mustang Wireline Services, LLC | 6/20/2013 | 8414 | 3110.00 | 1174 | 7/1/2013 | 2 | 42 | |
| Mustang Wireline Services, LLC | 6/24/2013 | 8415 | 4900.00 | 1174 | 7/1/2013 | 2 | 42 | |
| Vaughn Energy Services | 6/26/2013 | 55156 | 5700.00 | 1177 | 7/2/2013 | 2 | 42 | |
| Precision Energy Services, Inc. | 12/10/2013 | 208803 | 1358.00 | 1328 | 1/27/2014 | 2 | 42 | 17018.00 |
| G.W. Wireline, Inc. | 7/24/2013 | 68260 | 2562.00 | 1194 | 7/28/2013 | 2 | 43 | 2562.00 |
| Loveless Tank Trucks, LLC | 7/1/2013 | 8665 | 2195.00 | 1183 | 7/6/2013 | 2 | 47 | 2195.00 |
| L&S Hot Oil Service, Inc. | 6/26/2013 | 15610 | 1202.00 | 1179 | 7/2/2013 | 2 | 53 | |
| Lario Transports, Inc. | 6/29/2013 | 5596 | 1264.50 | 1178 | 7/2/2013 | 2 | 53 | |
| L&S Hot Oil Service, Inc. | 8/1/2013 | 15740 | 420.00 | 1196 | 8/14/2013 | 2 | 53 | 2886.50 |
| TXU Energy | 6/12/2013 | 056025973140 | 489.80 | 1161 | 6/14/2013 | 2 | 59 | |
| Snapfish | 7/2/2013 | 4625058006 | 238.72 | Credit Card | 7/2/2013 | 2 | 59 | |
| TXU Energy | 7/12/2013 | 056325879033 | 139.67 | 1191 | 7/17/2013 | 2 | 59 | 868.19 |
| Trident Steel Corporation | 6/5/2013 | P2280 | 89104.80 | Wire | 6/5/2013 | 2 | 83 | |
| Flusche Supply | 6/6/2013 | 105963 | 192.14 | 1193 | 7/23/2013 | 2 | 83 | |
| Sutherland Energy Co., LLC | 7/1/2014 | | -1325.48 | | | 2 | 83 | 87971.46 |
| Quasar Energy Serices, Inc. | 6/11/2013 | 112988 | 6333.94 | 1157 | 6/13/2013 | 2 | 85 | 6333.94 |
| Flusche Supply | 6/22/2013 | 106189 | 28759.86 | 1193 | 8/2/2013 | 2 | 86 | |
| Sutherland Energy Co., LLC | 7/1/2014 | | -683.98 | | | 2 | 86 | 28075.88 |
| Weatherford | 6/28/2013 | 9568330 RI | 12774.70 | 1184 | 7/6/2013 | 2 | 87 | 12774.70 |
| Flusche Supply | 6/13/2013 | 106186 | 2102.12 | 1193 | 7/27/2013 | 2 | 90 | |
| Flusche Supply | 6/17/2013 | 106191 | 140.49 | 1193 | 7/29/2013 | 2 | 90 | |
| Flusche Supply | 7/23/2013 | 106480 | 98.18 | 1204 | 8/23/2013 | 2 | 90 | 2340.79 |
| Joe Dimock | 5/2/2013 | | 25000.00 | 1115 | 5/2/2013 | 2 | 93 | |
| OS & S Operating, Inc. | 9/25/2013 | 8437G | 3788.75 | 1235 | 10/14/2013 | 2 | 93 | |
| Sutherland Energy Co., LLC | 7/7/2014 | | -4500.00 | | | 2 | 93 | 24288.75 |
| Flusche Supply | 6/24/2013 | 106182 | 1956.84 | 1193 | 8/3/2013 | 2 | 94 | |
| Kieschnick Welding | 7/31/2013 | 199374 | 547.62 | 1199 | 8/7/2013 | 2 | 94 | |
| Flusche Supply | 8/27/2013 | 106895 | 387.03 | 1222 | 9/20/2013 | 2 | 94 | 2891.49 |
| Flusche Supply | 6/12/2013 | 105964 | 192.77 | 1193 | 7/25/2013 | 2 | 98 | |
| Flusche Supply | 6/12/2013 | 105965 | 142.88 | 1193 | 7/26/2013 | 2 | 98 | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Flusche Supply | 6/12/2013 | 105995 | 551.89 | 1193 | 7/24/2013 | 2 | 98 | |
| Flusche Supply | 6/17/2013 | 105959 | 76.13 | 1193 | 7/28/2013 | 2 | 98 | |
| Flusche Supply | 6/17/2013 | 106191 | -10.68 | 1193 | 7/30/2013 | 2 | 98 | |
| Flusche Supply | 6/18/2013 | 105994 | 137.03 | 1193 | 7/31/2013 | 2 | 98 | |
| Flusche Supply | 6/19/2013 | 106180 | 1842.61 | 1193 | 8/1/2013 | 2 | 98 | |
| Flusche Supply | 6/24/2013 | 106185 | 3801.48 | 1193 | 8/4/2013 | 2 | 98 | |
| Flusche Supply | 6/26/2013 | 106181 | 1296.34 | 1193 | 8/5/2013 | 2 | 98 | |
| Flusche Supply | 6/26/2013 | 106183 | 2057.02 | 1193 | 8/9/2013 | 2 | 98 | |
| Flusche Supply | 6/26/2013 | 106184 | 459.89 | 1193 | 8/6/2013 | 2 | 98 | |
| Flusche Supply | 6/26/2013 | 106187 | 2519.87 | 1193 | 8/7/2013 | 2 | 98 | |
| Flusche Supply | 6/26/2013 | 106192 | -124.10 | 1193 | 8/8/2013 | 2 | 98 | |
| Flusche Supply | 6/30/2013 | 106188 | 3112.28 | 1193 | 8/10/2013 | 2 | 98 | |
| Flusche Supply | 6/30/2013 | 106190 | 1453.54 | 1193 | 8/11/2013 | 2 | 98 | |
| Flusche Supply | 7/3/2013 | 106380 | 422.62 | 1204 | 8/15/2013 | 2 | 98 | |
| Flusche Supply | 7/5/2013 | 106381 | 272.09 | 1204 | 8/16/2013 | 2 | 98 | |
| Flusche Supply | 7/8/2013 | 106379 | 349.99 | 1204 | 8/18/2013 | 2 | 98 | |
| Flusche Supply | 7/8/2013 | 106479 | 1006.48 | 1204 | 8/19/2013 | 2 | 98 | |
| Flusche Supply | 7/9/2013 | 106387 | -657.34 | 1204 | 8/21/2013 | 2 | 98 | |
| Flusche Supply | 7/17/2013 | 106378 | 64.91 | 1204 | 8/22/2013 | 2 | 98 | |
| Flusche Supply | 8/5/2013 | 106894 | 203.51 | 1222 | 9/13/2013 | 2 | 98 | |
| Flusche Supply | 8/6/2013 | 106570 | -98.18 | 1222 | 9/14/2013 | 2 | 98 | |
| Flusche Supply | 8/8/2013 | 106823 | 343.34 | 1222 | 9/15/2013 | 2 | 98 | |
| Flusche Supply | 8/16/2013 | 106818 | 253.86 | 1222 | 9/16/2013 | 2 | 98 | |
| Flusche Supply | 8/23/2013 | 106893 | 525.41 | 1222 | 9/17/2013 | 2 | 98 | |
| Flusche Supply | 8/26/2013 | 106838 | 11.93 | 1222 | 9/18/2013 | 2 | 98 | |
| Flusche Supply | 8/26/2013 | 106839 | 36.73 | 1222 | 9/19/2013 | 2 | 98 | |
| Flusche Supply | 9/13/2013 | 107068 | -150.11 | 1251 | 11/8/2013 | 2 | 98 | |
| Flusche Supply | 10/1/2013 | 107426 | 77.19 | 1251 | 11/9/2013 | 2 | 98 | |
| Flusche Supply | 10/11/2013 | 107425 | 912.66 | 1251 | 11/11/2013 | 2 | 98 | |
| Flusche Supply | 10/11/2013 | 107427 | 226.62 | 1251 | 11/10/2013 | 2 | 98 | |
| eLynxTechnologies | 10/31/2013 | 5522-0083109 | 16964.46 | 1261 | 11/19/2013 | 2 | 98 | 38275.12 |
| H&H Oilfield Construction | 6/11/2013 | 514452 et al | 35935.00 | 1209 | 8/26/2013 | 2 | 100 | |
| Kieschnick Welding | 7/3/2013 | 199364 | 724.44 | 1185 | 7/13/2013 | 2 | 100 | |
| Flusche Supply | 7/8/2013 | 106479 | 227.33 | 1204 | 8/20/2013 | 2 | 100 | |
| Kamay Electric Service, Inc. | 7/10/2013 | 42839 | 128.10 | 1186 | 7/13/2013 | 2 | 100 | |
| Kamay Electric Service, Inc. | 8/8/2013 | 43025 | 249.38 | 1202 | 8/10/2013 | 2 | 100 | |
| H&H Oilfield Construction | 8/19/2013 | 514544-5 | 940.00 | 1228 | 9/20/2013 | 2 | 100 | |
| H&H Oilfield Construction | 10/7/2013 | 331161 et al | 510.00 | 1246 | 11/4/2013 | 2 | 100 | 38714.25 |
| Loveless Tank Trucks, LLC | 8/1/2013 | 8698 | 360.00 | 1195 | 8/4/2013 | 2 | 101 | |
| Flusche Supply | 11/5/2013 | 107688 | 86.11 | 1279 | 12/13/2013 | 2 | 101 | 446.11 |
| Total | | | 1004520.54 | | | | | 1004520.54 |

JOSEPH W. DIMOCK
DIMOCK PETROLEUM
4245 Kemp Blvd., Suite 518
Wichita Falls, TX 76308
Telephone 940-761-1071
Facsimile 940-322-7468

April 21, 2014

Mr. Rod Sutherland
Sutherland Energy Co., LLC
500 Lamar Court
Irving, TX 75038

Re: <u>Hamrick Prospect Payout</u>

Dear Rod:

Your strained interpretation of our agreement does not make any sense. Both the *SEISMIC EXPLORATION AND FARMOUT AGREEMENT* ("Farmout Agreement") and the *Exhibit A To Seismic Exploration And Farmout Agreement* ("Farmout Ex. A") make it clear that the Farmee is required to deliver to Farmor operations of the Initial Earning Well (and, at Farmor's election, a 51% Working Interest in the related Earned Assignment) <u>immediately upon "project payout" of the Initial Earning Well.</u>[1]

By your interpretation, there would never be a "project payout of the Initial Earning Well" if you could continue to incur more capital costs (and recover double) after the Initial Earning Well is producing (which later costs thus do not directly benefit the Initial Earning Well). That was not the purpose or intent of our agreement.

While you may have *initially* enjoyed "sole discretion" to determine the type, nature, timing, and extent of all Seismic Exploration Operations" relating to the entire lease, that does NOT convert any *later* such costs (after the Initial Earning Well is already producing) into capital costs which you now seek to be included, and recover *double*, as part of the "project payout *of the Initial Earning Well*." In fact, Farmout Ex. A expressly states that all operations conducted by Farmee regarding the Initial Earning Well (until such time as "project payout" is reached), and all those conducted by Farmee regarding any Additional Earning Wells up until they are completed (as a producer of oil and/or gas in paying quantities) **shall be at Farmee's sole cost and risk.**[2] Since, once it is producing there is no longer any "risk" of reimbursement of capital costs related to the Initial Earning Well, to allow *further* discretionary costs to be "double recovered" would be inconsistent and unfair.

You still have not accounted for what you claim as hundreds of thousands of dollars in "land" costs, which accounting I have repeatedly requested, and which you have unreasonably delayed providing. Unless and until I have received a detailed accounting of those individual expenditures and the dates thereof, and thereafter come to some agreement with you regarding what portion is properly to be included in the "double recovery", you are to refrain from making any further expenditures of so-called land costs (or any other capital costs). Instead, it must be presumed that all of your stated "land" costs are unjustified and cannot be included in those amounts to be double-recovered - - and that "project payout" of the Initial Earning Well has already occurred.

Thus, you are hereby notified that you are to immediately "deliver to Farmor operations of the Initial Earning Well and a fifty-one percent (51%) working interest, at Farmor's election [which I so elect], in the appropriate Earned Assignment". Please provide appropriate assignment documents immediately.

You are further notified that, as owner of that 51% interest which you are required to immediately deliver, I will be taking over all operations on all wells covered by the referenced "Earned Assignment". You are directed to provide an immediate and complete accounting of operations to date, and to refrain from spending any funds generated from the above-referenced production.

Please call me to discuss this if you need clarification.

Sincerely,



Joseph W. Dimock

## QUOTED LANGUAGE FROM AGREEMENTS

[1] 4.1 **Upon** "project payout" **of the Initial Earning Well**, as defined in Paragraph 4.2 of Exhibit A, Farmee shall deliver to Farmor operations of the Initial Earning Well and a fifty-one percent (51%) working interest, at Farmor's election, in the appropriate Earned Assignment defined in Paragraph 3.2 above. [¶4.1 of Farmout Agreement]

[2] All operations conducted by Farmee regarding the Initial Earning Well, until such time as "project payout" is reached [when operations and 51% W.I. is transferred to Farmor], **shall be at Farmee's sole cost and risk.** [¶2.1 Farmout Ex. A] (bracketed added)] All operations conducted by Farmee regarding Additional Earning Wells up to production casing point for a vertical well and through installation of production facilities for a horizontal well **shall be at Farmee's sole cost and risk.** [See also: ¶¶5.2 & 5.3 of Farmout Ex. A]

# Sutherland Energy Co., LLC
## Hamrick Prospect Payout Estimation

| Month | Prospect Fee | Hamrick #3 Drill & Comp. | Land | Seismic | Total | Cumulative Expenditures | 2X Cumulative Expenditures | Monthly Oper. Income | Cumulative Operating Income |
|---|---|---|---|---|---|---|---|---|---|
| Nov-12 | $50,000 | 5,700 | | $400 | $56,100 | $56,100 | $112,200 | | |
| Dec-12 | | 9,101 | | | 9,101 | 65,201 | 130,401 | | |
| Jan-13 | | 20,304 | | | 20,304 | 85,505 | 171,010 | | |
| Feb-13 | | 72,038 | | | 72,038 | 157,543 | 315,086 | | |
| Mar-13 | | 29,933 | | | 29,933 | 187,475 | 374,951 | | |
| Apr-13 | | 7,928 | | | 7,928 | 195,404 | 390,808 | | |
| May-13 | | 16,942 | | | 16,942 | 212,346 | 424,692 | | |
| Jun-13 | | 29,340 | 1,007,521 | | 1,036,860 | 1,249,206 | 2,498,412 | $52,565 | $52,565 |
| Jul-13 | | 252 | | | 252 | 1,249,458 | 2,498,917 | 237,989 | 290,554 |
| Aug-13 | | 73,720 | | | 73,720 | 1,323,178 | 2,646,356 | 275,497 | 566,052 |
| Sep-13 | | 4,217 | | | 4,217 | 1,327,395 | 2,654,790 | 259,273 | 825,324 |
| Oct-13 | | 40,817 | | | 40,817 | 1,368,212 | 2,736,424 | 261,466 | 1,086,790 |
| Nov-13 | | 13,223 | | | 13,223 | 1,381,435 | 2,762,870 | 255,856 | 1,342,646 |
| Dec-13 | | 52,855 | | | 52,855 | 1,434,290 | 2,868,580 | 181,185 | 1,523,831 |
| Jan-14 | | 256,864 | | 1,620 | 258,484 | 1,692,774 | 3,385,548 | 173,981 | 1,697,811 |
| Feb-14 | | 26,798 | | | 26,798 | 1,719,572 | 3,439,143 | 240,652 | 1,938,464 |
| Mar-14 | | 90,610 | | | 90,610 | 1,810,182 | 3,620,364 | 256,727 | 2,195,191 |
| Apr-14 | | 9,807 | | | 9,807 | 1,819,989 | 3,639,978 | 303,603 | 2,498,793 |
| May-14 | | 139,032 | | 1,765 | 140,796 | 1,960,785 | 3,921,570 | 310,462 | 2,809,255 |
| Jun-14 | | 4,921 | | 98,816 | 103,737 | 2,064,522 | 4,129,044 | 335,172 | 3,144,427 |
| Jul-14 | | 35,004 | | 7,523 | 42,527 | 2,107,049 | 4,214,098 | 303,989 | 3,448,416 |
| Aug-14 | | 15,209 | | 445,371 | 460,581 | 2,567,629 | 5,135,259 | 276,731 | 3,725,147 |
| Sep-14 | | 24,261 | | 55,877 | 80,138 | 2,647,767 | 5,295,534 | 203,294 | 3,928,442 |
| Oct-14 | | 192,238 | | 233,429 | 425,668 | 3,073,435 | 6,146,869 | 237,854 | 4,166,296 |
| Nov-14 | | 31,934 | | 18,370 | 50,304 | 3,123,738 | 6,247,477 | 211,746 | 4,378,042 |
| Dec-14 | | 18,773 | | 22,052 | 40,825 | 3,164,563 | 6,329,127 | 164,281 | 4,542,323 |
| Jan-15 | | 138,205 | | 600 | 138,805 | 3,303,368 | 6,606,736 | 140,987 | 4,683,310 |
| Feb-15 | | 20,145 | | 78,217 | 98,362 | 3,401,730 | 6,803,459 | 130,637 | 4,813,947 |
| Mar-15 | | 777 | | -13,090 | -12,313 | 3,389,417 | 6,778,834 | 136,530 | 4,950,477 |
| Apr-15 | | -609 | | 17,170 | 16,561 | 3,405,978 | 6,811,957 | 137,571 | 5,088,048 |
| May-15 | | 25,295 | | 8,097 | 33,392 | 3,439,371 | 6,878,741 | 155,581 | 5,243,629 |
| Jun-15 | | | | | 0 | 3,439,371 | 6,878,741 | | 5,243,629 |
| Jul-15 | | | | | 0 | 3,439,371 | 6,878,741 | | 5,243,629 |
| Aug-15 | | | | | 0 | 3,439,371 | 6,878,741 | | 5,243,629 |
| Sep-15 | | | | | 0 | 3,439,371 | 6,878,741 | | 5,243,629 |
| Oct-15 | | | | | 0 | 3,439,371 | 6,878,741 | | 5,243,629 |
| Nov-15 | | | | | 0 | 3,439,371 | 6,878,741 | | 5,243,629 |
| Dec-15 | | | | | 0 | 3,439,371 | 6,878,741 | | 5,243,629 |



Hamrick Prospect Hardeman County, TX Payout Estimation

Legend: Cum. Expenditures — 2X Cum. Expenditures — Cum. Operating Income


PENGAD-Bayonne, N. J.

PLAINTIFF'S EXHIBIT

Hamrick Prospect Capital Costs

**Hamrick #3 Well**

| Mon/Yr | Company Labor Wade | Company Labor Mark | Company Labor Rod | Company Expense Reports Wade | Company Expense Reports Mark | Company Expense Reports Rod | Well Sub-total |
|---|---|---|---|---|---|---|---|
| Nov-12 | | | | | | | 0 |
| Dec-12 | | | | | | | 0 |
| Jan-13 | | | | | | | 0 |
| Feb-13 | | | | | | | 0 |
| Mar-13 | | | | | | | 0 |
| Apr-13 | | 206.57 | | | 167.81 | | 374.38 |
| May-13 | 5814.20 | 4337.97 | 19400.00 | 642.05 | 4718.62 | 2155.14 | 37067.98 |
| Jun-13 | 6977.04 | 4131.40 | 16000.00 | 1402.97 | 3305.30 | 1136.17 | 32952.88 |
| Jul-13 | 4651.36 | 3924.83 | | 1236.74 | 2495.01 | 386.30 | 12694.24 |
| Aug-13 | | 2065.70 | | | 805.27 | | 2870.97 |
| Sep-13 | | 1652.56 | | | 1492.35 | | 3144.91 |
| Oct-13 | | 1652.56 | | | 1428.17 | | 3080.73 |
| Nov-13 | | 1032.85 | | | 379.71 | | 1412.56 |
| Dec-13 | | | 2200.00 | | | | 2200 |
| Jan-14 | | | | | | | |
| Feb-14 | | | | | | | |
| Mar-14 | | | | | | | |
| Apr-14 | | | | | | | |
| May-14 | | | | | | | |
| Jun-14 | | | | | | | |
| Jul-14 | | | | | | | |
| Aug-14 | | | | | | | |
| Sep-14 | | | | | | | |
| Oct-14 | | | | | | | |
| Nov-14 | | | | | | | |
| Dec-14 | | | | | | | |
| Jan-15 | | | | | | | |
| Feb-15 | | | | | | | |
| Mar-15 | | | | | | | |
| Apr-15 | | | | | | | |
| May-15 | | | | | | | |

**Hamrick 3D Land**

| Mon/Yr | Company Labor Wade | Company Labor Mark | Company Labor Rod | Company Expense Reports Wade | Company Expense Reports Mark | Company Expense Reports Rod | Contract Labor Kylie | Hardeman Abst. & Title | Misc. | Lease Bonuses | Land Sub-total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Nov-12 | 2325.68 | | 2400 | | | 974.17 | | | | 0 | 5699.85 |
| Dec-12 | 7849.17 | | 400 | 465.97 | | | | 385.64 | | 0 | 9100.78 |
| Jan-13 | 11628.40 | | | 224.01 | | | | 243.56 | | 8208.34 | 20304.31 |
| Feb-13 | 9593.43 | | | 224.55 | | 654.38 | | | | 61565.51 | 72037.87 |
| Mar-13 | 10465.56 | | 6400.00 | 154.77 | | | | | | 12912.34 | 29932.67 |
| Apr-13 | 7558.46 | | | 3.44 | | 269.87 | | | | 96.52 | 7928.29 |
| May-13 | 4942.07 | | | | | | | | | 12000.00 | 16942.07 |
| Jun-13 | 290.71 | | | 23.96 | | | | | | 29025.00 | 29339.67 |
| Jul-13 | | | | | | 59.94 | | 81.19 | 111.15 | 0.00 | 252.28 |
| Aug-13 | 4942.07 | 413.14 | | 25.99 | | | | | | 68338.50 | 73719.7 |
| Sep-13 | 290.71 | 1652.56 | | 3.24 | 898.65 | | | 121.78 | | 1250.00 | 4216.94 |
| Oct-13 | 1162.84 | 1549.28 | | 4.16 | 768.58 | 197.70 | 2788.80 | 243.56 | | 34102.22 | 40817.14 |
| Nov-13 | 1453.55 | 1032.85 | | 18.12 | 497.67 | | 4289.24 | 1156.92 | | 4774.55 | 13222.9 |
| Dec-13 | 872.13 | 1549.28 | 10400.00 | | 240.56 | 337.66 | 4828.00 | 243.56 | | 34383.75 | 52854.94 |
| Jan-14 | | 2272.27 | | | 1085.79 | 20.16 | 7500.00 | 162.38 | | 245823.37 | 256863.97 |
| Feb-14 | | 1759.80 | 1600.00 | | 2048.05 | | 4050.00 | 243.56 | | 17096.13 | 26797.54 |
| Mar-14 | | 1759.80 | 3000.00 | 14.00 | 3045.40 | 176.98 | 2850.00 | | | 79764.15 | 90610.33 |
| Apr-14 | | 2346.40 | 2400.00 | | 1216.84 | | 2850.00 | 243.56 | | 750.00 | 9806.8 |
| May-14 | | 58.66 | 1600.00 | | 132.68 | 164.64 | 7342.50 | 419.47 | | 129313.60 | 139031.55 |
| Jun-14 | | 1407.84 | 400.00 | | 16.80 | | 3015.00 | 81.19 | | 0.00 | 4920.83 |
| Jul-14 | 320.91 | 234.64 | 400.00 | | 307.93 | 17.40 | 0.00 | | | 33723.30 | 35004.18 |
| Aug-14 | | 175.98 | | | 11.20 | | | | | 15022.22 | 15209.4 |
| Sep-14 | | 469.28 | | | 201.14 | | 1380.00 | | | 22210.42 | 24260.84 |
| Oct-14 | | 791.91 | | | | 121.36 | 4725.00 | | | 186600.00 | 192238.27 |
| Nov-14 | | 879.90 | 200.00 | | 295.79 | 32.88 | | | | 30525.00 | 31933.57 |
| Dec-14 | | 850.57 | | | 282.33 | | | | | 17640.23 | 18773.13 |
| Jan-15 | 640.82 | 586.60 | | | 118.45 | | | | | 136858.75 | 138204.62 |
| Feb-15 | | 175.98 | | | 259.18 | | | | | 19710.00 | 20145.16 |
| Mar-15 | | 351.96 | | | 289.61 | | | 135.31 | | 0.00 | 776.88 |
| Apr-15 | | 586.60 | | | 5.75 | | | | | -1201.17 | -608.82 |
| May-15 | | 967.89 | | | 327.22 | | | | | 24000.00 | 25295.11 |

**Hamrick 3D Seismic**

| Mon/Yr | Company Labor Wade | Company Labor Mark | Company Labor Rod | Company Expense Reports Wade | Company Expense Reports Mark | Company Expense Reports Rod | Other | Dawson Geophysical Company Permitting | Dawson Geophysical Company Accquisition | Seismic Sub-total |
|---|---|---|---|---|---|---|---|---|---|---|
| Nov-12 | | | 400 | | | | | | | 400.00 |
| Dec-12 | | | | | | | | | | 0.00 |
| Jan-13 | | | | | | | | | | 0.00 |
| Feb-13 | | | | | | | | | | 0.00 |
| Mar-13 | | | | | | | | | | 0.00 |
| Apr-13 | | | | | | | | | | 0.00 |
| May-13 | | | | | | | | | | 0.00 |
| Jun-13 | | | | | | | | | | 0.00 |
| Jul-13 | | | | | | | | | | 0.00 |
| Aug-13 | | | | | | | | | | 0.00 |
| Sep-13 | | | | | | | | | | 0.00 |
| Oct-13 | | | | | | | | | | 0.00 |
| Nov-13 | | | | | | | | | | 0.00 |
| Dec-13 | | | | | | | | | | 0.00 |
| Jan-14 | | | 1600.00 | | | 20.16 | | | | 1620.16 |
| Feb-14 | | | | | | | | | | 0.00 |
| Mar-14 | | | | | | | | | | 0.00 |
| Apr-14 | | | | | | | | | | 0.00 |
| May-14 | | | 1600.00 | | | 164.64 | | | | 1764.64 |
| Jun-14 | | | | | | | 1578.00 | 97238.46 | | 98816.46 |
| Jul-14 | | | | | | | | 7522.52 | | 7522.52 |
| Aug-14 | 962.73 | | 1800.00 | | | 259.75 | | 21548.62 | 420800.00 | 445371.10 |
| Sep-14 | 5776.38 | 703.92 | 3800.00 | 215.88 | 369.36 | 527.95 | | 44483.45 | | 55876.94 |
| Oct-14 | 4492.74 | | 1400.00 | 156.36 | 150.00 | 349.76 | 19763.15 | 21325.36 | 185791.89 | 233429.26 |
| Nov-14 | | | 1600.00 | | | 215.03 | 15355.83 | 1199.28 | | 18370.14 |
| Dec-14 | | | 600.00 | | | 111.97 | 19316.49 | 2023.25 | | 22051.71 |
| Jan-15 | | | 600.00 | | | | | | | 600.00 |
| Feb-15 | 1602.50 | | | 870.00 | | | 75744.00 | | | 78216.50 |
| Mar-15 | 961.23 | | 800.00 | | | 90.33 | -14941.15 | | | -13089.59 |
| Apr-15 | 320.41 | | | | | 17.90 | 16832.00 | | | 17170.31 |
| May-15 | | | | | | | 8097.21 | | | 8097.21 |

PENGAD-Bayonne, N. J.
PLAINTIFF'S EXHIBIT
3

# OUTLINE OF ROD SUTHERLAND'S DEPOSITION

a. Sutherland was fired from a prior job for stealing of well logs that he took "with the thought of using them somehow later for, for my benefit." CR 1455, emphasis added.

b. Sutherland had no wells of which his company was the licensed operator with the Texas Railroad Commission prior to the Hamrick No. 3 well. R 1456, emphasis added.

c. Sutherland is adding all his legal expenses in this lawsuit to operating costs of the Hamrick No. 3 well. CR 1460.

d. Sutherland is adding internal company expenses (including his own time, his employees' time and expenses, and internal reproduction costs for documents) related to this lawsuit to operating costs of the Hamrick No. 3 well. *Id.*, emphasis added.

e. Rather than using any valuation method related to the type of work at issue (like the customary cost of a secretary if reproduction work is performed and charged), Sutherland is charging to operating costs of the Hamrick No. 3 well the amount of time he (a petroleum engineer), or Wade Tidmore (another engineer), spends on this lawsuit based on the salary he chooses to pay himself and his employees. CR 1456, 1460.

f. Sutherland did not shoot any seismic prior to drilling the Hamrick No. 3 well. *Id.*

g. The seismic was shot in the summer of 2014, after the Hamrick No. 3 had been in production for approximately a year. *Id.*

h. The information used to drill the Hamrick No. 3 was information already in Dimock's files that were given to Sutherland, and Sutherland's pre-existing personal knowledge of the area. CR 1462.

i. **None** of the money allocated by Sutherland to "land" cost on the Hamrick No. 3 well payout was incurred to obtain any land rights to drill the Hamrick No. 3 well, because Dimock already had the rights under his pre-existing oil and gas lease. *Id.*

j.	Sutherland **admits he has spent roughly a million dollars on "seismic", and $1.4 million on "land" costs**. CR 1471.

k.	**Under the two-for-one payout formula Sutherland claims, with that level of spending for "land" and "seismic", Sutherland has obtained and retained $2.4 million of additional revenue**. CR 1471-1472.

l.	Sutherland used funds he kept from the Hamrick No. 3 well production to help pay for drilling wells not on Dimock's leasehold, the Howard well and the Panhandle Compress well [two dry holes]. CR 1472.

m.	**Sutherland has done no internal suspense of funds in behalf of the charities or Dimock of the well proceeds from the Hamrick #3 well**. *Id*.

n.	If the eventual legal decision in this case is that payout of the Hamrick #3 well occurred in March 2014, **Sutherland doubts he has sufficient funds to pay back Dimock and the charities**. *Id*.

o.	Sutherland admits Sutherland has a contractual obligation to deal with Dimock in good faith. CR 1474.

p.	Sutherland admits Plaintiff has an obligation to act as a reasonably prudent operator as to any well drilled under the subject contract. CR 1474-1475.

q.	Sutherland admits that Sutherland has a fiduciary duty to non-operators in regard to handling proceeds of the Hamrick #3 well. CR 1476.

r.	By early November 2013, the Hamrick #3 well production had essentially paid back the cost to drill and complete it and Sutherland knew if he did not spend money on something else that 2X payout would be reached by April 2014. CR 1487.

s.	**Sutherland billed his own personal expenses for trips to Quanah for this litigation as miscellaneous expense, as part of "operating costs" he is subtracting from the Hamrick #3 well production**. *Id*.

t.	As Sutherland phrased it, "**whether it's a dollar in my left pocket or a dollar in my right, it's the same**" when he was asked about reimbursing himself from Hamrick #3 well production for his own personal expenses. *Id*.

u.    Sutherland has **no budget for how much he plans to spend on seismic in the future**.  CR 1495.

v.    **Sutherland believes the seismic analysis will last for years to come and there is really almost no end to how much time will be spent on it.**  *Id*.